Sarah J. Crooks, OSB No. 971512
SCrooks@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

Susan E. Foster (*pro hac vice* pending)
SFoster@perkinscoie.com
Catherine S. Simonsen (*pro hac vice* pending)
CSimonsen@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff CollegeNET, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **COLLEGENET, INC.**, a Delaware corporation, | No. 3:14-cv-00771 |
| Plaintiff, | **COMPLAINT** Antitrust Action (28 U.S.C. §§ 1331 and 1337(a)) |
| v. | |
| **THE COMMON APPLICATION, INC.**, a Virginia corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff CollegeNET, Inc. files this complaint against Defendant The Common

Application, Inc. and, on information and belief, and demanding trial by jury, alleges as follows:

1-   COMPLAINT

**Perkins Coie LLP**
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

43081-0018/LEGAL120489324.13

## OVERVIEW

1.      Plaintiff CollegeNET, Inc. (hereinafter, "CollegeNET") brings this action against Defendant The Common Application (hereinafter, "Common Application") for violation of the antitrust laws.

2.      This is a federal antitrust action under Sections 1 and 2 of the Sherman Act involving collusion among competitor colleges to limit the manner in which they compete for student applicants by and through the formation and operation of an online application processing provider, Defendant Common Application.

3.      Common Application has orchestrated a sea change in the student application process, turning a once vibrant, diverse and highly competitive market into a straitjacketed ward of uniformity. Prior to the implementation of their anticompetitive agreement, colleges (and their application service providers such as CollegeNET) developed branded applications that marketed their unique attributes and distinguished each college from its competitors through a process that emphasized innovation, experimentation, technical superiority, reliability and customer service. Colleges could further compete in the student application process by offering unique benefits for different types of applications. This free and robust competition in application processing inured to the benefit of colleges (who were able to differentiate and market themselves through their applications, seek an optimal match between compatible students and colleges and achieve a higher yield); students (who were able to maximize their prospects at individual colleges and fully describe their creativity and accomplishments and receive additional benefits or pay lower application fees); and application service providers (who improved their product offerings by competing in innovation, technical superiority, price, and customer service).

4.      Today, that diversity and competition have been virtually eliminated among "elite" colleges, approximately 85% of whom are members of the Common Application. And, as colleges are increasingly compelled to join the Common Application, Common Application is poised to eliminate competition in the broader market within a few short years.

2-   COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

5.      Publicly, Common Application and its members promote that the purpose of this competitor collaboration is to simplify the admissions process for students (belied, however, by Common Application's processing catastrophe of fall 2013), and provide for "holistic" admissions (belied by the straitjacket imposed by Common Application on the ability of the schools to solicit through their application forms a more individualized and distinctive profile from students). Privately, however, participants acknowledge that the real benefit to member colleges is a 20-40% increase in application volume derived from banding together. Because Common Application has removed differentiation from the application form, it is easier for students to "press the button and pay" as they file more and more forms. As submission volume consequently increases, next year's applicants are compelled to file still more forms in an attempt to increase their odds of acceptance. This self-reinforcing increase in volume not only drives increased revenue for colleges; it drives a market misperception created by the artificially higher selectivity rating published by *U.S. News & World Report*—a misperception that is more valuable to member schools than providing an honest accounting of motives to students, families and the public. Owing to the influence of the rankings, and the disadvantage to schools that don't play the game, the consortium is able to force even reluctant colleges to use and promote its inferior, dumbed-down "common" application and accede to its increasingly restrictive membership rules which both limit colleges' ability to compete and foreclose or limit rival application providers' ability to compete.

6.      Common Application's purported promise of simplification is overstated and misleading. Its real purpose is uniformity directed towards pumping application volume. Real efficiencies are largely unrealized—particularly in view of the debacle which has been CA4, Common Application's fourth-generation online application forms and processing system. During the catastrophic fall 2013 processing season, CA4 was unsupported by even a single live customer service representative. Common Application's inept build-out and operation of CA4

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

created a nightmare for students, parents, colleges and school officials alike. In any competitive market, such incompetence would have driven away members and deterred new ones. Yet since the debacle, Common Application's member base has *expanded* instead of retracting. It is the Common Application's relentless efforts to expand its scope, limit differentiation beyond the standard college application data service it was originally formed to provide, and leverage the collective power of its members to exclude competitors which is the crux of this Complaint.

7.    Common Application has abused its market power in the relevant markets and conspired with its member colleges to impose naked and other restraints on competition including: price restraints (*e.g.*, mandatory member restrictions which prevent colleges from pricing competing applications lower), non-compete agreements (*e.g.*, mandatory member restrictions which prevent colleges from offering different benefits for any competing applications such as expedited decisions, fee waivers or scholarships), product limitations (*e.g.*, compulsory restraints on colleges' ability to differentiate in the application process), exclusive dealing arrangements (*e.g.*, restraints which penalize members who do not agree to use the Common Application exclusively), tying (mandatory service integration and incentive-based bundling of separate products and services) and a concerted group boycott. These and other restraints have combined to: (1) homogenize the manner in which colleges and universities compete for student applicants and, by extension, limit competition and innovation in undergraduate online application processing services; and (2) exclude rival providers of those services. None of these restraints is reasonably necessary to achieve any procompetitive goals sought to be achieved by this competitor collaboration.

8.    In a national climate where the cost of tuition continues to skyrocket beyond the Consumer Price Index and student debt has surpassed $1 trillion, Common Application's scheme to both eliminate competition between colleges and eliminate third party servicers from the marketplace is accelerating the cost per student of applying to college and limiting the

4-    COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

opportunities available to students (and competitors) that would otherwise be available in a free market economy. Neither CollegeNET nor any other company is safe to invest in innovation for streamlining and reducing higher education costs if it faces the risk of colleges later banding together to quash innovation and competition.

9.      Common Application and its member colleges' scheme has severely impeded innovation, reduced product differentiation, increased quality-adjusted prices, restricted output, and otherwise caused harm to competition and consumers, including students. Common Application's illegal conduct has further injured CollegeNET in its business and property, which will continue unless enjoined by this Court.

## PARTIES

10.      CollegeNET is a Delaware corporation with its principal place of business in Portland, Oregon. CollegeNET offers a suite of web-based administrative services, including customized online application forms and processing services and contact management services to higher education and non-profit organizations throughout the United States and the world.

11.      Common Application is an association of over 550 non-profit member colleges and universities and is incorporated as a non-profit Virginia corporation having a place of business at 3033 Wilson Blvd., Suite 500, Arlington, Virginia. The Common Application offers a standard college application data service as well as application forms and processing services, utilized by all of its members.

## CO-CONSPIRATORS

12.      Various entities not made defendants in this lawsuit, including but not limited to certain of Common Application's member colleges and universities who directed or approved the actions complained of, have participated as co-conspirators with Common Application in connection with the antitrust violations asserted in this complaint, and, by and through Common

5-    COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Application, have performed acts in furtherance thereof, and have made statements constituting evidence thereof.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 4 and 15(a). CollegeNET alleges violations of the Sherman Antitrust Act over which this Court has jurisdiction under 15 U.S.C. §§ 4 and 15 and 28 U.S.C. § 1337(a). This Court also has federal question jurisdiction over CollegeNET's federal antitrust claims under 28 U.S.C. § 1331. The offering and solicitation of applications for admission to college and the related application processing services involved in the relevant markets defined herein, including the markets for student applications, college admissions and the related services for standard college application data and application forms and processing, are all commercial activities that substantially affect, and are in the flow of, interstate trade and commerce. Common Application's activities affecting such markets substantially affect interstate commerce.

14.     Common Application is subject to the personal jurisdiction of this Court. Common Application conducts business in Oregon and in this judicial district and division by, among other things, purposefully providing and/or offering its online application forms and processing services to one or more Portland, Oregon colleges and by purposefully providing and offering Portland, Oregon individuals and residents (including students) access to those services.

15.     Venue is proper in this Court under 15 U.S.C. § 22 as Common Application transacts business in this District, and under 15 U.S.C. § 26, as CollegeNET's principal place of business is in Portland, Oregon and it seeks injunctive relief against continuing and threatened loss or damage by violations of the federal antitrust laws.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

## STATUTORY AND LEGAL FRAMEWORK

16.     The Sherman Antitrust Act was enacted to prevent restraints on competition which tend to restrict output (in terms of quantity, quality or innovation), raise prices or otherwise create an anticompetitive effect on competition to the detriment of purchasers or consumers. Section 1 of the Act prohibits conspiracies in restraint of trade. 15 U.S.C. § 1. Section 2 of the Act prohibits conspiracies to monopolize, attempts to monopolize and monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2. Conduct condemned under Section 2 includes the willful acquisition of monopoly power by excluding or impairing a rival's ability to compete. There is no blanket exemption from the antitrust laws based on an organization's non-profit status, or its status as an educational or public-service oriented enterprise. And, as the Supreme Court stated in *National Collegiate Athletic Association v. University of Oklahoma*, 468 U.S. 85, 101 n.23 (1984), "Good motives will not validate an otherwise anticompetitive practice."

## NATURE OF THE ACTION

17.     These claims arise from the activities of Common Application and its co-conspirators to: (1) limit competition for college applicants; (2) tie access to Common Application's applicant pipeline to use of its online application forms and processing service, thereby suppressing competition in the markets for such services; (3) exclude rival providers of such services from the markets; and (4) monopolize and attempt to monopolize those markets.

18.     The Common Application was originally formed as a selective membership organization of 15 colleges seeking to assist students by simplifying the college admissions process through modest collective action: Specifically, the Common Application offered a paper "common" student application form that member colleges could *choose* to use in addition to other applications and application supplements, and that student applicants could *choose* to submit (via the postal mail) to multiple member colleges. The common student application eliminated the need for student applicants to write the basic information required by each

7-   COMMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

member college more than once. The applicant would fill out the common student application form once, photocopy the form, and submit it to each member college. Common Application's collection and provision of this data commonly required by all member colleges is hereinafter referred to as Common Application's "Standard College Application Data Service."

19.     Since that time, the Common Application has transformed itself into a powerful commercial enterprise open to any college seeking access to its lucrative pipeline of applicants. Owing to the competitive disadvantages of not participating, increasingly more colleges feel compelled to join the Common Application (and increasingly more student applicants often have no alternative but to use the Common Application), despite the significant limitations of its service offering, "CA4."

20.     While many colleges have (often reluctantly) joined the Common Application, they have knowingly given up their independence in exchange for becoming a member of the club and gaining access to Common Application's national pipeline of applicants—a pipeline that results in members' receiving 20%, 30% or even 40% more applications than they would otherwise receive, a hefty boost in their selectivity ratings and rankings, and increased application fee revenues. Common Application conditions membership in the club, and access to the pipeline, on use of Common Application's online application forms and processing services, to the exclusion of rival providers. The result is that colleges are forced (and agree) to offer the same, unbranded, undifferentiated online application to all applicants, and one that is so technologically inferior to rival providers' products that it would never survive in a competitive market and that many members would not purchase if they had the choice. This results in a severe reduction in competition among colleges to offer students an innovative, high-quality, and/or low-cost college application experience, and a corresponding foreclosure of competition in the online application forms and processing markets.

8-   COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

21.      While Common Application invokes its ostensible mission of simplifying the application process for students as the purported justification for limiting its members' ability to use outside vendors to develop, host, and process their application forms, in most cases the Common Application in fact does not make it any simpler to apply to multiple schools. Members remain able to ask an unlimited number of additional, institution-specific questions soliciting short- and long-form (i.e. essay) responses, and fully 75% of all members demand that students do so. This is the precise opposite of the "one and done" model Common Application is often perceived to offer as a means of simplification. Common Application in many respects is thus no longer in the "common application" business; instead, it has used its power in the Standard College Application Data Service market to force all colleges seeking access to that pipeline to use Common Application as their common application *developer and processor*, for what are effectively different, institution-specific applications that all use the same commonly-branded, dumbed-down, glitch-filled system. There is no "simplification" justification for these many other ways in which the Common Application has "commonized" the broader application process and reduced differentiation.

22.      Finally, the debacle which was and is CA4—Common Application's fourth-generation online application forms and processing system, which was unsupported by even a single live customer service representative and which created a nightmare for students, parents, colleges and school officials alike—dramatically *complicated*, rather than simplified, the admissions process for students and school officials. Today, the Common Application is a commercial admissions application provider that operates as a highly restrictive, ostensibly "non-profit" membership organization intent on achieving industry-wide domination. Almost 85% of elite schools are Common Application members. And, despite widely reported glitches in its technical systems and disaffection among its members, the Common Application is poised to completely dominate the broader market. In introducing its most recent system, CA4, Common

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Application announced that it was "preparing for the possibility" that it would ultimately "handle the full volume of the entire American college application process."[1] Today, it has contracts covering at least an estimated 60% of the online college application processing market.

23.     Members are well aware that Common Application's Standard College Application Data Service results in significant network effects: As Common Application's membership ranks grow, so do the number of applicants using that service and, therefore, the number of applications members receive. But Common Application's members have gone far beyond the modest collaboration necessary to achieve any legitimate network effects. Common Application, by and through its members, has leveraged its monopoly power in the Standard College Application Data Service market to monopolize and foreclose competition in the online application forms and processing markets, mutually enforcing exclusivity provisions that prevent rivals from competing with the Common Application to offer these services and otherwise implementing and enforcing restrictions on member colleges.

24.     Through the actions of Common Application and its co-conspirators, there has also been decreased competition among colleges for student applicants. Common Application has stated: "We fully believe there's a best way to admit students to college."[2] Through increasingly restrictive membership rules and policies, Common Application and its board of directors have imposed their view of what is "best" on member colleges, who because of the joint agreement, are assured that no matter how inferior the Common Application product is (as most recently evidenced by the "nightmare" caused by CA4), applicants will not substitute away and apply to a competitor college offering a superior application experience. As a result, colleges have less ability to compete in attracting students through price and product differentiation in the

---

[1] Letter from J. Carey Thompson, President, The Common Application Board of Directors, to Common Application members (2012).
[2] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A21.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

application process, less ability to predict yield (student acceptances per student offers), and far less ability to ensure an appropriate match between the college and the student applicant. Meanwhile, students have lost the ability to personalize their submissions and maximize their success with each college, and they have been forced to pay higher cumulative application fees and receive fewer benefits due to Common Application's rules that, for example, require members to promote and encourage the use of the Common Application equally with members' other, institution-specific online application offerings.

25.     Common Application's market power is most directly reflected by its rapidly growing market share in spite of the widely acknowledged inferiority of its product. Common Application has long been reviled for its poor customer service, its lack of a user-friendly product and technical "glitches" which have been known to simply "lose" student applications in cyberspace. The most recent example, however is the debut of CA4 in the fall of 2013, which created a veritable "nightmare" for students, parents, secondary school users and colleges. Applicants and school officials had serious problems even logging in to the system. Users' "dashboards"—meant to track application status—took days to reflect current status, the system cut off students' text submissions mid-word, and application deadlines were frequently missed or extended solely due to the system's technical problems. Common Application offered no live phone support to help its desperate student applicants through one of the most stressful experiences of their lives. Reflecting its market power in the relevant markets, this disastrous product introduction did not cause Common Application's membership to decline: Rather, Common Application's membership grew another 8% this last year, adding another approximately 40 schools to its roster.

26.     Common Application and its co-conspirators' anticompetitive actions include but are not limited to imposing and agreeing to the following membership restrictions and restraints (hereinafter, "Challenged Restraints"):

11-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

- **Bundling/Forced Purchase Requirements:** Membership requirements that have increasingly bundled or otherwise forced colleges that wish to use only the Common Application's Standard College Application Data Service (including the pipeline of applicants that comes with it) to also accept and use the Common Application for online application forms and processing services (*e.g.*, student application form processing, member-specific supplements to the Common Application, which many members require in addition to the Common Application ("Institutional Supplements"), early decision agreements, evaluation forms, and payment processing).

- **Exclusivity Restrictions**: A membership structure that rewards exclusivity and penalizes non-exclusive members by charging them 15-35% higher prices. As a result, an estimated 60% of the applications processed by Common Application are those of its exclusive members.

- **"Equal Treatment" Requirement:** Membership requirements that limit the ability of even non-exclusive members to use and promote competing applications and that prevent price and quality competition. For example, in one form of precluded competition, colleges will offer certain selected students a separate, expedited application track. These so-called "fast track" applications may waive the application fee or application requirements, offer expedited processing and further reduce the burden on students. Yet, Common Application's rules, which explicitly prohibit members from offering expedited treatment or charging students a lower fee for any other application, prohibit such offerings.

- **Uniformity Requirements:** Membership requirements that have limited or eliminated competition among member colleges in areas beyond Standard

12- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

College Application Data Service (*e.g.*, limitations on the questions members can ask on their Institutional Supplements, restrictions or incentives for members to adhere to certain admissions deadlines or not to offer expedited decisions, limitations on members' ability to brand and market themselves within their applications, and requirements that members deny student applicants the ability to differentiate themselves from other applicants and tailor or customize their applications to each member institution).

27.    Notably, none of these Challenged Restraints is necessary to achieve any legitimate goal of the Common Application that would serve to justify this competitor collaboration. To the contrary, Common Application operated for approximately 25 years before it and its members began introducing these restraints, which have the primary effect of suppressing competition among members and excluding rival providers of online application forms and processing services. They are not necessary to any legitimate, procompetitive interest.

28.    The Challenged Restraints are completely divorced from the Common Application's stated mission of "serving students" or promoting "holistic review" of applicants. For example, the penalties for non-exclusivity merely eliminate competitive options for colleges and students. So long as students and colleges have the *option* of using the purportedly "simpler" Common Application, how is either goal being promoted by *eliminating the choice* to use a competing holistic application? And the uniformity requirements which *affirmatively prevent* students from differentiating themselves through essay modifications, student uploads, or other methods that have been eliminated by the Common Application are of no benefit to students who seek to differentiate themselves. They simply benefit member colleges by insulating them from competition with one another for student applicants. Similarly, limiting competition from competing applications by imposing restrictions on pricing or other benefits, and tying access to the Common Application's Standard College Application Data Service (and its pipeline) to a

13-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

college's use of Common Application's online application forms and processing services, does not serve students or any other legitimate goal. Neither championing "holistic review," nor simplifying students' application experience, nor promoting "access" to college are the touchstone of this competitive organization. Instead, the Common Application has become a convenient vehicle to reduce competition among colleges for applicants and achieve market domination in the online application forms and processing markets, and drive application volume, all through collective horizontal action.

29.     As with any effective conspiracy, Common Application aggressively enforces its policies to ensure compliance and, not coincidentally, exclude competitors. In one egregious example, in the aftermath of Hurricane Katrina, Tulane University suffered a significant drop in its college population and sought to encourage students to apply to Tulane rather than competitor colleges. In an effort to do so, it offered fast track student applications and a waiver of application fees. In response, Common Application expelled Tulane. Years later, in an effort to access the significant application pipeline afforded by the Common Application, Tulane sought to reapply. Common Application denied the request unless Tulane agreed to become an exclusive member for a multi-year term. The lesson to Tulane and other members and prospective members was clear: We make the rules. Comply or suffer the consequences of expulsion. And, in light of Common Application's market dominance, that is a price that colleges increasingly have no choice but to pay.

## BACKGROUND

### I.    DEFINITIONS

30.     "College" means a regionally accredited, not-for-profit educational institution in the United States that offers four-year (baccalaureate), full-time degree programs. There are approximately 1,500 Colleges.

14-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

31.    "College Admissions Market" means the market for College students/student applicants to College.

32.    "Elite College" means a top-ranked College (*e.g.*, by *U.S. News & World Report* as a top-50 national university or a top-50 liberal arts college).

33.    "Elite Admissions Market" means the market for Elite College students/student applicants to Elite Colleges.

34.    "Holistic" in the context of college admissions refers to an admissions process that takes into account not only objective information about the applicant, *e.g.*, test scores and grades, but also subjective information that may reflect the student's ability to succeed in college or contribute to the community. In its more formal iteration, holistic review typically requires the submission and review of at least one recommendation/evaluation and one untimed writing sample.

35.    "Online College Application Processing" services refer, collectively, to online application and evaluation forms and processing services offered by third-party service providers to Colleges. Online College Application Processing providers develop a College's online application and evaluation forms, host those forms online, process those forms, process transcripts and/or process application fee payments (or fee waiver forms):

- An online "application form" is an online interface through which a College (1) collects information from the applicant necessary to review an applicant for admission and (2) can differentiate itself to the applicant and create a brand image for itself in the eyes of the applicant.

- An online "evaluation form" is an online interface through which a College collects information about the applicant from a third party.

- Form "processing" refers to: the (secure) transmission of completed application and evaluation forms to the College, including the sometimes

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

extensive re-configuration of the submitted information in a way that allows the College to make use of it in reviewing applicants, *e.g.*, an online administration portal hosted by the developer through which to view submitted forms, a customized, flexible download engine that formats the data for import into the College's student information system, or an engine that creates PDF (portable document format) files or TIFF (tagged image file format) files the College can store and review in its own database.

- "Transcript processing" refers to the (secure) online transmission of the applicant's high school transcript to the College.

- "Payment processing" refers to the (secure) online transmission of the applicant's application fee payment or fee waiver form to the College.

The markets for (1) online application forms and processing, (2) online evaluation forms and processing, (3) transcript processing, and (4) payment processing are submarkets of the Online College Application Processing Market.

## II.    THE COLLEGE ADMISSIONS INDUSTRY

36.    Colleges compete with one another for applicants and applications and, ultimately, for students to fill their degree programs as tuition-paying customers. The applicant pool is a scarce resource, as each applicant will apply to only a handful of institutions, and will attend only one. Competition among Elite Colleges is particularly intense as the pool of highly qualified students seeking admission to Elite Colleges is even smaller.

37.    Meanwhile, Colleges benefit from receiving a greater number of applications, for several reasons. First, many of them charge a fee to apply, typically ranging from $35-60 per application. The greater the number of applications a College receives, the more fees it generates. Second, and even more important, the greater the number of applications a College receives, the lower its acceptance rate. A lower acceptance rate creates the appearance of

16-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

"selectivity," which benefits the College in several ways. First, the College secures a higher ranking in *U.S. News & World Report*'s list of best colleges. Second, since applicants desire to attend more selective Colleges (admission to a selective College may later serve as a signal of quality to employers), the greater a College's reputation for selectivity, the greater the number of applications (and application fees) it will receive, generating in turn even lower acceptance rates. Third, rising selectivity attracts greater donations from alumni. Fourth, Colleges' creditworthiness is determined in part based on their selectivity—the higher their selectivity, the lower their borrowing costs. Fifth, rising selectivity attracts better, more well-known professors. In sum, because the applicant pool is a scarce resource, and because Colleges benefit financially from increasing the number of applications they receive, Colleges normally compete with one another for applicants.

38.     Colleges' competition for applicants is a slice of the broader competition in which they engage for tuition-paying students to fill their degree program ranks. In other words, Colleges compete for such students along a number of dimensions: the educational services and quality of the degree programs they offer, tuition prices, scholarships, and—most relevant here— the admissions applications they offer. First, Colleges use their applications as a vehicle for differentiating themselves and their unique interests to applicants. We learn a great deal about another party from what they are interested in asking about. An applicant is never more attentive to a College's messaging and responsive to their marketing efforts than when she is filling out that College's application. Second, Colleges compete to offer the highest-quality, easiest-to-use, most pleasant application experience to applicants, so as to maximize the chance that an applicant will submit an application. For example, in a competitive market, applicants encountering a College's complicated, difficult-to-use, error-prone online application system may substitute away from that College toward a College offering a higher-quality application experience.

17-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

### III.    THE ONLINE COLLEGE APPLICATION PROCESSING INDUSTRY

39.    The Online College Application Processing Market and each of its submarkets is highly concentrated. Common Application is the largest provider, competing with CollegeNET, ApplicationsOnline, LLC ("AOL"), XAP Corporation ("XAP"), Hobsons U.S. ("Hobsons") and ApplyYourself Inc. ("AY"), each of which provides all related services including student application and evaluation form development and processing services as well as application fee payments (albeit some by contracting with third-party payment processing providers such as Sallie Mae Bank).

40.    The various services falling under the Online College Application Processing services umbrella may be purchased separately from many of these application service providers, and some select services may be purchased from specialty providers. For example, Parchment Inc. offers transcript transmission services, and a College may purchase admission application processing services from CollegeNET and transcript services from Parchment. As another example, some Colleges use AY or Hobsons for student application form development and processing, and Naviance, Inc. ("Naviance") for evaluation form development and processing.

41.    When Common Application launched its first online system in 1998, it processed only one common student application form accepted by all member Colleges—not payments, evaluation forms, transcripts, or supplemental, non-common student application forms. Today, customers wishing to purchase Common Application's Standard College Application Data Service (*i.e.*, the data submitted to Common Application through the common student application form) must also purchase from Common Application its payment processing, evaluation forms development and processing, transcript processing, and supplemental, non-common student application form development and processing services. CollegeNET offers all of these services on an a-la-carte basis.

18-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

## IV.    THE STANDARD COLLEGE APPLICATION DATA SERVICE INDUSTRY

42.    A Standard College Application Data Service is a type of network service. The service provider hosts a single, web-based background information form that applicants wishing to apply to any of the network Colleges—which all require this same information—fills out only once. The background information includes the applicant's name and contact information, demographics, family information, educational background and academic performance, extracurricular, personal, and volunteer activities, and work experience.

43.    The network Colleges then contract with the provider to allow for the auto-population of their application forms with the applicants' background information. If the Standard College Application Data Service provider is also the network College's Online College Application Processing provider, then the provider enables this auto-population internally. Otherwise, the network College purchases the data from the Standard College Application Data Service provider and provides the data to the Online College Application Processing provider it hired to develop, host, and process its online application form(s). When the applicant logs in to that College's online application system, she enters her unique identification number generated by the Standard College Application Data Service provider, and the application is auto-populated with the background information she submitted to that provider.

44.    In both cases, the result is that the applicant saves the time of having to fill out the background information more than once. The greater the number of Colleges subscribing to the network, the more likely the Standard College Application Data Service is to attract applicants, since it is more likely that the network will include more than one College to which she wishes to apply. And as more applicants use the Standard College Application Data Service to submit their background information, more members sign up with the service, in order to gain access to those applicants (the "applicant pipeline"). Standard College Application Data Services are thus characterized by significant network effects.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

45.    Common Application and AOL (through its product, the Universal College Application) both offer a Standard College Application Data Service: Both organizations provide a background information form which applicants need only fill out once in order for their members'/customers' applications to be auto-populated with that information. Common Application has monopoly power in this market, with 557 subscribing members versus AOL's 43.

46.    Because of Common Application's aggressive pursuit of growth and elimination of competitors in the Standard College Application Data Service Market, AOL has been largely unable to grow this business. For example, after seven years in existence, it has only 43 subscribers, while Common Application added over 240 new members in that same time period. Common Application's relentless pursuit of growth in this market caused the demise several years ago of at least two other rivals attempting to compete with Common Application in this space, including Peterson's Universal Application.

## V.    COLLEGENET

47.    CollegeNET is a Portland, Oregon-based company providing web-based on-demand technologies to institutions of higher education and non-profits. CollegeNET serves over 1,300 higher education and non-profit institutions world-wide.

48.    CollegeNET was the first company to deliver administrative Software as a Service (SaaS) to higher education. Intelligent Connections® web-based admissions system, first developed in 1995, now provides application forms and accompanying administrative support services for hundreds of major campuses around the world at the undergraduate and graduate level.

49.    Intelligent Connections® is a suite of web-based admissions products and services. Each product or service can be purchased separately or in combination with others. These products and services include: (1) Admissions Application Processing: CollegeNET

20-   COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

designs as many customized online application forms as an institution desires, hosts the forms online, processes submissions and application fee payments, and enables efficient and paperless review and notification; (2) Letters of Recommendation: CollegeNET designs and hosts institutions' online letters of recommendation/evaluation forms, streamlining the entire process from student request through submission and review; (3) Applicant Portals: CollegeNET allows applicants to check the status of their application materials and view and respond to admissions decisions via the web; each portal is fully branded to the client institution and hosted by CollegeNET, requiring no software installation or maintenance by the institution; (4) Admit Application Evaluation System: This system manages the entire application review and evaluation process by enabling authorized personnel to view applications, read the comments of other reviewers, and record their own comments and scores from anywhere they have internet access; again, the system is accessed via the web and hosted by CollegeNET, requiring no software installation or maintenance by the client institution.

50.      CollegeNET's online application forms allow Colleges significant flexibility to customize their application and applicant experience. Colleges can brand their forms and ensure their own look and feel, integrate video, web links and other creative user experiences and, of course, allow complete independence with respect to the questions asked of students or the answers accepted (or form of answers uploaded).

51.      CollegeNET is a major contributor to college students. CollegeNET has distributed over $1,500,000 in scholarships through its CollegeNET.com scholarship election portal—the first site on the web to give students the power to decide who will win scholarship support.

52.      CollegeNET's products and services are known as some of the most innovative and highest quality in the industry. For example:

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

- CollegeNET's 99.99% uptime is one of the best in the industry. CollegeNET's expert IT staff monitors and supports the CollegeNET hosting environment 24 hours a day, 7 days a week, continuously improving CollegeNET's services with virtually no system down time.

- CollegeNET's e-commerce features provide secure online credit/debit and e-check payment processing.

- In order to safeguard against power failures or natural disasters, CollegeNET stores customer data both on its secure data servers at its headquarters in Portland, Oregon and at its backup data center in Arizona.

- CollegeNET's entirely web-based, CollegeNET-hosted systems save its customers thousands of dollars in administrative, IT labor, paper, printing, and mailing costs each year.

- Authorized users can access CollegeNET systems 24 hours a day, 7 days a week, on or off campus, without having to install anything.

- CollegeNET's Help Desk is fully-staffed and available to handle any support issues so its customer institutions' technical staff can focus on their own work.

- CollegeNET offers cutting-edge, and patent-pending features such as its new ApplyCam™ Video, allowing customer institutions to demonstrate that they provide the most up-to-date and convenient services available.

53.    CollegeNET customers report the highest level of satisfaction. Joe Manning, Associate Dean of Admissions at CollegeNET customer James Madison University, recently stated:

> We've been using CollegeNET's online admissions systems for 15 years and we are 100 percent satisfied with how the system has performed. Our applicants and administrators have been extremely happy with the system. We've had zero downtime and the data collection is always seamless. CollegeNET's continual upgrades of

22-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

student-facing applications ensure that our applicants can easily and successfully navigate the application process.

54.     Similarly, Bob Bennett, Senior Associate Director of Admission at CollegeNET customer Clemson University, recently stated:

> We feel very fortunate to be working with CollegeNET. The Intelligent Connections system is very reliable. We've been consistently pleased with its performance and the trustworthy data it provides. I can't speak highly enough about their technology and IT staff.

55.     Lisa Pinamonti Kress, Director of Admissions at CollegeNET customer University of Kansas, recently stated:

> I can't imagine using any other system. KU has partnered with CollegeNET for more than 10 years and we continue to enjoy excellent service. The online admissions system works extremely well for our students and prospects. In 10 years, we've had no downtime or any glitches in processing applications.

56.     CollegeNET is a leader in the online graduate application space. CollegeNET processes admissions applications for leading institutions in graduate education including Stanford University, Princeton University, Cornell University and Brown University.

57.     CollegeNET also used to be a major provider in the Online College Application Processing space but has lost 229 College customers to Common Application in the last 10-15 years. As far as CollegeNET is aware, none of these former customers joined the Common Application for any reason related to improving their processing efficiency, data security or application flexibility and control. CollegeNET previously hosted Institutional Supplements and supported Common Application member Colleges in a variety of ways prior to Common Application's adoption and enforcement of many of the Challenged Restraints. CollegeNET's losses are due virtually exclusively to Common Application's anticompetitive and exclusionary conduct, as described below. CollegeNET's competitive success in the graduate application processing space—from which Common Application is conspicuously absent—is a strong

23-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

indicator that something other than processing innovation and quality is behind the selection of vendors in the undergraduate space.

58.    CollegeNET is not the only provider impacted by Common Application's anticompetitive conduct. For example, AOL's Universal College Application serviced 80 Colleges several years ago before dropping to 32 immediately prior to the introduction of CA4 (it is now back up to 43, but the increase was only as a backup vendor). And CollegeNET is aware of at least one provider that has been all but eliminated from the market.

## VI.    COMMON APPLICATION

### A.    The Early Years

59.    Common Application was formed in 1975 by a group of 15 private, selective Colleges that wished to provide a common, standardized (paper) application form for use at each member institution. Applicants could fill out this "Common App" once, photocopy it, and submit it to any member institution. The form consisted of questions soliciting background information about the applicant (name and contact information, demographics, family information, educational background and academic performance, extracurricular, personal, and volunteer activities and work experience), a short-answer question and a selection of essay prompts from which the applicant could choose.

60.    In these early days, there was no effort to standardize the broader application process but merely to simplify certain aspects of that process. For example, many members soon began requiring applicants to fill out and submit "Institutional Supplements" in addition to the Common App in order to be considered for admission. These Institutional Supplements were not "common" to all members. To the contrary, each member had considerable flexibility. Institutional Supplements asked different, additional questions of the applicant and often required different, additional short- or long-form answers/essays. The applicant would fill out

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

each member institution's Institutional Supplement and submit it (again, through the mail) alongside the Common App.

61.     Similarly, there was no effort to limit or prevent members from offering their own competitive institution-specific application (which may be provided by a rival application forms and processing provider) in addition to the Common App.

62.     Common Application also had virtually no hand in other aspects of the application process such as the submission of transcripts and evaluation forms to member institutions. Instead, after a student applying through the Common Application (a "Common Applicant") filled out, photocopied, and submitted her Common App, she would ask her school officials to mail her transcript and any required school reports and evaluation forms to the member Colleges to which she had applied. Member Colleges were permitted to require their own, customized evaluation forms, or to use Common Application's template forms.

63.     Common Application also had no hand in application or evaluation form, transcript, or payment processing. Members were free to hire third-party vendors to help them export the data contained in the Common Apps they received into their electronic database and review systems or to process payments for them.

64.     In 1998, Common Application launched its first generation online application system. Members were given the choice of whether to accept the Common App online, receive the application through the postal mail, or both. Common Application also gave its members the option of hiring third-party vendors to process Common Application forms submitted to them by student applicants: Common Application's license agreement included a provision allowing for the license to such third-party vendors of the right to "access, use or download" the Common Application forms. As before, members were not penalized for offering their own, institution-specific application in addition to the Common App, and they were free to hire third-party vendors to host and/or process the Common Application itself or the Institutional Supplements,

25-  COMMPLAINT

43081-0018/LEGAL120489324.13

evaluation forms, and transcripts submitted to them by Common Applicants, as well as to

process application fees for Common Applicants. Common Application provided template

evaluation forms, but members were not required to use them.

65.     In 2000, Common Application registered with the Virginia Secretary of State as a

non-profit corporation. Common Application's purpose as stated in its articles of incorporation

is:

> To serve students by facilitating and simplifying the college
> application process through the development and use of a common
> application for students seeking admission to member institutions.
> In so doing, the Common Application introduces candidates to a
> broader range of institutions than they might otherwise consider,
> provides immediate access to application forms, and may be used
> as an educational tool in preparing students for the college
> selection and application process.

66.     To be eligible to become a member, an institution was required to be non-profit,

private, accredited by a regional accrediting organization, and in good standing with the National

Association for College Admission Counseling ("NACAC"), and to comply with NACAC's

Statement of Principles of Good Practice. Membership was also limited to "selective" Colleges

and universities.

## B.    A Shifting Mission, from Serving Students to Expanding Market Share, Homogenizing the Market and Excluding Rivals

67.     Since the early 2000s, Common Application has transformed dramatically from a

humble, non-profit organization seeking to simplify the application process for students through

modest, voluntary collaborative action to a market share-hungry commercial entity imposing

draconian exclusivity provisions and membership restraints on its members, all with the effect of

facilitating a conspiracy among its members to limit competition amongst themselves for

applicants/students, excluding rivals, and monopolizing the Online College Application

Processing Market.

26-  COMMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

68.     Common Application's scheme worked. As the Common Application itself stated in 2013, "The growth we have experienced . . . has been enormous, rapid, and stunning . . . ."[3] For example, from 2000 through 2014, Common Application's membership grew at 4-5 times the rate it grew from 1980 to 1994, to reach approximately 557 members in the 2014-2015 school year. Between the 2005-2006 and 2014-2015 school years, Common Application doubled its size, and its growth has only accelerated in recent years. Common Application's total revenues went from $339,046 in 2003 to approximately $15 million in 2012. If Common Application continues to grow at its sustained growth rate, it will almost double its size in another five years.

69.     One of the first indications of Common Application's shifting, increasingly monopolistic and revenue-enhancing mission was its replacement in 2000-2001 of "selectivity" with "holistic admission" as its core membership criterion. This in turn allowed it to open its membership doors to more private Colleges, and ultimately, public institutions. This evolution from a closed membership structure to a much more open membership organization paved the way for its explosive growth and broader homogenization of the college admissions experience at the expense of competition on the merits and innovation.

70.     A significant change happened in or around 2003, when Common Application redefined its "equal treatment" requirement so as to limit competition from other institution-specific forms. Prior to that time, members were simply required not to discriminate against applicants based on which student application form (the Common App or an institution-specific application) they used. Around 2003, Common Application started requiring members to "encourage the use of the Common Application" or "fully support the use of the Common Application." Under this new "equal treatment" regime, members were required to charge an

---

[3] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A21.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

application fee to Common Applicants that was "no greater than the fee charged for [their] other

accepted applications" (*i.e.*, Colleges could not charge students less for institution-specific

applications). Members were also required to "provide a link to Common App Online on the

same webpage where [they] link[ed] any other online applications" and, a few years later, to

provide "an equally prominent link to the Common App Online wherever [they] post[ed] a link

to another online application," and not to "explicitly offer any special benefits (expedited

admissions decisions, special scholarship consideration, e.g.) to students regardless of the

application they choose."

71.     This change dramatically reduced competition among members to offer easier-to-

use, higher-quality and/or lower-priced alternatives to the Common App to applicants. In theory,

members were permitted to offer their own, institution-specific application. But since they were

not permitted to promote their institution-specific application over the Common App, they had

no incentive (1) to invest in such an application as a marketing tool to use to differentiate

themselves and attract applicants away from other member institutions, (2) to make the

application process simpler for students (thereby drawing them away from other member

institutions) by, for example, offering pre-populated applications, waiving institution-specific

application fees, or offering expedited treatment, or (3) to invest in first-class technology that

made the application process simpler, easier to use, and more pleasant than the technology

platform offered by the Common App online. One form of competition that was eliminated was

"fast track" applications. As Bryan Gross, Associate Vice President for Enrollment Management

at St. John's University in New York told *Time*, fast track applications allow Colleges to "get

someone to apply who might not otherwise" and in turn "a chance to send marketing messages to

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

convey to them the benefits of attending our school."[4] Through its equal treatment rule, this form of competition was eliminated.

72.    As a result of the decreased incentives, if members offered an alternative application to the Common App, it was usually a simple institution-specific application developed, hosted, and processed through its institution-hosted student information system software. Thus, once an institution became a member of the Common Application, any incentive to innovate in the college application experience it provided its applicants and to use its application as a marketing tool to differentiate itself from its competitors was virtually eliminated.

73.    In an effort to further promote the Common Application over other institution-specific applications (and/or competitors), Common Application also began to incentivize new and existing members to use the Common Application exclusively. As a result, it began penalizing "non-exclusive" members by charging them significantly higher per-application fees than it charged members that agreed to use the Common App exclusively. In other words, by agreeing to offer only the same Common App that everyone else offered—by agreeing entirely to cease competing with other members by offering a better application experience or marketing its unique attributes within its institution-specific application—a member gained access to a greater slice of the anticompetitive rents this cartel produced. In short, the members were being forced to sell out on the mission to help students by virtue of collectively agreeing not to compete vis-à-vis innovating for the benefit of applicants.

74.    By driving exclusivity, Colleges benefited because they knew that regardless of how well the online Common Application actually functioned—regardless of how reliable, applicant-friendly, and at the forefront of technology it was—members were unlikely to lose an

---

[4] Kayla Webley, *As College Applications Rise, So Does Indecision*, Time, May 1, 2013, *available at* http://nation.time.com/2013/05/01/as-college-applications-rise-so-does-indecision/.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

applicant (and, with her, her application fee) to another institution that offered a higher-quality (or lower quality-adjusted-cost) application experience, since virtually all of their competitors were themselves Common Application members that offered the exact same application. This was particularly true for Elite Colleges, where application innovation and processing has been virtually eliminated between them for the discrete pool of elite student applicants.

75.    As Common Application grew, existing members were beginning to understand that Common Application was providing tangible monetary benefits to them: What started out as a service to simplify the college application process for students (the Standard College Application Data Service) had become a pipeline of applicants that benefited Colleges. The more members that joined, the more likely it was for any given applicant to apply to an incumbent member too, since she had already completed the Common Data form. Access to the Standard College Application Data Service was thus the ticket to more applications.

76.    As discussed, Colleges benefit from receiving a greater number of applications: More applications means more application fees. As the pipeline effect of Common Application's Standard College Application Data Service gained momentum, members' admissions offices became veritable money makers for their institutions, bringing in thousands if not millions of dollars in application fees. As *The Chronicle of Higher Education* reported, "Although access is [Common Application's ostensible] altruistic aim, **colleges have long viewed it as a tool for enhancing their bottom lines**. Most any new member can expect a surge in applicants"[5] (emphasis supplied).

77.    The increase in applications also gave Common Application members a boost in their selectivity rankings: The greater the number of applicants, the lower the percentage of applicants they accepted, and the higher they landed on *U.S. News & World Report*'s ranked list

---

[5] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A20.

30-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

of top U.S. colleges and universities. As the Undergraduate Admissions Dean of Georgetown University suggested in 2010, "the system encourages colleges to garner extra applications in order to boost their rejection rates and drive up national rankings."[6]

78.     Common Application's mission shift around 2000-2001 to promoting "holistic admission" also served members'—particularly Elite Colleges'—interests in boosting their rankings by suppressing their acceptance rates. *The Daily Californian* recently explained this phenomenon: "Why do admissions offices go to such great lengths to present their selection processes [as holistic]? . . . [P]art of the answer has to do with the college rankings frenzy that has become so influential in the admissions process. Colleges are desperate to maximize the number of applications they receive so they can reduce their acceptance rates and boost their rankings. Admissions offices therefore encourage unqualified students to apply by suggesting that, even if their test scores and grades aren't good enough, they might get in if only they can show that they are sufficiently mature, kind and responsible" through their letters of recommendation/evaluation forms and essays.[7] As *Time* reported, "[m]ore and more people who aren't necessarily qualified are applying to top schools, inflating the application numbers while not seriously impacting admissions."[8]

79.     As members' acceptance rates began free-falling, students panicked, believing that it had become harder to get into college. Their natural response was to apply to a greater number of Colleges to "play the numbers" and increase their chances of getting in somewhere.

---

[6] Larry Gordon, *Commonsense Application – College Admission Becomes More Efficient, But Some Aren't Cheering*, The Journal Times, Nov. 30, 2010, *available at* http://journaltimes.com/news/local/education/commonsense-application---college-admission-becomes-more-efficient-but/article_305b5178-fbbe-11df-90e2-001cc4c03286.html.

[7] Jason Willick, *The 'Holistic' Admissions Lie*, The Daily Californian, May 3, 2014, *available at* http://www.dailycal.org/2012/10/01/the-holistic-admissions-lie/.

[8] Dan Edmonds, *College Admissions: The Myth of Higher Selectivity*, Time, March 20, 2013, *available at* http://ideas.time.com/2013/03/20/college-admissions-the-myth-of-higher-selectivity/.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

As the *New York Times* reported in collaboration with *The Chronicle of Higher Education* in 2010, "Students hedge against the plummeting admissions rates by flooding the system with even more applications."[9] Another school counselor reported: "They'll say, 'Oh, my gosh, I should apply to a million schools—if I shoot lots of arrows, maybe I'll hit something.'"[10] As David Hawkins, NACAC Director of Public Policy and Research told *Time* in 2013: "The idea is to hedge your bets and get as many applications as you can out there to see where you get accepted."[11] As *Time* reported, "The inflation in the number of applications can be traced to the Common App."[12] For example, between 2010 and 2011, the percentage of students applying to at least three Colleges rose from 77% to 79% (more than 10% more than in 2000) and the percentage of students applying to at least seven Colleges rose from 25% to 29% (both of which are more than double the percentage of such students a decade earlier).[13]

80.     Common Application members realized all this—they realized that the tool they originally implemented to promote their mission of "serv[ing] students by facilitating and simplifying the college application process" had become a tool to increase their own revenues and boost their rankings. So they changed their mission in 2005 to read:

> The Common Application is a not-for-profit organization that **serves** students **and member institutions** by providing an admission application—online and in print—that students may submit to any of our nearly 300 members. Membership is limited to colleges and universities that evaluate students using a holistic

---

[9] Eric Hoover, *Application Inflation: When Is Enough Enough?*, The New York Times, Nov. 5, 2010, *available at* http://www.nytimes.com/2010/11/07/education/edlife/07HOOVER-t.html?pagewanted=all&_r=0.

[10] *Id.*

[11] Kayla Webley, *As College Applications Rise, So Does Indecision*, Time, May 1, 2013, *available at* http://nation.time.com/2013/05/01/as-college-applications-rise-so-does-indecision/.

[12] Dan Edmonds, *College Admissions: The Myth of Higher Selectivity*, Time, March 20, 2013, *available at* http://ideas.time.com/2013/03/20/college-admissions-the-myth-of-higher-selectivity/.

[13] *Id.*

32- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

selection process. Since our founding over 30 years ago, we have been committed to maintaining a reliable service while promoting equity, access, and integrity in the college application process. (emphasis supplied)

The Common Application was now self-avowedly an organization dedicated to serving *its own member institutions*. And those institutions now had a foolproof tool for facilitating a horizontal conspiracy among them to reduce competition for applicants: Grant members the addictive access to the applicant pipeline—something they cannot afford to turn down—but only if they agree not to compete with other members for applicants by offering higher-quality, more innovative, differentiated online application experiences.

81.     By 2006, their spokesman, Rob Killion, Common Application's new Executive Director, was publicly announcing: "[I] hope all holistic-scoring institutions will eventually use the Common Application."[14] Of course that goal has today become even more aggressive, and as Common Application announced in 2012, it is preparing for the eventuality that it will control the entire undergraduate admissions process.

### C.    The NACAC Endorsement

82.     Not all of Common Application's efforts to prevent its members from using competing providers have been as overt as its exclusivity provisions and "equal treatment" requirements. Common Application has made significant money from its operation and it has used these funds (and its questionable 501(c)(3) status) to further compel its growth strategy. Over the years, Common Application has invested significant sums—albeit not the kind of investment required to build a competitive, fully-functioning online application system—on subtle marketing campaigns through which it has effectively bribed college admissions counselors and other non-profit associations into endorsing its inferior products and elevating its status over for-profit vendors.

---

[14] Laura Mandel, *U. Penn: Common App Has Set Trends in Field*, Daily Pennsylvanian, March 20, 2006.

33-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

83.    For example, Common Application donates tens of thousands of dollars every year to NACAC. In 2013, Common Application was the lone platinum sponsor of NACAC's annual conference, for which it paid $50,000. And it recently gave NACAC $80,000 to send 80 college counselors to a professional development workshop, where the Common Application no doubt featured prominently. In exchange, Common Application gets preferential treatment from NACAC. For example, NACAC provides an application fee waiver form that low-income students can fill out and submit along with their applications to Colleges. Its webpage answering "FAQs" about its fee waiver form provides:

> Can I fax the fee waiver form to the college?
>
> For security purposes, the form must be submitted either via postal mail or a verified electronic server (e.g., The Common Application Online, Naviance).[15]

NACAC's designation of "The Common Application Online" and "Naviance" as the only two "verified" electronic means of submitting a NACAC fee waiver is completely arbitrary. Any other forms processor is capable of securely transmitting forms. Common Application also gets preferential treatment at NACAC's annual conference: While every other Online College Application Processing provider (including CollegeNET) is relegated to the "for-profit vendor" section, Common Application is permitted to host its booth in an entirely separate and more visible space. And while NACAC polices for-profit vendors' use of NACAC's online exchange forum (which students, college counselors, and admissions officials use to exchange information and thoughts on the admissions process), it gives Common Application free rein to use the forum to tout its application system and address users' issues. Common Application also mails at least

---

[15] National Association for College Admission Counseling, FAQs for Application Fee Waiver Form, http://www.nacacnet.org/studentinfo/feewaiver/pages/default.aspx (last visited May 3, 2014).

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

one Common Application poster each year to every high school in the nation, listing its roster of member Colleges and gaining a major advantage in terms of visibility to prospective applicants.

84.    Even if CollegeNET were to pay NACAC the same sums Common Application does, CollegeNET would be unable to secure the same level of NACAC endorsement Common Application enjoys. Common Application is at a distinct advantage simply by virtue of being an (ostensibly) not-for-profit entity and a membership organization. This distinction in status is a major barrier to entry faced by every other for-profit application processor trying to break Common Application's stranglehold on the market. As Boston University's Associate Vice President and Executive Director of Admissions commented, the Common Application is "the only app many students and counselors know."[16]

### D.    The Naviance /AY Alignment

85.    In 2005-2006, Common Application entered into an exclusive agreement with Naviance, the largest provider of planning and advising systems for secondary schools. Naviance serves more than 5,500 schools, and in some states more than 60% of all students use Naviance. The agreement has allowed for tight integration of the Common Application and Naviance's electronic document transmission business. The tight linkage has conferred a major advantage on Common Application in the Online College Application Processing Market, and on Common Application members in the College Admissions Markets. Because Naviance is integrated into so many secondary schools' counseling departments, guidance counselors are familiar with Naviance and encourage students to apply to college through the Common Application because it permits uploads and transmission through the familiar Naviance system.

---

[16] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A22.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

86.     In June of 2006, Common Application awarded an exclusive Online College Application Processing services contract to AY. From 2007 to 2013, AY would run and manage Common Application's online application system.

87.     Naviance and AY are both subsidiaries of Hobsons U.S., a part of the U.K. Daily Mail and General Trust group.

**E.      Common Application Extends Its Scope and Mandates Use of Non-Core Services**

88.     As Common Application grew, it also began to extend its reach and solidify its control of other aspects of the application process. Its typical pattern was to begin by offering additional "optional" services. While members could choose to purchase the service from Common Application, they were free to use other providers. Eventually Common Application would impose rules that made it more and more difficult to avoid using the Common Application (whether by expanding the exclusivity rules to require use of these additional services or through other policies). Ultimately, Common Application would bundle the service into its own offering and make its use mandatory.

89.     For example, in the mid-2000s, Common Application introduced Common Application-branded Arts Supplement, Athletic Supplement, Early Decision Agreement, Final School Report, and International School Report forms. Members could opt to require these forms in addition to the Teacher Evaluation, School Report, and Midyear Report forms, which Common Application already offered. Notably, many of these forms were available from other organizations (*e.g.*, NACAC) or application form services.

- The School Report was a form filled out by the applicant's secondary school official, providing background on the secondary school, its course offerings, and the applicant's rank among her classmates, and asking the school official

36- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

to evaluate the applicant; its transfer application equivalent was the College Official's report;

- The International School Report was the international secondary school equivalent to the School Report form;

- The Midyear Report and Final Report documented the applicant's progress by the middle of her senior year of high school and at the end of her senior year of high school;

- The Teacher Evaluation form asked a teacher to evaluate the applicant; its transfer application equivalent was the Instructor Evaluation form;

- The Early Decision Agreement required the applicant to agree to attend the institution she applied to in the "Early Decision" application phase if she was admitted;

- The Athletic Supplement and the Arts Supplement asked students to, respectively, describe their athletic and artistic talents and to submit samples of their work.

90.    Common Application also introduced its own payment processing service (which it contracted with Sallie Mae to provide). Initially, members could elect to offer Common Applicants the choice to pay their application fee from within the Common Application online system (*i.e.*, through Sallie Mae), or to direct Common Applicants to an offsite link where they would pay their application fee using the College's preferred payment processing provider.

91.    Common Application also introduced its own Institutional Supplement service for members wishing to ask additional questions not on the Common App and market themselves to applicants. Again, this was an aspect of the market that it had not originally sought to participate in through its Standard College Application Data Service offering. As with the payment processing service, initially the Institutional Supplement service was a separate, entirely optional

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

service with entirely separate pricing—members could hire the Common Application, or a third-party provider, to develop, host, and process their supplements, while still getting access to the Standard College Application Data Service pipeline. For example, in 2006, Common Application's pricing structure was as follows:

|  | Charge |
|---|---|
| **Membership** | $750-$2,500 depending on # of applicants |
| **Fee per application** | First 6,000 applications: $6.00<br>Thereafter: $3.00 |
| **Fee per application fee payment processed** | Application fee <$40: $2.25/app<br>Application fee $41-50: $2.50/app<br>Application fee $51-60: $2.75/app<br>Application fee $61-75: $3.00/app<br>Application fee >$75: negotiated |
| **Supplement – creation** | 1-2 pages: $1,250<br>2-5 pages: $1,750<br>5-7 pages: $2,250<br>8 or more pages: negotiated |
| **Supplement – annual update** | $200/hour |
| **Supplement – annual hosting** | $500 |

92.    A few years later, Common Application launched its "online school forms system" permitting students to request evaluations from within the online system and permitting school officials to login to that same system through a different interface to complete applicants' requests and submit forms and transcripts to member Colleges. The online school forms system was an "all or nothing" system: As long as a Common Applicant chose to request evaluations and transcripts from within the Common Application online system, school officials were required to submit those items through the Common Application online system, unless they opted out of the online school forms system for *all applicants*. This requirement all but forced evaluation forms processing online—and exclusively into *Common Application's* online system.

93.    Concurrent with the debut of the "online school forms system," Common Application *again* changed its mission, adding yet another constituency it purported to serve: not

**Perkins Coie** LLP<br>1120 NW Couch Street, Tenth Floor<br>Portland, OR 972094128<br>Phone:  503.727.2000<br>Fax:  503.727.2222

just students, and not just member institutions, but now also "secondary schools" and their officials.

94.    A few years later, Common Application began mandating that member institutions *require* the submission of the Common Application-branded School Report and Final Report forms for Common Applicants submitting online. This change is a prime example of Common Application's strategic shift away from *offering* products and services to make it easier for students to apply to college, to *requiring* members (and, by extension, applicants) to use Common Application-branded and -controlled products and services throughout every stage and facet of the college application process, both to monopolize the Online College Application Processing Market and to restrict the dimensions along which members competed for applicants.

95.    Having introduced a broader array of services, Common Application then changed its definition of "exclusive" users: members that "use the Common Application as their only application for admission—online or in print—**as well as allow students to submit everything required (supplements, payments, etc.) within the Common Application Online system**." Common Application offered members steep discounts on the per-application fee they paid to Common Application if they agreed to become exclusive members. As Killion told *The Baltimore Sun* in 2007, "his nonprofit [wa]s now trying to entice—through lower fees—member Colleges to use the Common Application exclusively."[17] Thus, Common Application began penalizing members that wished to use a different third-party processor for their evaluation forms, transcripts, Institutional Supplements, and application fee payments. As a result, members were effectively forced to use Common Application for these services, forcing competitors out of these submarkets. For example, from 2002 through 2004, CollegeNET developed, hosted, and

---

[17] Gadi Dechter, *Cast Off by His Customer, Businessman Starts Again*, The Baltimore Sun, June 27, 2007, at 2, *available at* http://articles.baltimoresun.com/2007-06-27/news/0706270164_1_universal-college-application-common-application-reiter.

39-  COMPLAINT

processed Boston University's Institutional Supplement, processing 11,378 such supplements in the 2004 year. In 2005, that number dropped to 2,170 as Boston University migrated to exclusive use of Common Application as its Institutional Supplement provider, and in 2006 that number dropped to zero. In the 2012-2013 admissions cycle, approximately 75% of Common Application's members required Institutional Supplements as part of their admissions application. In other words, the vast majority of Common Application members—all of whom wished to offer an Institutional Supplement in order to achieve at least *some* differentiation in the admissions process—were effectively forced to use Common Application for this service.

96.    Common Application also began restricting member institutions' ability to customize and personalize their Institutional Supplements, requiring the Institutional Supplements to have a standard "look and feel" and to contain minimal school-specific branding and promotion. Kelly A. Walter, Associate Vice President and Executive Director of Admissions at Boston University, reported: "There's less willingness to allow us to continue asking questions that are unique to us, to get an answer that's important to us."[18] In other words, members were aggressively policing other members' Institutional Supplements to prevent them from gaining an advantage in the admissions process by asking insightful questions of applicants that showed off the institution's unique character and genuine interest in the applicant, that allowed the applicant to express herself, and that effectively acted as a competitive marketing tool.

97.    In a quest to capture even more of the market, Common Application also dropped from its definition of "holistic admission" the pursuit of a diverse student body. Now, all an institution had to do to qualify as using a "holistic admission" process was to ask for a recommendation/evaluation from a school-based counselor or academic teacher and an untimed writing sample. These watered-down membership criteria were all but empty. As Scott

---

[18] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A21.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Anderson, Common Application's Senior Director for Policy, reported to *The Chronicle of Higher Education*, "We take members at their word," that they actually review the evaluation forms and writing samples Common Application mandates that its members require.[19] In other words, Common Application vigorously polices the restraints that protect members from competition with one another but pays only lip service to the restraints that do not.

98.     Around this same time, Common Application took yet another step to solidify its grip on the market. Specifically, it modified its license agreement to remove any references to "vendors who are assisting member colleges or universities with the use of the Common Application forms with the educational admissions operations of said college or university." The new license agreement read: "Under no circumstances are You granted permission to sublicense [Common Application] Forms for any purpose to any third party, affiliate or vendor (other than Common Application's authorized vendor) unless specifically authorized in writing by Common Application." Common Application was determined to have a monopoly not only over its forms, but also over the market for processing them. If a Common Application member wanted access to Common Application's pipeline of applicants, it had to use Common Application's forms, and it had to let Common Application process them, no matter how inferior Common Application's products and services were or would prove to be.

99.     About five years ago, Common Application introduced a new, three-tiered exclusivity structure comprised of "Standard," "Fully Online" and "Fully Exclusive" ("Fully Online Member[s] who also use[d] the Common Application as [their] only application—online or in print") members. Common Application offered the following menu of prices in conjunction with this new exclusivity scheme, with Fully Exclusive members enjoying the greatest discounts:

---

[19] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A21.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

| | Standard | Fully Online | Fully Exclusive |
|---|---|---|---|
| **Membership** | $750 | $750 | $750 |
| **Fee per application** | $5.50 | $4.75 | $4.00 |
| **Fee per application fee payment processed** | $3.00 | $2.75 | $2.50 |
| **Supplement – creation** | Free | Free | Free |
| **Supplement – annual update** | Free | Free | Free |
| **Supplement – annual hosting** | Free | Free | Free |
| **Supplement – custom rules** | Free | Free | Free |
| **Custom student information system export files** | Free | Free | Free |
| **Custom data delivery process** | Free | Free | Free |
| **School forms** | Free | Free | Free |

Common Application had thus by this stage in its development fully embraced the model of penalizing members for using any product or service provider besides Common Application for any part of the admissions process (including the Institutional Supplement, which members originally had the *option* of purchasing from Common Application for a separate fee). And it had begun bundling all of its distinct services (except for payment processing) into a single offering—the $750 membership fee, plus the per-application fee. Members could no longer buy just Common Application's Standard College Application Data Service, while using a different provider for its Institutional Supplement (unless it was willing to pay for the Institutional Supplement twice—once to the Common Application as part of the bundled (and higher, non-exclusive) membership price, and once to its preferred alternative vendor).

100. In 2011, Common Application announced a two-year, $8 million development process of Common Application's fourth generation online system, "CA4". With CA4, Common Application intended to cease its use of a third-party application provider (previously, AY) and in June 2014 to bring the process in-house. CA4 was set to launch in the fall of 2013, when Common Application would retire its paper application altogether.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

101.    Common Application made it no secret that, with CA4, it sought—in the words of Common Application then-President J. Carey Thompson—to equip itself to "handle the full volume of the entire American college application process: 1500+ not-for-profit 4-year institutions, 3 million+ applicants, 15 million+ applications, and 100 million+ supporting documents."[20] With CA4, Common Application sought to completely dominate the Online College Application Processing Market—to the exclusion of what Thompson described as "a sea of for-profit companies and entities attempting to shape the college admission landscape."[21] In other words, Common Application intended to continue using its non-profit status as a shield from competition against "for-profit" companies like CollegeNET offering superior-quality, products and services for the benefit of higher educational institutions and, most important, students.

102.    Of course, in view of the Common Application's clear commercial activities and goals, its status as a "non-profit" is highly questionable. Yet, it has leveraged this status, both in terms of its marketing message and cost advantages, to the exclusion of competitors.

**F.    The CA4 "Nightmare"**

103.    If ever there were an exemplar of the evils of product development in a non-competitive vacuum, it is CA4. CA4 is a woefully deficient, technologically backwards, glitch-riddled product that would never survive in a competitive marketplace. From the moment it launched in the fall of 2013, CA4 was, in the words of applicants, members, and outside observers, a complete "nightmare."

104.    A sampling of applicants' comments, posted to Common Application's Facebook page, best capture its deficiencies:

---

[20] Letter from J. Carey Thompson, President, The Common Application Board of Directors, to Common Application members (2012).
[21] *Id.*

43-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

- Just submitted 2nd request for help. YOUR WEBSITE IS CRAP!!!! It timed out and gave an error code. I am an I.T. director. I'd lose my job if my company had the crap website your company has. Our customer service manager would be fired if we had the CRAP customer service you have. No phone number, no response to website submissions for help. Biggest disappointment with a company I've had in years. You took my money and failed to deliver on your end. Hope more people with voice their frustrations and someone in an executive position at COMMON CRAP fires those responsible for this horrible culture of incompetence and apathy.

- My deadline is in less than a month. PLEASE fix the recommender login issue! It's been "in progress" for weeks, and I am starting to feel hopeless.

- I had to check the box that said I have previewed the PDF FILE in order to submit my applications on time, even though I was unable to see the preview. And now I missed my deadline because I received an error message even though I pressed submit. What is our compensation for being unable to apply to college/blindly applying to college due to lack of previews?

- So many issues with the Supplemental Essay submission. Each time we do it we get a different max word count. She has had to re-write a couple of the essays multiple times. VERY FRUSTRATIING!!!

- Every single one of my students has encountered formatting problems. They've tried cutting and pasting through "sticky notes", "notepad", etc., with limited success. They've tried pushing control C and control V, as someone suggested on this page. They've stopped putting in help desk requests as many plan to email or send hard copies of their essays directly to the colleges. So, please don't think that the formatting issues are fixed just because the help desk requests are down. They've just given up on finding help . . . .

- My son finished several applications more than a week ago. He paid to have them sent. We have confirmation of payment. However, they were NEVER sent. The Common Application is having some technical difficulties and was not able to send out the applications. Others have had this issue. There is no phone support. There is no web response to asking for help- other than an automated "we have received your message/inquiry". In desperation, I went to the corporate office of the company- and guess what? It does not exist. It is a shell address. My son is being penalized for an error within the Common Application web service. It is unconscionable that there is no way apparently to rectify this. His hard work and diligence getting a jump start on applications for scholarship and early action-for naught. I am LIVID.

44-  COMMENT COMPLAINT

- URGENT...can't complete application because green check not showing up on member question although all answers are submitted. Sent at least 10 requestS to the help center since noon yesterday--NOT ONE RESPONSE...deadline is tonight...HELP

- This is ridiculous. This is making the college application process even worse than before. Stop adding to our stress. Unbelievable.

- This is an **inefficient system with more flaws than not**. It generally takes an hour to do 15 minutes worth of work.

- Common AP is **STILL COMPLETLY UNUSABLE**!!!!! No support, NO HELP, no one to call only frustration and requests for recommendations piling up on my desk. COMMON AP FIX THIS NOW!!!!!!!

- This site is a complete joke. **The sheer incompetence has negatively impacted literally thousands of young lives**. This is just shameful. The site's issues, or "glitches", have been going on for far too long. How is this STILL happening?? - Step UP!

- **This website is horrible**. My daughter had to create another account because she couldn't access her first account. She had to start over again. Looks like she has the same problem!!! SHE IS FRUSTRATED AND SO AM I!!!!!!!!!

- Your site is **so poorly designed** that instead of making it convenient to write a recommendation letter for a student, **it actually makes the process even MORE COMPLICATED**!!!! I don't "like" your site.

- The Common Application is supposed to make things easier. I cannot submit my application, I have tried everything. Writing to the help desk has been useless. Do something about it! You are playing with peoples' dreams and future!

- Happy New Year to you Common App. How could you not fix this problem knowing that this started back in October? I am currently helping my younger sister apply and **the unnecessary amount of stress and anxiety your incompetence has caused is disgusting**. It's **error after error**. **How this many bugs could have been missed by your developers is beyond me**. The traffic you're receiving is not that substantial —there are already frameworks and systems in place for this (think black friday). Also, some of the general logic is just insane. Why do you use Greenwich standard time but record submissions in eastern time? Why does the Common Application reevaluate whether an address is real every time an applicant submits it to another college? Why does it take so long to generate a pdf ... it's a pdf not movie?

45-  COMMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Why can the Common Application not be submitted to multiple schools at once/ why is the time recorded based on when the payment goes through (hint it should be when the applicant clicks confirm and submit, then they should be taken to the payment screen)? I don't know if this is a function of incompetence or laziness or lack of understanding or just general nastiness. **Maybe Common Application needs some competition — this monopoly needs to end**.[22]

105.    While the CA4 "nightmare" persisted, commentators began to link the severe

deficiencies of Common Application's products to its utter insulation from competition. As

Slate.com observed:

Common Application doesn't need to beg forgiveness, because they have a captive audience: While hell hath no fury like the parents of a college applicant scorned, too many students are already locked into the system. Common App's generally desultory attitude toward customers is symptomatic when a monopolistic middleman has control over a scarce product, in this case college acceptances. Explaining why no phone support will be forthcoming, Common Application issued an Oct. 18 "Statement of Commitment": "Given the volume of users who interact with our system, phone support would immediately become unsustainable." For "unsustainable," read "unprofitable."[23]

The head of a non-profit organization that helps low-income and first-generation students in the

Washington, D.C., area prepare for college observed: "They've got a virtual monopoly. The

student users have few options."[24] *The College Whisperer* opined: "Ah, to err is human. To

---

[22] www.facebook.com/commonapp (emphasis supplied).

[23] David Auerbach, *Because the College Application Process Just Wasn't Stressful Enough*, Slate, Nov. 13, 2013, *available at* http://www.slate.com/articles/technology/bitwise/2013/11/common_app_problems_a_meltdown_worthy_of_healthcare_gov.html.

[24] Eric Hoover, *More Details on Common Application 'Nightmare'*, The Chronicle of Higher Education, Oct. 14, 2013, *available at* http://chronicle.com/blogs/headcount/more-details-on-common-application-nightmare/36893.

46-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

really screw things up, you have to be a nearly monopolistic pseudo not-for-profit corporation raking in millions!"[25]

### G.    Greater Penalties for Non-Exclusivity and Stronger Restraints on Competition with CA4

106.    With CA4 came a host of other changes at Common Application, all of which further penalized members for using Common Application's rivals for any aspect of the application process and further restrained members' competition with one another, all to the detriment of students and application process providers. First, Common Application rolled out yet another three-tiered exclusivity structure comprised of "Non-Exclusive," "Exclusive I," and "Exclusive II" members.

- In addition to abiding by the "equal treatment" requirements, all members, including "Non-Exclusive" members are now required: (1) to use the Common Application for *all* form and payment processing for Common Applicants—they are not permitted, for example, to direct Common Applicants to their own website to fill out their Institutional Supplement or to pay their application fee; (2) to accept all Common Applicant evaluation forms (including final transcripts) online, for schools that choose to send them online; (3) to accept the Common Application fee waiver; and (4) to abide by fixed admissions deadlines, including Early Decision deadlines.

- "Exclusive I" members must, in addition, use the Common Application as their only admission application for full-time, undergraduate, degree-seeking applicants.

---

[25] The College Whisperer, *Oops! Common App Has Done It Again!!!*, Bayside-Douglaston Patch, Sept. 20, 2013, *available at* http://bayside.patch.com/groups/the-college-whisperer/p/oops-common-app-has-done-it-again_b78c08f3.

47-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

- "Exclusive II" members must further (1) establish uniform fees for all applicants (*e.g.*, domestic and international); (2) restrict the number of "Early" plans they offer; (3) abide by even more fixed admissions deadlines; (4) use Common Application as their only transfer application; and (5) use Slideroom.com for their Arts Supplement (if they offer one).

In other words, what used to qualify a member for the greatest discounts (agreeing to use the Common Application exclusively) now qualifies a member only for the first level of discounts; and what used to qualify a member for the first level of discounts (agreeing to accept all Common Application forms via the Common Application online) is now a requirement of all members and brings with it no discounts. And, by its rules Common Application and its members have colluded to impose greater uniformity in the application process.

107.    The penalties for choosing to be a Non-Exclusive member are extreme: Non-Exclusive members pay Common Application $4.75 per application submitted and $2.75 per application fee payment processed, while Exclusive II members pay $3.75 and $1.75, respectively—a difference of $2 per application for those members that charge an application fee. The transfer application exclusivity provision is also new—members are automatically disqualified from the lowest fees if they choose an outside vendor to develop, host, and process their transfer applications. This is yet another example of Common Application's steady, intentional expansion into every corner and pocket of the college admissions process.

108.    Even the fees paid by Exclusive II members are prohibitively high, effectively draining members' applications budget on Common Application so that they cannot afford to hire a competing provider to help them innovate, provide a higher-quality offering to students, and differentiate themselves. If Common Application offered, on a standalone basis, its Standard College Application Data Service—access to the raw data inputted by Common Applicants into the common student application form—the cost of that product would be measured in pennies,

48- COMMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

43081-0018/LEGAL120489324.13

not dollars. Members could then afford to contract with third-party providers to develop and process their own, customized application form(s) (which could still be prepopulated with the Standard Data purchased from Common Application) and to process their transcripts and fee payments. Of course, under Common Application's bundled pricing structure, in which it forces members to pay Common Application for *all* of its Online College Application Processing services even if they prefer an alternative provider, most members cannot afford to pay those same fees *again* to a competing provider.

109.     Common Application's efforts to exclude rivals and enhance its growth at the expense of students (and any ostensible effort to increase access by diverse or underprivileged applicants), is further exemplified by its decision to require members, as a condition of qualifying as "exclusive," not to offer two alternative, student-focused application and scholarship programs—the Act Six Leadership and Scholarship Initiative ("Act Six"), and the Institute of International Education ("IIE"):

- Act Six is the Northwest's only full-tuition, full-need scholarship for emerging urban and community leaders who want to use their college education to make a difference on campus and in their communities at home. Act Six works with eight colleges and universities across the Northwest. Each Act Six region works with specific college partners, and students from a particular region can apply to one or all of that region's partner colleges through Act Six.

- IIE is a non-profit international education and training organization that manages scholarships, training, exchange, and leadership programs around the world. It offers a number of applications to different programs, *e.g.*, fellowships, scholarships, studies abroad, Global Engineering Education Exchange, etc.

49- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Prior to 2013, members could still qualify as "Fully Exclusive" even if they also accepted applications from Act Six and IIE. Now, if Common Application members want to offer applicants the option of applying to their institutions through IIE or Act Six (instead of Common App), Common Application no longer considers them to be exclusive users, and it requires them to pay the significantly higher fees associated with "Non-Exclusive" membership. Notably, both of these application programs are run by competitors of Common Application.

110.    With CA4, Common Application also further homogenized the college application process and limited members' and students' choices. For example, Common Application made three notable changes to the Common Essay. First, it did away with uploads, requiring instead that applicants copy and paste their essay into a text box that cuts off the essay at the 650-word mark (a cap Common Application began imposing in 2012-13), thus making it impossible for applicants who wished to express themselves in greater than 650 words from getting around the arbitrary 650-word cap. And as Bev Taylor of the Ivy Coach lamented on the *Huffington Post*'s College blog:

> This is an issue because it restricts students from doing fun things with a document. Our students have included photos of their artwork, they've used math symbols in explaining a problem, and they've drawn pictures. One student wrote an essay about how she re-captions *The New Yorker* cartoons and included some of her cartoons in her uploaded essay. By "confining students to a box," we eliminate that originality of thought.[26]

111.    Second, Common Application limited applicants' answers to the Common Essay to three submitted versions and made clear that "[w]e allow these changes to your essay to

---

[26] Bev Taylor, *Unacceptable Changes to the Common Application for College Applicants*, Huffington Post, Jan. 22, 2013, *available at* http://www.huffingtonpost.com/bev-taylor/common-application-change_b_2520657.html.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

correct grammar or spelling mistakes, not to submit different essays" to different Colleges.[27] Applicants thus could not customize their essay answers to each individual institution to which they were applying. In Common Application's words, this restraint is purportedly necessary to "[b]alance[] [the] need for corrections and updates with [the] philosophy of a common application." Of course, the original philosophy of a "common" application never involved forcing applicants to make their applications to each institution common; to the contrary, it was about making it easier for applicants to submit a "common" application to multiple institutions *if they so desired*. Tying applicants hands from differentiating themselves has nothing to do with the stated mission of Common Application to "serve students" or "promote holistic admission." Indeed, Common Application is now affirmatively undermining free competition among *applicants* for admission to member institutions.

112.    Third, Common Application did away with the essay question "topic of your choice." Now, students must fit their long-form essay answers to one of four uncreative, constraining prompts, severely restricting students' ability to differentiate themselves by taking a creative approach accommodated by an open-ended question.

113.    None of these changes are mandated by Common Application's ostensible goal of simplification for students or promoting holistic review. Nor are they mandated by technical concerns; such features and capabilities were previously available within the Common Application and are available in competing applications. Students benefit from increased flexibility, a benefit that students have been denied by the coordinated agreement of member Colleges. Yet, the more Colleges become exclusive and the greater Common Application's share of the market, the more significant the impact on competition.

---

[27] The Common Application, Updating the Essay, https://appsupport.commonapp.org/link/portal/33011/33013/Article/1513/Updating-the-Essay (last visited May 3, 2014).

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

114.    Common Application also moved members' Institutional Supplements entirely within the Common Application online system. Prior to 2013-2014, members had the option of offering their Institutional Supplements as standalone online forms available for completion on their own websites (albeit at the penalty of paying the "Standard" member rates, and at the cost of developing, hosting, and processing their own Institutional Supplements, along with that portion of the fee bundled into the Common Application fee). With CA4, they were required to offer their Supplements within the CA4 system, losing any flexibility they ever had to brand their Supplements, market themselves within them, and hire a competent, reliable vendor to develop, host, and process them. In short, Common Application now insulates members from competing with one another for applicants virtually in any way, at any stage, and through any facet of the application cycle.

### H.    Record Number of New Common Application Members Despite Inferior Product

115.    Despite the "nightmare" that was and still is CA4—despite the unquestionable inferiority of Common Application's products—Colleges in increasingly greater numbers are hiring Common Application as their exclusive provider of Online College Application Processing services. Common Application recently announced its third-highest one-year increase in the number of new members ever, from 517 in 2013-2014 to approximately 557 in 2014-2015. It raked in a whopping $13 million in revenue in 2011 (the most recent year for which its tax return is available) and processed approximately 3.3 million applications in the 2013-2014 cycle as of February 2014. As of 2012, Common Application's annual operating budget was $15 million and it held a reserve fund of the same amount—$15 million. Figure 1 below shows the growth in Common Application's number of members and online Common Apps processed over time.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222



**Figure 1. Common Application's Number of Members and Online Applications Processed over Time (numbers approximate and extrapolated in part from Common Application's tax returns)**

Notably, approximately 30% of the new members for the 2014-2015 year do not currently use "holistic review" in making their admissions decisions, *i.e.*, they do not require both a recommendation and an untimed writing sample for all applicants. Of course, they will have to next year, when they start using the Common App. Colleges are evidently willing to do virtually anything—switch to a technologically inferior product, limit their ability to market themselves in their applications, and even *fundamentally change their admissions procedures*—all to get access to the Common Application's applicant pipeline.

## I.    The Organization and Management of the Common Application

116.    The membership of Common Application is comprised solely of regionally accredited colleges and universities that award 75% of their undergraduate degrees at the bachelor's (*i.e.*, 4-year) level.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

117.    Each Common Application member is a legally distinct entity from every other member, with its own separate management, board of directors, educational agenda, business model, and economic interests. Each member has its own independent economic interest in attracting applicants to its own institution. These economic interests are separate and distinct from the interest and purported purpose of the single entity, Common Application. The members compete with one another in the market for applicants and applications through, among other vehicles, their undergraduate admission applications. Apart from their agreement to cooperate as Common Application members, there would be nothing to prevent each of the members from making its own market decisions relating to purchases of Online College Application Processing services to offer to applicants, and they would make independent decisions with respect to each of the Challenged Restraints. As such, Common Application is not a single entity, but rather a consortium of competitors.

118.    Since its founding, Common Application has had a steering committee or board of directors comprised of admissions officers from member Colleges and, more recently, a few secondary school counselors. The president and constituency of the board of directors change every year, though some members stay on the board for more than one year (subject to a four-year term limit), and some rotate off and then return to the board after a hiatus.

119.    Admissions officers from member Colleges represent the majority of Common Application board members and always have. For example, in 2013-2014, nine members of the board of directors represented member Colleges, and four represented secondary schools.

120.    Common Application's board of directors meets regularly to discuss and vote on business decisions and renew and modify the restraints to impose on members. Each year, the board of directors approves the new membership agreement and changes to the Common Application service. For example, the board of directors met to approve CA4 and each of the membership agreements that was submitted to member Colleges for 2013-2014 and most

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

recently for 2014-15. The board of directors has final decision-making authority for all initiatives undertaken by Common Application and all restraints it imposes on its members. By virtue of their majority representation on the board of directors, the College members of the board of directors have effective control over Common Application's business decisions and the restraints it imposes on its members.

121.    Common Application is a highly secretive organization and does not publicly disclose or distribute its bylaws, articles of incorporation, board minutes or member agreements.

122.    Common Application's member-directors have always come from highly selective Colleges. Every year since 2003 if not earlier, a majority of the member-directors have been administrators from the *U.S. News & World Report*'s list of top 50 national universities or top 50 liberal arts colleges, and 90-100% of them have fallen in the top-100 lists. The President of the board has almost always come from a top-50 national university or liberal arts college.

123.    Common Application's board of directors is thus particularly interested in using the Common Application as a tool to increase their application numbers and boost their selectivity ratings. These Elite Colleges disproportionately benefit from the pipeline effect of the Common Application: When a new member joins and brings with it new applicants to the Common Application's online application system, those new applicants are more likely to submit additional applications to the highly selective, highly desirable members than to the lower-tier members. These Elite College members' dominance on the board of directors explains in large part the trajectory of the organization over time.

124.    Each year, each member signs an agreement with Common Application (and, by extension, with each of Common Application's other members) in which the member agrees to abide by all Common Application rules and restraints.

125.    Each member, by and through Common Application and the other members, vigorously polices and enforces compliance with Common Application's rules and restraints. For

55- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

43081-0018/LEGAL120489324.13

example, Common Application monitors each non-exclusive member's website to ensure that it is promoting use of the Common App equally with its institution-specific application. Common Application staff send warning messages to non-compliant members ordering them to come into compliance with this requirement. The expulsion of Tulane University for its use of fast apps is an example.

## SCOPE OF LEGITIMATE COOPERATIVE ACTION

126.    The only product Common Application offers that furthers its stated purpose of serving students by simplifying the application process is the product it started out offering in 1975: the Standard College Application Data Service. As the former Executive Director of Common Application, Rob Killion, asked rhetorically in 2007 in pitching the benefits of Common Application's product, "Do you really want to answer your mother's name more than once?"[28] Or, as he stated in 2010, the Common Application is meant to relieve applicants of the burden of "writ[ing] their mother's name and occupation and father's name and occupation a second time."[29] (Hereinafter, references to Common Application's "Core" offering shall be read to mean Common Application's original Standard College Application Data Service.)

127.    Common Application could serve—and could historically have served—its mission just as well if it had continued to offer its members—with no strings attached—use of the Common Application's Standard College Application Data Service to collect applicants' basic information, which members could have licensed from Common Application for a nominal fee. Member institutions would have been free to hire one or more Online College Application Processing providers to develop, host, and process those forms, as well as evaluation forms,

---

[28] Anjali Athavaley, *Big Pain on Campus: Applying to Multiple Schools*, The Wall Street Journal, Nov. 8, 2007, *available at* http://online.wsj.com/news/articles/SB119448457512085957.

[29] Larry Gordon, *Commonsense Application – College Admission Becomes More Efficient, But Some Aren't Cheering*, The Journal Times, Nov. 30, 2010, *available at* http://journaltimes.com/news/local/education/commonsense-application---college-admission-becomes-more-efficient-but/article_305b5178-fbbe-11df-90e2-001cc4c03286.html.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

transcripts, and application fee payments. And they would have had the resources to do so, having paid only a nominal fee for the Common Application's unbundled Standard College Application Data Service. To apply to a Common Application member institution, an applicant would first have completed Common Application's online common student application form. Her submission of her basic information through that form would have generated—as it does now—a Common Applicant ID number. The applicant would have used the Common Application's online system to search for Common Application member institutions and to learn about their application requirements and deadlines. If she clicked on the name of one of the member Colleges in order to apply to the College, the Common Application would have linked her to that College's application website. The applicant would have logged into the College's application system and completed its institution-specific online application form(s). Instead of entering her basic information into the application form of each College to which she was applying, the applicant would have entered her Common Applicant ID number, which would have caused the auto-population of the basic information into each College's online application forms. She would then have proceeded to fill out the institution-specific portions of each institution's application, to upload any files required by the College (including Common Essay and institution-specific essay responses), to request evaluation forms and transcripts, and to pay her application fee—all *outside* the Common Application's system. The third-party forms processing provider would have processed these forms, including by providing the customized data export feature enabling the College to review the forms according to its preferences.

128.     The result would have been the same simplification of the college application process as Common Application purportedly exists to serve, *but also* free competition among members for applicants/students, free competition in the Online College Application Processing Market, and free competition against Common Application and Slideroom.com for members' business, thus encouraging experiment, innovation, and improvement in the college application

57-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

process. This free competition would have brought the quality of these services up and the quality-adjusted price down to competitive standards, for the benefit of applicants/students.

129.    All of the other restraints Common Application imposes—its requirement that members use Common Application's online application system for Common Essay submission, for the solicitation of short- and long-form answers to institution-specific questions not required by all members, for requesting and submitting evaluation forms and transcripts, and for submitting early decision agreements; its requirement that members use Common Application's payment processing service for Common Applicants; its restrictions on what questions members can ask applicants; its prohibition on applicants' submitting more than three different Common Essay answers to different members; its "equal treatment" requirement that prohibits members from promoting or incentivizing the use of alternatives to the Common Application, including by charging a lower fee for a non-Common Application; its penalties for non-exclusive use of the Common Application; its requirements to abide by uniform admissions deadlines/decision plans (or its penalties for not abiding by such deadlines/plans); its penalties for not using Slideroom.com for arts supplements; its penalties for not using Common Application for transfer applications; and its effective prohibition on members' marketing themselves to Common Applicants—are unrelated to Common Application's mission, are naked restraints on competition among members, have harmed competition among them, have harmed competition in the Online College Application Processing Market, and will continue to do so unless enjoined. Alternatively, any justifications for such restraints could be obtained through other less restrictive alternatives.

## RELEVANT MARKETS AND COMMON APPLICATION'S MARKET POWER

130.    The relevant markets in which to analyze the anticompetitive effects of the above-described conduct and restraints include: (1) the market for applications to Colleges (the "Student Application Market"); (2) the market for admission to Colleges (the "College

58-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

Admissions Market") ((1) and (2) collectively, the "Admissions Markets"); (3) the Online

College Application Processing Market and each of its submarkets; and (4) the College market

for Standard College Application Data Services.

131.    The Student Application Market and the College Admissions Market may be

alternatively limited to Elite Colleges (the "Elite Student Application Market" and the "Elite

College Admissions Market," respectively).

### A.    The Student Application Market

132.    The market for student applications for admission to full-time, four-year degree

programs at Colleges (regionally accredited undergraduate colleges and universities in the

United States) is a distinct "product" market.

133.    This market does not include the market for student applications to non-U.S.

Colleges. By and large, U.S. Colleges do not compete with non-U.S. Colleges for the same

applicants—most students seek admission to, and degree programs from, either only U.S.

Colleges or only Colleges in other countries. Most students seeking admission to, and degree

programs from, U.S. Colleges reside in the United States and are U.S. citizens, and they will not

substitute a non-U.S. degree program for a U.S. degree program because the former are generally

farther away (presenting substantially higher travel costs), require them to know a foreign

language, are inferior to U.S. College degree programs, and do not have the visibility to U.S.

students that U.S. Colleges do, and because U.S. students attending degree programs abroad do

not qualify for federal financial aid. Given a small but significant, nontransitory increase in the

price of U.S. College degree programs, students seeking such degrees would not substitute non-

U.S. College degree programs for U.S. degree programs.

134.    This market does not include the market for graduate student applications. An

Undergraduate Degree is a prerequisite to entry into a graduate program and applicants are not

generally substitutable. Given a small but significant, nontransitory increase in the price of

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

undergraduate degree programs, students would not substitute graduate degree programs for undergraduate degree programs and therefore would not submit applications to the former in place of the latter.

135.    This market does not include the market for student applications for admission to two-year and/or part-time degree programs. There are substantial differences between two-year and/or part-time degree programs on one hand, and four-year and/or full-time undergraduate degree programs on the other, including but not limited to the time required to complete the degree, the cost, the entry requirements, the application timeline and process (admissions deadlines for 2-year and part-time programs are usually much later), the skills and knowledge imparted, and the employment prospects conferred upon the student. Given a small but significant, nontransitory increase in the price of 4-year and/or full-time undergraduate degree programs, students seeking such degrees would not substitute 2-year and/or part-time degree programs for 4-year and/or full-time degree programs and therefore would not submit applications to the former in place of the latter.

136.    This market does not include the market for student applications for admission to an institution that is not regionally accredited. Regionally accredited institutions offer a substantially different product than unaccredited institutions. Unaccredited institutions' admissions standards are much lower than those of accredited institutions; degrees from unaccredited institutions are often considered invalid for purposes of applying for transfer credit or for qualifying for certain lines of employment; and students studying at unaccredited institutions are ineligible for federal financial aid. Given a small but significant, nontransitory increase in the price of accredited degree programs, students seeking such degrees would not substitute unaccredited degree programs for accredited degree programs and therefore would not submit applications to the former in place of the latter.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

137.    This market does not include the market for student applications for admission to a for-profit institution. For-profit institutions offer a substantially different product than not-for-profit institutions. For-profit institutions' admissions standards are much lower than those of not-for-profit institutions, and degrees from for-profit institutions are often considered invalid for purposes of applying for transfer credit or for qualifying for certain lines of employment. Given a small but significant, nontransitory increase in the price of for-profit degree programs, students seeking such degrees would not substitute for-profit degree programs for non-profit degree programs and therefore would not submit applications to the former in place of the latter.

138.    Common Application will process approximately 43% of Colleges' freshman admissions applications in the 2014-15 year. Common Application members thus collectively have market power in the Student Application Market. Moreover, this number understates members' market power—their collective ability to raise prices and/or lower output/quality without losing applicants. That is due in large part to Common Application's high visibility among College applicants by and through its network and its preferential arrangements with Naviance and NACAC. As Boston University's Associate Vice President and Executive Director of Admissions explained, the Common App is "the only app many students and counselors know."[30] In other words, many applicants believe the Common App is the only way to apply to college and do not even consider applying to non-Common Application members even if they are dissatisfied with the application experience offered by Common Application members.

139.    In addition, many applicants are motivated by Common Application members' promise of "holistic review" and therefore less readily substitute away from Common Application members to institutions that do not use "holistic review," even when Common Application members offer an inferior application process. Finally, every student who seeks to

---

[30] Eric Hoover, *The Uncommon Rise of the Common App*, The Chronicle of Higher Education, Nov. 22, 2013, at A21.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

apply to more than one College, at least one of which is an exclusive member of the Common Application, is already forced to accept the price and quality level of the Common App, and once she has accepted that price and quality level, she tends not to shop around for lower prices or higher quality for her other applications.

140.    In the alternative, the Student Application Market may be limited to the Elite Student Application Market—the market for student applicants for admission to Elite Colleges. Elite Colleges are highly selective institutions, generally admitting a relatively smaller portion of student applicants and requiring generally much higher standardized test scores, grades, and class rank. Elite Colleges are also considered to provide the highest-quality, most academically rigorous educations in the country, impart greater knowledge and skill to their students than non-Elite Colleges, provide a class of other high-performing students from whom to learn during the course of the program, invest substantially greater resources in undergraduate learning, small class sizes, and high faculty-to-student ratios, provide substantially more support and assistance throughout the program to maximize the chances of student success and graduation, offer the highest graduation rates, and confer the greatest earning potential and employment prospects on their student-customers. It is these factors, among others, that drive *U.S. News & World Report*'s rankings and thus render such rankings accurate proxies for a College's status as Elite or not Elite. Given a small but significant, nontransitory increase in the price of Elite College degree programs, students seeking such degrees would not substitute degree programs at non-Elite Colleges for degree programs at Elite Colleges and therefore would not submit applications to the former in place of the latter.

141.    Approximately 85% of Elite Colleges are Common Application members, and approximately 73% of them are exclusive members (Exclusive I or Exclusive II). In addition, Common Application will process approximately 70% of Elite Colleges' freshman admissions applications in the 2014-15 year. By virtue of their high collective market share, Elite Colleges

62-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

that are members of the Common Application collectively have market power in the market for student applicants for admission to Elite Colleges. In addition, barriers to entry into this market are high. Generally, it takes years, if not decades, and substantial sums to develop a track record as an Elite College. A College must be willing to pay the best professors above-market to attract them to their school, to offer enough scholarships to develop a reputation for admitting high-achieving students and to boost its standardized test score and grade averages, to hire enough professors to offer a low faculty-to-student ratio, etc. Indeed, the list of Elite Colleges has remained largely unchanged for the past few decades, evidencing the difficulty of breaking into this market.

142.    Direct evidence of Common Application members' unconstrained exercise of their market power includes their ability to agree not to compete to attract applicants by marketing/advertising themselves in their applications, enabling students to determine through the application process if they would be a good "match" for the College, or providing high-quality, easy-to-use, or low-priced applications, all without losing applicants, their ability to force other Colleges who did not previously mandate holistic review to nominally agree to such review and to accept other limitations on competition among them, and their ability to raise and maintain the prices of those uncompetitive products above levels that would be established in an efficient and competitive market. Instead, Common Application members offer the same, low-quality, difficult-to-use application in which they do not market themselves or enable students to determine whether they will fit well with the College, and yet they do not lose applicants as a result.

### B.    The College Admissions Market

143.    Colleges offering full-time, four-year degree programs compete with one another to sell such degree programs to students seeking such degrees. The market for these degree programs (the "College Admissions Market") is a distinct product market.

63-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

144.    This market does not include the market for non-U.S. degree programs, for graduate degree programs, for two-year degree programs, for part-time degree programs, for degree programs from regionally-unaccredited institutions, or for degree programs from for-profit institutions, for the same reasons that the Student Application Market does not include the market for applicants to such degree programs.

145.    The market share and market power of Common Application members in the College Admissions Market track the market share and market power of its members in the Student Application Market. For all of the reasons discussed *supra*, Common Application members have market power in this market.

146.    In the alternative, the College Admissions Market may be limited to the "Elite College Admissions Market"—the market for full-time, four-year degree programs at Elite Colleges. As alleged *supra*, degree programs offered by Elite Colleges are not reasonably interchangeable with degree programs offered by non-Elite Colleges.

147.    The market share and market power of Common Application members in the Elite College Admissions Market track the market share and market power of its members in the Elite Student Application Market. For all of the reasons discussed *supra*, Common Application members have market power in this market.

148.    Direct evidence of Common Application members' unconstrained exercise of their market power includes their ability to agree not to compete along several dimensions for student-customers, without losing student-customers or suffering from a reduction in quality in their student-customer body. Specifically, Common Application members do not compete with one another to attract students by marketing/advertising themselves in their applications, enabling students to determine through the application process if they would be a good "match" for the College, or providing high-quality, easy-to-use, or low-priced applications. Instead, Common Application members offer the same, low-quality, difficult-to-use application in which

64-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

they do not market themselves or enable students to determine whether they will fit well with the College, and yet they do not lose student-customers or suffer a reduction in the quality of their student-customer body as a result.

C.    **The Online College Application Processing Market**

149.    The College market for online application and evaluation forms and processing services (the "Online College Application Processing Market") is a distinct product market.

150.    The suppliers in this market are United-States based and include Common Application, CollegeNET, AOL, XAP, Hobsons and AY. Generally speaking, non-U.S. entities offering online application and evaluation forms and processing services are government-run entities that exist solely for the purpose of serving their home country colleges' admissions processing needs; they do not seek to enter the U.S. market and would not do so given a small but significant, nontransitory increase in the price of Online College Application Processing services offered to U.S. Colleges.

151.    Student information system ("SIS") providers do not compete in this market. SISs, also known as student information management systems, student records systems, student management systems, campus management systems, or school management systems, are software applications used by educational establishments to manage student data. Every College has an SIS which it uses to manage its student data. Included in many SIS packages is basic software allowing the College to build and host its own online application forms, or the SIS offers the software to build such application forms for a small fee.

152.    This basic software is not a reasonable substitute for Online College Application Processing services provided by third-party providers—and thus does not constrain the prices for the latter—for several reasons. First, SISs are software installed on the College's own server (which is being used to power all of the College's other systems). Thus, the security of the application systems powered by that server is only as secure as the College's own server. By

65-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

contrast, third-party providers host the web-based application systems they offer on cloud-based servers with typically much stronger security systems in place to prevent against hacking and unauthorized access to the sensitive personal and financial data submitted with an application. Colleges' own servers are typically not reasonable substitutes for these more robust servers offered by third-party providers.

153.    Second, SIS software is typically not capable of processing online payments, so a College using such software for its application system must separately purchase a payment processing service and then invest the time and resources into integrating the two systems, while still worrying that the sensitive financial information submitted through the payment processing feature will be breached. This again makes SIS not a reasonable substitute for third-party provided Online College Application Processing services.

154.    Third, SIS-based applications require substantial time investment by the College's admissions and information technology departments to build the application, integrate it with their existing systems, and troubleshoot technical issues as they arise. By contrast, virtually all of these functions and services are included in Online College Application Processing services hosted by third-party providers.

155.    Fourth, third-party providers offer full customer service to the College's admissions and IT departments and to applicants submitting applications. By contrast, Colleges using SIS must also become their own customer service provider, fielding applicants' phone calls and troubleshooting their technical issues.

156.    Fifth, SIS software is not robust enough to allow applicants to request forms from third parties (*i.e.*, evaluation forms), to allow school officials and recommenders to login to the same system and submit those items within the same system, or to allow College admissions officers to track the status of these various items through a complex tracking interface or to organize, analyze, and review submissions. SIS-based applications are also limited in their

66-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

ability to enable the College to customize the look and feel of, and market itself within, the application. In short, SIS software allows for the development of only the most basic, unsophisticated applications and application systems. There is a distinct group of Colleges that require far more than such barebones software and systems for whom SIS software is simply not a product to which they would turn in response to a small but significant, nontransitory increase in price.

157.    Because of these differences, the costs of hiring a third-party provider are significantly higher than the costs of developing and maintaining an SIS-based application. All of these differences, including the price differences, explain why SIS-based applications are not included in the Online College Application Processing Market. SISs are not a reasonable substitute for third-party Online College Application Processing providers, and they thus do not constrain the prices of those latter services.

158.    The competitive constraints and barriers to entry into providing Online College Application Processing services to Colleges are significant. The industry is characterized by high fixed costs: A provider must spend millions of dollars on software development, server space, and technology that allows for the secure or encrypted transmission of sensitive data, and must invest heavily in marketing before it can win its first customer and begin processing online admissions applications. A provider must also spend several years building up a track record of performance before it can secure enough customers to recover its fixed costs. As a provider's customer base grows, it must invest millions more dollars in scaling the system to serve the larger user base. For example, Common Application spent two years and $8 million in merely upgrading its system from third- to fourth-generation.

159.    In addition, Common Application is so entrenched in the marketplace that rivals must spend substantial sums obtaining (and seeking to retain) customers. The high fixed costs make it extremely difficult for new entrants to break in and perform successfully, where, as here,

67-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

there is a dominant provider that captures most of the application flow (Common Application). Building application volume is a prerequisite to recouping high fixed costs.[31] For this reason, there has been no successful new entry into the market in the last 15 years, and many providers have exited the market.

160.    The costs of switching from one Online College Application Processing provider to another are also high. When an institution hires a new provider, it must learn and become comfortable with a new system and train its admissions officials to use the new system. The institution must also devote substantial time and resources to working with the provider to design the forms. It can take anywhere from three to six months or longer to develop an online application system for a new institutional client.

161.    In addition, a substantial number of Common Application's members are exclusive users, so even if they wanted to substitute away and use an alternative provider of Online College Application Processing services, they couldn't. Common Application's "equal treatment" requirement—which it imposes on *all* members—provides a further disincentive for non-exclusive members to offer a different, higher-quality, and/or lower-cost application in addition to the Common App. Since members are not permitted to offer lower-cost applications through different providers or to promote the use of their institution-specific application over the Common App, they have no incentive to shop around for such an alternative provider, even if they are dissatisfied with the Common App's products. Because Common Application forces its members to pay for its full suite of services, most of its members cannot afford to also offer a separate, institution-specific application form. And Colleges that are most dependent on the

---

[31] Note that this is not a justification for Common Application's imposition of the Challenged Restraints that raise its rivals' costs and prevent switching. Common Application already captures enough of the application flow to recover the fixed costs associated with maintaining and upgrading its system; the sole purpose and effect of these Restraints is to grow its market share at the expense of rivals, not recoup fixed costs.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

pipeline generated by Common Application's Standard College Application Data Service—Elite Colleges and those especially concerned with their rankings—are particularly unlikely to switch to an alternative Online College Application Processing services provider, since Common Application requires its members to purchase the latter services from Common Application to have access to the former.

162.    In addition, members are significantly limited in their ability to switch away from the Common Application to an alternative provider—even where Common Application's product is inferior and its quality-adjusted prices are higher—because Common Application has tied access to the applicant pipeline generated by its Standard College Application Data Service to use of its Online College Application Processing Services. Because of this anticompetitive tie, Colleges can expect a drop in the number of applications they receive of roughly 20-40% if they switch from Common Application to another provider, because with the switch to a new provider, they are forced to forego access to the pipeline. As one university official explained: "You're walking away from the only app many students and counselors know. If your apps go down 20 percent, it's front-page news." And these are not one-time switching costs: Every year that a College gives up the pipeline in order to gain access to competitive Online College Application Processing services, it foregoes that 20-40% of application fee revenues and the boost to its selectivity ratings. These switching costs insulate Common Application from competition for Colleges' business.

163.    Members are also reluctant to leave the Common Application—and new members are likely to join—simply because of the artificially-inflated status of its products which it has paid NACAC to confer upon it, and the association with "elite" or "selective" schools membership confers. This is yet another barrier to competition with Common Application.

164.    Collectively, these factors which reflect the unique structure of this market, including the limitations on access to customers, act as substantial constraints on input and entry.

69-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

165.    CollegeNET estimates that Common Application's share of the Online College Application Processing Market is at least 60%.[32] Thus, by virtue of its high market share and the high switching costs and barriers to entry that define this market, Common Application has market—indeed, monopoly—power in this market.

166.    Based on publicly available data, CollegeNET further estimates that Common Application's share of each of the Online College Application Processing submarkets—those for (1) online application forms and processing, (2) online evaluation forms and processing, (3) transcript processing, and (4) payment processing are submarkets of the Online College Application Processing Market—is at least 60%, except perhaps in the transcript processing market.[33] By virtue of its high market share and the high switching costs and barriers to entry that define these submarkets, Common Application has market and monopoly power in these submarkets.

167.    Direct evidence of Common Application's unconstrained exercise of its market power in the Online College Application Processing Markets includes its ability to force members to take uncompetitive, inferior products that would not survive in an efficient and competitive marketplace, its ability to raise and maintain the prices of those uncompetitive products above levels that would be established in an efficient and competitive market, and its ability to lower and maintain the inferior quality of those uncompetitive products below levels

---

[32] This is the case whether Common Application's market share is measured by dividing the number of application forms, evaluation forms, transcripts, and application fees or fee waiver forms processed by Common Application by the total number of such items processed by all Online College Application Processing providers, or by dividing the number of applications submitted through Common Application by the total number of applications submitted through all such providers. This is also the case even if all U.S. undergraduate institutions' (not just "Colleges'") third-party-processed forms, transcripts, and payments are included in the relevant denominator.

[33] This is the case even if all U.S. undergraduate institutions' (not just "Colleges'") third-party-processed forms, transcripts, and payments are included in the relevant denominators.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

that would be established in an efficient and competitive market. Indeed, on the heels of the CA4 "nightmare," Common Application recruited an almost-record number of new members. That its customer base is growing despite its uncompetitive, inferior products is exemplary of its market power.

### D.    The Standard College Application Data Service Market

168.    The College market for the background information solicited from and submitted by applicants into an online form accepted by multiple Colleges (the "Standard College Application Data Service Market") is a distinct product market. It does not include or fall within the Online College Application Processing Market, which includes full application forms development and processing and which does not generate distinct pipeline effects. For example, Common Application began offering its Standard College Application Data Service long before it began offering Online College Application Processing services. Whereas online application forms are (usually customized) forms developed with specific institutions in mind, and processed for specific institutions, a Standard College Application Data Service provides a generic, text-based data entry form for applicants to input their background information required by more than one College. The technology required to capture this data once the applicant submits it, and to store it in a database to transmit to subscribing Colleges, is elementary, compared with the sophisticated systems required to provide Online College Application Processing services. Competitors in this market including Common Application and AOL.

169.    XAP Corporation offers several localized standard college application data service networks that do not compete with Common Application and AOL in the national Standard College Application Data Services market. For example, it hosts a background information form generating applicant data that network Colleges limited to a specific geographic region (*e.g.*, North Carolina Colleges) subscribe to. Generally speaking, XAP's localized standard college application data service networks attract only a limited number of

71-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

applicants—specifically, those looking to apply only to Colleges located within the geographically-limited network. As a result several of the Colleges belonging to the consortia of Colleges for which XAP provides standard college application data services are also members of Common Application because they seek access to the national pipeline of applicants Common Application provides.

170.    XAP's product and service offerings exemplify the differences between a Standard College Application Data Services and Online College Application Processing Services. XAP hosts several statewide application systems. For example, an applicant can login to the College Foundation of North Carolina ("CFNC"), powered by XAP, and access applications to almost every College in North Carolina. The first step the applicant is directed to take is to fill out a Common Data "profile" form, asking the applicant's name and contact information, demographics, family information, educational background and academic performance, extracurricular, personal, and volunteer activities and work experience. Next, the applicant searches for member Colleges to apply to. XAP gives each of those member Colleges the choice of (1) not using XAP as their application form developer, (2) buying XAP's "standard" application form (which looks and performs similarly to the Common App except permits the College to brand the form with its school colors and logo, and neither CNFC nor XAP requires the College to require evaluation forms or essays), (3) buying XAP's "enhanced" application form, which allows the addition of custom pages and additional questions beyond the standard application, much like Common Application's member pages and writing supplements, and (4) buying XAP's "custom" application ("you customize the layout, the application fields, and anything you need for a one-of-a-kind application tailored to fit your system"). When the applicant clicks on a particular member College's application link, she is directed to that College's application, which may be a standard, enhanced, or custom application depending on what the College selected (or, in the case of (1), she is directed to the third-party provider's site).

72-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

The application form is automatically prepopulated with the Common Data she already submitted in her profile. She then proceeds to complete the application form and submit it. As this process shows, Standard College Application Data Services are different from application form and processing services.

171.    There are no reasonable substitutes for access to the applicant pipeline offered by the Standard College Application Data Service providers. Given a small but significant, nontransitory increase in the price of such access, institutions that seek such access would not substitute any other product or service for such access.

172.    Common Application and Universal College Application are the dominant providers of Standard College Application Data Services and thus the dominant suppliers of the applicant pipeline to which such Standard College Application Data Services provide access. Common Application's share of this market is in excess of 90%. It thus has monopoly power in this market.

173.    Common Application's unconstrained abuse of its monopoly power in this market is evidenced by its ability—through its use of the Challenged Restraints, including its exclusivity provisions—to exclude or severely threaten the viability of rival Standard College Application Data Service providers, including AOL (Universal College Application), Peterson's Universal Application, and at least one other rival from the market. Further evidence of Common Application's market power is its ability to force members who want access to its Standard College Application Data Service pipeline to use Common Application's Online College Application Processing services to the exclusion of rivals and even though those services are uncompetitive, inferior products that would never survive in a competitive market and its ability to convert Colleges that did not previously mandate holistic review to alter their admissions procedures and philosophies to gain access to the applicant pipeline.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

## ANTICOMPETITIVE EFFECTS, INJURY, AND DAMAGES

174.    Common Application's illegal and anticompetitive conduct has had a significant anticompetitive effect on the relevant markets, most directly in the reduction of output as defined by decreased quality, innovation and product differentiation in the college application process. Beyond the Standard College Application Data Service, there is no substantial procompetitive justification for any restraints on competition among the member Colleges and the resulting anticompetitive effects cannot be justified.

175.    Within the Admissions Markets, Common Application has reduced innovation and product differentiation, decreased quality and service standards, and increased quality-adjusted prices, costs and the burden of applying to College, all with a corresponding impact to Common Application's rivals, including CollegeNET, which offers state-of-the-art, customized, flexible application processing services. As a direct result of this competitor collaboration, Colleges' ability to market themselves to students and students' ability to market themselves to Colleges has been reduced along with a corresponding reduction in the ability of both Colleges and students to achieve the best match, and ultimately initiate a successful college career. By explicit agreement of member Colleges, price competition from alternative applications has been completely eliminated to the detriment of students who have also suffered from the reduction in other forms of competition such as expedited or flexible decision deadlines.

176.    Notably, while the Common Application and its member Colleges' actions have artificially increased a student's perceived need to submit more applications to Colleges (resulting in increased cost and burden to both students and Colleges for a lower-quality experience), this has not resulted in any increased output in the College Admissions Markets. The number of applicants admitted to college has not increased as a result of collaboration, nor have Colleges been provided a significantly better applicant pool. As Fred Hargadon, former

74-  COMPLAINT

Dean of Admissions at Princeton and Stanford, reported, "I couldn't pick a better class out of 30,000 applicants than out of 15,000. I'd just end up rejecting multiples of the same kid."[34]

177.    Within the Online College Application Processing Markets, the Common Application has reduced quality, innovation and product differentiation, created significant barriers to entry and limited and excluded rivals.

178.    These anticompetitive effects are the result of Common Application's collusive and exclusionary conduct which expands beyond Core services to its adoption and implementation of the Challenged Restraints, all in concert with its member Colleges.

179.    The Common Application's Standard College Application Data Service creates significant network effects. The benefits of the network however, flow virtually exclusively from Common Application's members' collaboration to provide that service, and are dramatically outweighed by the anticompetitive effects created by Common Application's expanding scope, the increasing reach of the network (including the broader set of competing Colleges) and the Challenged Restraints.

180.    A network created for a limited product or service offering (*e.g.*, sharing of a student's background information) can have procompetitive impacts, even when operated by horizontal competitors. First, it may allow introduction of a new product or service. For example, while such a service may be developed and operated by an independent third party, where, as here, no such service previously existed, the competitor collaboration may allow a new product or service to be introduced. Second, a network can create benefits for both buyers and sellers that becomes greater with each additional participant. For example, here students can submit their background information to more Colleges while saving the time of filling out the information form more than once. Correspondingly, Colleges may have access to more students. However,

---

[34] Eric Hoover, *Application Inflation*, The Chronicle of Higher Education, Nov. 5, 2010, *available at* http://chronicle.com/article/Application-Inflation/125277/.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

these benefits are limited and have declined with technological advancements (*e.g.*, browser auto-fill features) and other changes in the venture.

181.    Additionally, as implemented here, any such benefits are far outweighed by the anticompetitive effects inherent in the Common Application's pursuit of growth: increasingly reduced competition and innovation and decreased efficiency as a result of artificially increased application (and holistic application) rates.

182.    By virtue of the fact that Common Application is a membership organization of horizontal competitors, the anticompetitive effects have been greatly increased as the scope of services offered within the network has increased. With each additional service, the area in which this organization of horizontal competitors has limited, or eliminated, competition among themselves has necessarily become greater, further homogenizing the market. And, there was no significant need or procompetitive benefit from such further expansion of the competitor collaboration: Each of the additional service offerings was available through other providers. (Indeed, in some cases Common Application simply contracted with a third-party provider, *e.g.*, Naviance, AY, and Sallie Mae.)

183.    The Common Application's, and its member Colleges', increasing restrictions on non-Core products or services has had a significant anticompetitive effect by reducing output as measured in terms of reduced quality, innovation and product differentiation. The increasing size of the organization (and increasing market power) has and will continue to exacerbate these anticompetitive effects. Thus for example, many of the Challenged Restraints seek to limit the manner in which Colleges compete in the Admissions Markets and seek to impose, by agreement of competitors, the "best" way to apply to College, thereby reducing competition in innovation and product differentiation. These limitations seek not only to force Colleges to adopt holistic review but also to adopt the Common Application's own version of a more formalized holistic review and extends these restrictions to non-Core products. Absent the limitations on non-Core

76- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

products, there would be significantly greater competition. For example, in the absence of the Challenged Restraints, each College would design its own application in order to best reflect that College's distinct character and interests, to best showcase its strengths and attractions, to provide the most information possible to applicants about that College, to best "sell" those applicants on that College, and to ask questions reflective of that College's mission and philosophy so as to attract good "matches." Many Colleges would also likely develop different applications tailored to different types of students or offering different benefits. Thus for example, Colleges might offer free or discounted applications for expedited processing, different deadlines, or more efficient processes imposing less burden on students, *e.g.*, where information is submitted subject to verification only after the admission decision or where the writing requirement is met by a personal statement or previously prepared writing sample that is uploaded for review.

184. The anticompetitive effects of the Common Application and its Challenged Restraints are further exacerbated by the fact that it relies on largely mandatory restrictions (which are heavily policed) as opposed to voluntary standards, thereby giving each of the horizontal competitors no choice but to comply or risk expulsion through Common Application's aggressive auditing and policing activities. And, for many Colleges, the "choice" of not belonging to the Common Application is simply no "choice" at all.

185. While some limited number of Challenged Restraints may relate to its "holistic admissions" mission, Common Application cannot have it both ways: It could be a trade association promoting and facilitating holistic admissions, through advocacy and voluntary actions. Or, it could be a limited commercial collaboration of competitors, with a limited purpose and objective. Having chosen the later, the touchstone for assessing the legitimacy of its actions remains the Core objectives for which there is a need for competitive collaboration and not a

77- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

broader goal that serves only to eliminate differentiation (e.g. by mandating "best" practices, which may otherwise differ even within the realm of holistic review.)

186.    Common Application's exclusivity-related restrictions implicate each of these concerns because they extend to an ever-wider array of members and non-Core services, and are imposed through varying degrees of compulsion. The significant price discounts offered for Exclusive I and Exclusive II members, its bundling activities, its exclusive relationship with Naviance and its other Challenged Restraints that seek to limit a College's ability to use alternative applications and application services have increased its market power and caused significant anticompetitive effects in each of the relevant markets. And, significantly, none of these restrictions is required for purposes of Common Application's "simplification" or "holistic review" missions. Rather they are aimed solely at ensuring growth and creating barriers to entry for rivals.

187.    Additionally, none of these restrictions is necessary to achieve the procompetitive benefits of the network: The benefit of the network is access and all such legitimate benefits are obtained merely by virtue of the student's and College's initial participation in Common Application. As evidenced by its repeated introduction of systems with greater and greater capacity, this competitor collaboration had already achieved the economies of scale necessary to compete. As such, additional growth cannot serve any legitimate objective on its own. And, while providing the student the *ability* to submit additional applications through the Common Application may be beneficial, and providing the College the *opportunity* to entice the student by accepting the Common Application may also provide some benefits, *compelling the student* to submit additional applications solely through the Common Application by eliminating other choices that Colleges may offer in a free market, and *preventing Colleges* from offering such competitive applications with different features or benefits, including lowered pricing, are clear anticompetitive consequences that are not necessary to any legitimate objective.

78-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

188.    Here, Common Application has successfully entered into explicit exclusivity agreements, such that an estimated approximately 50-60% of the applications it processes are those of its exclusive users. Through these agreements, member Colleges agree not to give their Online College Application Processing business to any of Common Application's competitors, including CollegeNET, even though they would not choose Common Application as their exclusive provider of these services in an efficient, competitive market. While Colleges could theoretically choose another provider in new year, this is not a realistic option: High switching costs limit a College's ability to quickly (and economically) move to an alternative provider. And, the cost of switching is even higher due to the resulting artificial drop in selectivity ratings which alone makes it virtually impossible for any College to leave.

189.    Common Application's membership structure further limits the ability of even non-exclusive members to use rival providers. The penalty for choosing non-exclusivity is steep. As the *Examiner* reported, "For Harvard University, which has consistently used the Universal College Application (UCA) along with the Common Application, additional fees to maintain competition in the industry—not to mention provide backup in case of crashes—may reach close to $70,000."[35] Any non-exclusive member is thus faced not only with the standard up-front fees and per-application fees charged by a competing provider, but also the "penalty" extracted by Common Application. Having paid this fee, all that many Colleges are able to do to retain even a modest level of differentiation is to use their existing SIS system. And as Common Application's equal treatment rule limits what Colleges can do even within these forms, there is little incentive to develop more robust applications using third-party providers.

---

[35] Nancy Griesemer, *The Common App Will Retain Controversial Pricing Structure for Next Year*, Examiner, March 23, 2014, *available at* http://www.examiner.com/article/the-common-app-will-retain-controversial-pricing-structure-for-next-year.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

190.    Additionally, through the Challenged Restraints, Common Application and its members have increasingly limited member Colleges' ability and incentive to use rival providers of application processing services, to the detriment of competition in each of the relevant markets, thus harming Colleges, students, and application service providers such as CollegeNET. By bundling services, Common Application has reduced member Colleges' freedom of choice, increased homogenization and limited or eliminated their member Colleges' ability to use third-party providers such as CollegeNET. Whereas previously members had the freedom to license the Core service data to third-party application providers and offer an independent application experience, that opportunity has been eliminated. By imposing the equal treatment provisions on all members, Common Application has reduced incentives to use competing providers. Similarly, by reducing members' ability to differentiate, Common Application has reduced any incentive and in many cases any opportunity to do so. These provisions have combined to create significant barriers to entry and impair rivals' ability to compete and have contributed to Common Application's market power, all to the direct and immediate harm of CollegeNET.

191.    Together these restrictions have had a significant anticompetitive effect on the Online College Application Processing Market. In the absence of the Challenged Restraints, each College would make its own independent decision about which provider offered the highest quality and/or lowest cost services. The Colleges would compete with one another in the market to purchase these services and, in turn, to offer them to applicants in order to attract applicants to their institution. Instead, the Colleges have agreed not to compete to offer the highest-quality product to applicants and, in turn, not to compete to buy the highest-quality product. By agreeing to offer only the Common Application (or similar-quality, same- or higher-priced applications), and agreeing to penalize those members who purchase these services from rival providers, Common Application members have limited and foreclosed Common Application's competitors—including CollegeNET—from the market for Online College Application

80-  COMPLAINT

Processing. This has impeded innovation in those markets and increased quality-adjusted prices. Common Application's ability to force its customers to take uncompetitive, inferior products would not survive in an efficient and competitive marketplace, and its ability to raise and maintain the prices of those uncompetitive products above levels that would be established in an efficient and competitive market would disappear.

192.    Common Application and its horizontal member competitors have further caused an anticompetitive impact by virtue of the illegal aspects of its venture including expanding into non-Core services and spuriously creating market misperceptions and higher selectivity ratings for its members to the detriment of non-member Colleges.

193.    The Challenged Restraints are not ancillary to or reasonably necessary to carry out the organization's official mission of "serv[ing] students by facilitating and simplifying the college application process." As the foregoing discussion makes clear, the inferior product that resulted from members' collusion to suppress competition for applicants has not "simplified" or "facilitated" the college application process. To the contrary, it has made the process more difficult, complicated, and stressful for students than it would be in a competitive market. The members' agreement not to compete has stifled innovation and increased quality-adjusted prices and is not ancillary or reasonably necessary to the organization's more recently stated goal of "promoting holistic admission as a path to college access." Requiring members to use the Common Application as their Online College Application Processing provider in no way promotes holistic admission. Common Application could serve that mission much better if it abandoned its efforts to force all members to use the singular Common Application and instead promoted holistic and diverse evaluation in a voluntary (not mandatory) manner.

194.    The effect of Common Application's and its co-conspirators' anticompetitive conduct has been to cause injury to CollegeNET, who has been prevented or significantly limited in its ability to offer its customized application processing services to Colleges. Such harm to

81-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

CollegeNET and harms to competition are the types of injury that antitrust laws were designed to prevent and those harms flow directly from that which makes Common Application's conduct unlawful.

195.    Common Application has engaged in a continuing and continuous course of conduct with respect to the acts, practices, and conduct as alleged herein in violation of United States law and has injured competition and CollegeNET in an amount to be proven at trial and has caused and will continue to cause injury to competition, consumers, the public interest, and the business and property of CollegeNET unless permanently enjoined.

196.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### HORIZONTAL RESTRAINT OF TRADE IN THE STUDENT APPLICATION/COLLEGE ADMISSIONS MARKETS: VIOLATION OF SHERMAN ACT SECTION 1

197.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 196 above.

198.    The agreements among Common Application members and Common Application relating to the membership and operation of the Common Application, including its scope of services and the Challenged Restraints, constitute contracts, combinations, and conspiracies to insulate competitors from competition with one another for applications and student-customers. By agreeing not to compete for applications and student-customers—by agreeing, *inter alia*, not to compete to offer the highest-quality, highest-functioning, easiest to use, most technically sophisticated online application systems and payment processing services to student applicants, to offer lower-priced or expedited alternatives to the Common App (or, in the case of exclusive

82-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

members, to offer any alternatives at all), to advertise/market their degree programs within their applications, to offer the most information about their institution so that the applicant can determine whether she is a good match for the institution, to ask different questions in their applications that reveal the character of their institutions, to offer applicants options within their applications such as uploads, alternative file-type submissions, and the ability to customize or tailor their applications to each institution to which they are applying—Common Application members, and the subset comprised of Elite Colleges, by and through their agreements with Common Application, have restrained competition in the Student Application and College Admissions Markets, and the Elite Student Application and Elite College Admissions Markets, respectively.

199.    These contracts, combinations, and conspiracies were and are *per se* unreasonable because the Challenged Restraints were and are not a necessary consequence of, and not reasonably ancillary to, Common Application's official mission and purpose of simplifying the college application process or its more recently stated mission of promoting holistic review of applicants. Indeed, Common Application and its members adopted the Challenged Restraints long after it became a viable membership organization and long after students began using its Standard College Application Data Service. Not only are these restraints not reasonably necessary to accomplish Common Application's and its members' ostensible mission(s); they actually have *undermined* and continue to undermine the ostensible purpose of simplifying the college application process by making it harder, more frustrating, more time-consuming, and more expensive to apply to college.

200.    In the alternative, these contracts, combinations, and conspiracies are unreasonable under the rule of reason. Common Application members have monopoly power in the Student Application Market, the Elite Student Application Market, the College Admissions Market, and the Elite College Admissions Market. The Challenged Restraints threaten to reduce

83-  COMMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

competition in these markets, thereby threatening to reduce marketwide output (quality, innovation, and product differentiation) and increase marketwide quality-adjusted prices, and they have in fact already severely reduced competition, reduced marketwide output, and increased marketwide prices. As a result of the Challenged Restraints, student applicants and Colleges have no choice but to take an inferior product with flaws that would never be tolerated in a competitive market, innovation and product differentiation have been severely impeded, and student applicants now pay *more* to apply for college admission than they used to. These Restraints are not justified by any procompetitive purpose or offsetting procompetitive effects. Any purported procompetitive justifications or effects of these Restraints are outweighed by their anticompetitive effects.

201.    Common Application could serve—and could historically have served—its mission just as well if it had continued to offer its members—with no strings attached—use of the Common Application's Standard College Application Data Service to collect applicants' basic information, which members could have licensed from Common Application for a small fee. This is and would have been the least restrictive way to achieve Common Application and its members' mission of simplifying the application process, while also allowing free competition among members for students/applications, free competition to buy Online College Application Processing services, and free competition against Common Application and Slideroom.com for members' business.

202.    By entering into, renewing, and enforcing the contracts, combinations, and conspiracies with its members described above, Common Application has violated and continued to violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

203.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15.

84-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

By restricting competition among members to provide, *inter alia*, high-quality, innovative, differentiated online application forms and processing services to student applicants, the Challenged Restraints have restricted competition among members to purchase those services from providers and have prohibited or inhibited them from purchasing those services from providers other than Common Application, including CollegeNET, thereby preventing CollegeNET from competing with Common Application to provide those services and from earning the profits it would have earned but for Common Application's unlawful conduct.

204.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

205.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

### SECOND CLAIM FOR RELIEF
### HORIZONTAL RESTRAINT OF TRADE IN THE ONLINE COLLEGE APPLICATION PROCESSING MARKETS:
### VIOLATION OF SHERMAN ACT SECTION 1

206.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 205 above.

207.    The agreements among Common Application members and Common Application to abide by and enforce the Challenged Restraints constitute contracts, combinations, and conspiracies among competitors to insulate themselves from competition with one another to buy Online College Application Processing services. Rather than compete in bidding for these products, Common Application members, by and through their agreements with Common Application, have jointly agreed on one pricing scheme that all of them pay for the same product from the same provider (Common Application), thereby restraining purchasing competition

85-  COMPLAINT

43081-0018/LEGAL120489324.13

among them in the Online College Application Processing Market and submarkets and fixing the price and output of those products.

208.    These contracts, combinations, and conspiracies were and are *per se* unreasonable because they are naked restraints on competition among competitors and naked agreements to fix the price and output of Online College Application Processing services. Common Application is a joint purchasing vehicle used by its members solely or primarily to restrict output (quality, innovation, and product differentiation) and increase quality-adjusted prices in the downstream Student Application and College Admissions Markets—not to achieve efficiency gains in the Online College Application Processing Market and submarkets. Moreover, Common Application members have substantial market power in all of these markets—the Student Application, College Admissions, and Online College Application Processing Markets and submarkets—and there is direct evidence that their abuse of their market power in these markets has in fact restricted output (quality, innovation, and product differentiation) and increased quality-adjusted prices in these markets.

209.    In the alternative, these contracts, combinations, and conspiracies are unreasonable under the rule of reason. Common Application members have monopsony power in the Online College Application Processing Markets and submarkets. Their agreements, by and through Common Application, to fix the prices and output of the products in those markets threaten to reduce competition in those markets, thereby threatening to reduce marketwide output (quality, innovation, and product differentiation), and they have in fact already severely reduced competition and marketwide output. As a result of these agreements, marketwide Online College Application Processing output (quality, innovation, and product differentiation) has been artificially restricted below what would exist in a competitive market. Moreover, these anticompetitive effects in the Online College Application Processing Markets have not been

86-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

offset by any procompetitive, output-expanding or price-reducing effects in the Student

Application and College Admissions Markets.

210.    By entering into, renewing, and enforcing the contracts, combinations, and

conspiracies with its members described above, Common Application has violated and continued

to violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

211.    As a direct and proximate result of the unlawful conduct of Common Application

in furtherance of the violations alleged, CollegeNET has been injured in its business and

property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15.

By agreeing with its members to fix the prices they pay for Online College Application

Processing services, to fix the marketwide output (quality, innovation, and product

differentiation) of those services, and to prohibit or inhibit members from purchasing those

services from providers other than Common Application, including CollegeNET, Common

Application has artificially suppressed CollegeNET's output and profits, and has prevented

CollegeNET from competing with Common Application to provide those services and from

earning the profits it would have earned but for Common Application's unlawful conduct.

212.    CollegeNET also is entitled to recover from Common Application the cost of suit,

including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

213.    CollegeNET will suffer irreparable injury and loss of its business and property,

for which there is no adequate remedy at law, unless the Court enjoins Common Application

from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus

entitled to injunctive relief against Common Application.

### THIRD CLAIM FOR RELIEF
### CONCERTED REFUSAL TO DEAL/GROUP BOYCOTT:
### VIOLATION OF SHERMAN ACT SECTION 1

214.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 213

above.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

215.    Common Application, acting through its members, has engaged in and continues to engage in a concerted refusal to deal in violation of Section 1 of the Sherman Act. Competing Colleges that comprise the Common Application have agreed not to purchase Online College Application Processing services from CollegeNET, and have implemented a pricing structure that penalizes those who purchase such services from CollegeNET. Common Application's Challenged Restraints that prohibit or penalize members from purchasing such services from CollegeNET constitute explicit concerted agreements to boycott CollegeNET.

216.    Common Application's member institutions have created a horizontal restraint— an agreement among competitors on the way in which they will compete with one another, unreasonably restraining trade. A substantial amount of interstate commerce in Online College Application Processing services is affected by Common Application's ban on and penalties for purchasing from rival providers, including CollegeNET.

217.    Common Application possesses market power in the Online College Application Processing Markets. Its group boycott has blocked CollegeNET from competing to provide Online College Application Processing services. Common Application's actions have had a substantial adverse effect on competition in those markets. Common Application's actions are not reasonably necessary to achieve any procompetitive justifications.

218.    By entering into, renewing, and enforcing the contracts, combinations, and conspiracies with its members described above, Common Application has violated and continued to violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

219.    As a direct and proximate result of Common Application's illegal group boycott, students and competition in the Student Application, College Admissions, and Online College Application Processing Markets have been injured, and CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

U.S.C. § 15. Common Application has prevented CollegeNET from competing with Common Application to provide Online College Application Processing services.

220.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

221.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

**FOURTH CLAIM FOR RELIEF**
**EXCLUSIVE DEALING/DE FACTO EXCLUSIVE DEALING:**
**VIOLATION OF SHERMAN ACT SECTION 1 AND 2**

222.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 221 above.

223.    Common Application has monopoly power in the Online College Application Processing Markets and submarkets.

224.    Common Application has used its market and monopoly power to coerce Colleges into entering into exclusivity agreements with it pursuant to which those members agree not to buy Online College Application Processing services, or to buy only limited quantities of such services, from Common Application's competitors, including CollegeNET. These exclusivity agreements, together with other restrictions that limit the incentives and ability of members to use competing providers, take several forms as set forth above, including but not limited to:

- First, all Common Application members agree to charge the same or higher application fee to an applicant applying through an alternative application (developed, hosted, and processed by a rival provider) as they charge to apply through the Common Application. This is effectively an agreement not to

89-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

patronize rivals that offer such alternative applications that members wish to use to attract certain applicants with reduced or waived application fees.

- Second, all Common Application members agree not to promote the use of an alternative application over the use of the Common Application, including by posting more prominent links to the alternative application and offering incentives or benefits to applicants using the alternative application. This is effectively an agreement not to patronize rivals that offer alternative applications that are superior to the Common Application (*e.g.*, are of higher quality, are easier to use, offer greater benefits to the College, etc.).

- Third, Exclusive I and Exclusive II members agree not to purchase Online College Application Processing services from rival providers.

- Fourth, Exclusive II members agree not to use rival providers for development, hosting, or processing of their transfer applications.

- Fifth, all Common Application members agree not to use a rival provider to develop, host, and process their Institutional Supplements (*i.e.*, the non-common parts of their application forms), early decision agreements, evaluation forms, transcripts, payments, and fee waiver forms submitted to them by Common Applicants.

- Sixth, Non-Exclusive members are penalized for retaining the right to offer a competing application.

225.    By entering into these agreements, Common Application has foreclosed a substantial amount of competition in the Online College Application Processing Market and submarkets, and is likely to further foreclose a substantial amount of competition in those markets in the future. A substantial portion of member Colleges are Exclusive I or II members, representing approximately 50-60% of all of the applications processed by Common Application.

90-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

Overall, Common Application processes more than 60% of all College applications. While there is some ability for CollegeNET to attract non-exclusive schools, this opportunity is limited. And, all of the member Colleges are locked into the Common Application due to the high switching costs and barriers created by Common Application's control of the Standard College Application Data Market, including the precipitous drop in ratings that any member College who leaves the Common Application would experience. Outside the Common Application, these same barriers to entry prevent CollegeNET from attracting and retaining new College customers. CollegeNET does not have the ability to recreate another Standard College Application Data service. AOL has tried and largely failed, Colleges and students have expressed their desire for a single source of such services and Common Application has modified its license agreements to limit competitors' ability to mitigate Common Application's hold on the market. As a result, CollegeNET has been foreclosed from a substantial portion of the market and that foreclosure will only increase. In the past four years alone, Common Application's membership has grown 35%, and with an average growth rate of 8-10%, there is every likelihood that Common Application will soon capture virtually the entire market.

226.    By entering into these agreements, Common Application has excluded CollegeNET from the market for providing Online College Application Processing Services, thereby having a direct adverse effect on competition by preventing CollegeNET from competing with Common Application to provide those services. By such acts, practices, and conduct, Common Application has restrained trade in the relevant markets for those services.

227.    Common Application's conduct has no procompetitive benefit or justification. As set forth above, the anticompetitive effects of its behavior outweigh any purported pro-competitive justifications. The ultimate effect of Common Application's exclusive dealing agreements with its members is to suppress competition in the Online College Application

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

Processing Market and submarkets, to reduce the marketwide output (quality) of those services, to impede innovation in those services, and to increase their quality-adjusted prices.

228.    Through its anticompetitive conduct as alleged above, Common Application specifically intended and intends to maintain and expand its monopoly power in the Online College Application Processing Market and its submarkets.

229.    Common Application's anticompetitive scheme has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success and thus a dangerously high probability of reducing output (quality), impeding innovation, and increasing quality-adjusted prices in these markets.

230.    By its acts, practices, and conduct, Common Application has engaged in a course of conduct that amounts to exclusive dealing in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

231.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from competing with Common Application to provide Online College Application Processing services and from earning the profits it would have earned but for Common Application's unlawful conduct.

232.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

233.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

**FIFTH CLAIM FOR RELIEF**
**TYING**
**VIOLATION OF SHERMAN ACT SECTION 1 AND 2**

234.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 233 above.

235.    Standard College Application Data Services are a distinct product/service from Online College Application Processing services. The markets for the latter are distinct from the market for the former, as evidenced by the fact that not all Colleges that purchase Online College Application Processing services also buy Standard College Application Data Services. For example, as of the 2014-2015 school year, only approximately 570 of the approximately 1,500 U.S. Colleges will purchase Standard College Application Data Services (from Common Application or Universal College Application). The rest frequently purchase Online College Application Processing services without purchasing Standard College Application Data Services.

236.    Standard College Application Data Services on one hand, and Online College Application Processing services on the other, do not operate better when bundled by Common Application than when linked by the end user or a rival provider of the latter services. For example, an institution buying Standard College Application Data Services from Common Application can just as easily, and with no reduction in satisfaction, bundle those services with (*i.e.*, use those services together with) a rival provider's Online College Application Processing services, as Common Application can bundle those two sets of services together itself.

237.    It is physically and economically possible to separate the purchase of Standard College Application Data Services from Online College Application Processing Services. Members made precisely such separate purchases before Common Application introduced its own Online College Application Processing services. For example, before Common Application introduced its Institutional Supplement service (and bundled that service with its Standard College Application Data Service), members purchased Standard College Application Data Services from Common Application and Institutional Supplement services from other providers.

93-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

238.    Common Application possesses substantial economic power in the Standard College Application Data Services Market.

239.    Common Application ties the purchase of its Standard College Application Data Service to the purchase of its Online College Application Processing services. Common Application's customers purchase these latter services from Common Application not because they prefer Common Application's services over those of competitors' but only because Common Application requires them to purchase those services from Common Application in order to obtain its Standard College Application Data Service, either at all or on favorable terms.

240.    The tie has the potential to foreclose—and has foreclosed—rival suppliers of Online College Application Processing services in a way that has impaired the vitality of competition to offer these services. Indeed, the tie has harmed competition for these services, reduced the marketwide output (quality) of these services, impeded innovation in these services, and increased marketwide quality-adjusted prices.

241.    A not insubstantial volume of commerce is affected. Common Application collected $12.8 million in revenue in 2011, in large part from its Online College Application Processing services it offered and sold to members. But for the tie, most if not all of that business would have gone to Common Application's competitors, to the benefit not only of those providers but also of Colleges and applicants.

242.    Accordingly, Common Application's tie is *per se* unreasonable.

243.    In the alternative, Common Application's tie is unreasonable under the rule of reason. Common Application has monopoly power in the market for Standard College Application Data Services and it has used that power to maintain and expand a monopoly in the market for Online College Application Processing services. The tie threatens to reduce competition in the tied product markets and thereby to reduce marketwide output (quality), impede innovation, and increase marketwide quality-adjusted prices. The tie has in fact already

94- COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

shown itself to reduce marketwide output and innovation by severely diminishing the quality of the Online College Application Processing services offered in the market and increasing the quality-adjusted price of those services. The tie forecloses Common Application's rivals, including CollegeNET, from competing with Common Application to offer these services at a lower quality-adjusted price and/or to innovate those services. The tie is not justified by any procompetitive purpose or offsetting procompetitive effects.

244.    By tying the purchase of its Standard College Application Data Service to the purchase of its Online College Application Processing services over the past approximately 10-15 years and continuing today, Common Application has violated and continues to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

245.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from competing with Common Application to provide Online College Application Processing services to members and from earning the profits it would have earned but for Common Application's unlawful conduct.

246.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

247.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

**SIXTH CLAIM FOR RELIEF**
**MONOPOLIZATION OF THE ONLINE PROCESSING MARKETS:**
**VIOLATION OF SHERMAN ACT SECTION 2**

248.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 247 above.

249.    Through an anticompetitive scheme to monopolize the markets, including but not limited to the Challenged Restraints, Common Application has obtained and is seeking to maintain monopoly power in the Online College Application Processing Market and its submarkets.

250.    By imposing the Challenged Restraints on its members, Common Application has engaged in a monopoly scheme to exclude competition—not by outcompeting its rivals on the merits, but rather by abusing its monopoly power to coerce Colleges into shifting their Online College Application Processing business away from Common Application's rivals and to the Common Application. The anticompetitive acts Common Application has undertaken in furtherance of this scheme to monopolize include without limitation:

- Requiring members to charge the same or higher application fee to an applicant applying through an alternative application (developed, hosted, and processed by a rival provider) as they charge to apply through the Common Application.

- Prohibiting members from promoting the use of an alternative application over the use of the Common Application, including by posting more prominent links to the alternative application and offering incentives or benefits to applicants using the alternative application (the "equal treatment" requirement).

- Charging penalty prices to members that purchase Online College Application Processing services from rival providers.

96-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

- Charging penalty prices to members that use rival providers for development, hosting, or processing of their transfer applications.

- Systematically converting optional products and services offered by Common Application into mandatory products and services members were required to purchase from Common Application (or penalized for not purchasing from Common Application), including Institutional Supplements, early decision agreements, evaluation forms, transcripts, payments, and fee waivers.

- Revoking members' right to license from Common Application and/or sublicense to third-party vendors the right to use and process Common Application's forms.

- Limiting a member Colleges ability to differentiate itself in Institutional Supplements and other ancillary products.

251. Common Application's anticompetitive conduct has had a direct adverse effect on competition. The requirement that members charge the same or higher application fee to an applicant applying through an alternative application effectively prohibits members that wish to attract certain applicants with reduced or waived application fees from giving alternative application business to rivals, thus preventing those rivals, including CollegeNET, from competing with Common Application to offer these innovative application forms to Colleges. The "equal treatment" requirement effectively prohibits members that wish to offer alternative applications that are superior to the Common Application (*e.g.*, are of higher quality, are easier to use, offer greater benefits to the College, etc.) from giving such alternative application business to rivals, thus preventing those rivals, including CollegeNET, from competing with Common Application to offer these innovative application forms to Colleges. The price penalty provisions coerce members into not giving alternative application business to rivals, thus preventing those rivals, including CollegeNET, from competing with Common Application to

97-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

offer Online College Application Processing services to Colleges. By systematically forcing members that wanted to purchase/license only Common Application's Standard College Application Data Service to also buy from it all of the other services it added over time— Institutional Supplement, early decision agreement, evaluation form, transcript, payment, and fee waiver services—Common Application prevented its members from purchasing those services from rival providers, thus preventing those rivals, including CollegeNET, from competing with Common Application to offer those services. By such acts, practices, and conduct, Common Application has restrained trade in, and willfully maintained or expanded its monopoly power in, the Online College Application Processing Markets.

252.    Common Application's conduct has no procompetitive benefit or justification. The anticompetitive effects of its behavior outweigh any purported pro-competitive justifications. The ultimate effect of Common Application's monopolization of these markets is to reduce the marketwide output (quality, innovation, and product differentiation) and increase quality-adjusted prices.

253.    By its acts, practices, and conduct, Common Application has engaged in a course of conduct that amounts to monopolization and/or unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

254.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from competing with Common Application to provide Online College Application Processing services to members and from earning the profits it would have earned but for Common Application's unlawful conduct.

255.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

98-  COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

43081-0018/LEGAL120489324.13

256.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

**SEVENTH CLAIM FOR RELIEF**
**ATTEMPTED MONOPOLIZATION OF THE ONLINE ADMISSIONS PROCESSING**
**MARKETS:**
**VIOLATION OF SHERMAN ACT SECTION 2**

257.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 256 above.

258.    Common Application has market power in the Online College Application Processing Market and its submarkets and has a dangerous probability of obtaining monopoly power.

259.    Through its anticompetitive conduct as alleged above, Common Application specifically intended and intends to maintain and expand its monopoly power in the Online College Application Processing Market and its submarkets.

260.    Common Application's anticompetitive scheme has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success and thus a dangerously high probability of reducing output (quality), impeding innovation, and increasing quality-adjusted prices in these markets.

261.    Common Application's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

262.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from competing with Common Application to provide Online College

99-   COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone: 503.727.2000
Fax: 503.727.2222

43081-0018/LEGAL120489324.13

Application Processing services to members and from earning the profits it would have earned but for Common Application's unlawful conduct.

263.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

264.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

## EIGHTH CLAIM FOR RELIEF
## CONSPIRACY TO MONOPOLIZE THE ONLINE APPLICATION PROCESSING MARKETS:
## VIOLATION OF SHERMAN ACT SECTION 2

265.    CollegeNET re-alleges the allegations contained in paragraphs 1 through 264 above.

266.    Through an anticompetitive scheme to monopolize the markets, including but not limited to the Challenged Restraints, Common Application has conspired to monopolize the Online College Application Processing Market and submarkets.

267.    Common Application's agreements with its members to enforce and police the Challenged Restraints, as alleged above, constitute a combination or conspiracy to monopolize these markets.

268.    Through these agreements, Common Application specifically intended and intends to maintain and expand its monopoly power in the Online College Application Processing Market and submarkets. Common Application has monopoly power in these markets, or has a dangerous probability of success.

269.    Common Application's anticompetitive conduct as alleged above constitute overt acts in furtherance of its conspiracy to monopolize.

100-COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

270.    Common Application's conduct constitutes conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

271.    As a direct and proximate result of the unlawful conduct of Common Application in furtherance of the violations alleged, CollegeNET has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from competing with Common Application to provide Online College Application Processing services to members and from earning the profits it would have earned but for Common Application's unlawful conduct.

272.    CollegeNET also is entitled to recover from Common Application the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

273.    CollegeNET will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Common Application from its unlawful conduct and continuing violations of the antitrust laws. CollegeNET is thus entitled to injunctive relief against Common Application.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff CollegeNET prays for the following relief:

A.    Adjudge Common Application to have violated and to be in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

B.    Enter judgment for CollegeNET against Common Application for three times the amount of damages sustained by CollegeNET as a result of Common Application's unlawful behavior, together with the expenses of litigation and cost of this action, including a reasonable attorney's fee, and such other relief as appropriate.

C.    Pursuant to Federal Rule of Civil Procedure 65 and 15 U.S.C. § 26, enjoin Common Application, enjoin Common Application and its members from engaging in further anticompetitive and unlawful conduct including but not limited to directly or indirectly adopting,

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

disseminating, publishing, or seeking adherence to any code of ethics, rule, bylaw, resolution, policy, guideline, standard, manual or policy statement that has the purpose or effect of enforcing, mandating or implementing any of the Challenged Restraints.

      D.      Further pursuant to Rule 65 and 15 U.S.C. § 26, limit the Common Application's scope of permissible conduct to the legitimate needs of this competitor collaboration or, in the alternative, order Common Application to offer the Standard College Application Data Service to its members, un-tied to any of its Online College Application Processing services, for a standalone price that reflects the cost of providing such Standard College Application Data Service.

      E.      Grant such other equitable relief, including disgorgement of all unlawfully obtained net revenues that the Court finds just and proper to address and to prevent recurrence of Common Application's unlawful conduct.

      F.      Grant such other and further equitable or legal relief as the Court deems just and proper.

*[The remainder of this page is intentionally left blank.]*

102-COMPLAINT

**Perkins Coie** LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 972094128
Phone:  503.727.2000
Fax:  503.727.2222

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1) and Local Rule 38-1, Plaintiff CollegeNET demands a jury trial on all issues triable to a jury.

Respectfully Submitted,

DATED: May 8, 2014

**PERKINS COIE LLP**

By:/s/ Sarah J. Crooks
_____
    Sarah J. Crooks, OSB No. 971512
    SCrooks@perkinscoie.com
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Susan E. Foster (*pro hac vice* pending)
SFoster@perkinscoie.com
Catherine S. Simonsen (*pro hac vice* pending)
CSimonsen@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff CollegeNET, Inc.

103-COMPLAINT