**Thomas M. Triplett**, OSB #651256
Email: ttriplett@schwabe.com
**Richard K. Hansen,** OSB # 832231
Email: rhansen@schwabe.com
**Román D. Hernández**, OSB # 011730
Email: rhernandez@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, Oregon 97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

**Thane D. Scott**, Pro Hac Vice
Email: thane.scott@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, Massachusetts 02110-1726
Telephone: 617.951.8000
Facsimile: 617.345.5005

**Frank M. Hinman**, Pro Hac Vice
Email: frank.hinman@morganlewis.com
**Sujal J. Shah**, Pro Hac Vice
Email: sujal.shah@morganlewis.com
**Susan J. Welch**, Pro Hac Vice
Email: susan.welch@morganlewis.com
**Dominique Malata Perez**, Pro Hac Vice
Email: dominique.perez@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286

Attorneys for Defendant The Common Application, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **COLLEGENET, INC.**, a Delaware corporation | No. 3:14-cv-00771-HZ |
| Plaintiff, | **DEFENDANT THE COMMON APPLICATION, INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW** |
| v. | |
| **THE COMMON APPLICATION, INC.**, a Virginia corporation | |
| Defendant. | ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  FACTS ................................................................................................................. 4

    A.   The Parties ................................................................................................ 4

    B.   Alleged Competitive Effects Of TCA's Challenged Conduct .............................. 6

III. LEGAL STANDARD ........................................................................................... 8

    A.   Rule 12 ..................................................................................................... 8

    B.   Foundational Antitrust Principles ............................................................ 9

        1.   Consumer Welfare Is the Touchstone of Antitrust Law ......................... 10

        2.   Antitrust Laws Protect Competition, not Competitors ........................... 11

        3.   Consumer Welfare Is Enhanced, not Injured, by Practices that Maximize Output and Minimize Price ....................................................... 12

IV.  THE FAC SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ........... 14

    A.   CollegeNET Admits Lower Prices And Higher Output, So It Cannot Allege Harm To Competition As A Matter of Law ............................................. 14

    B.   The Two Cornerstones Of CollegeNET's FAC Do Not Make Economic Sense and Fail To Salvage Its Case ............................................................. 17

        1.   CollegeNET's Fabricated Concept of "Net Output" Is an Antitrust Non-Starter ....................................................................... 17

        2.   CollegeNET Cannot Allege TCA's Lower Prices Are Anticompetitive Because Its Buyers' Cartel Claim Is Unsupported as a Matter of Law ....................................................................... 20

    C.   CollegeNET's Challenged Restraints Do Not Injure Competition Or Consumer Welfare As A Matter of Law .................................................... 24

        1.   The "Exclusivity Restrictions" Are Per Se Legal Discounts and, in Any Event, Do Not Foreclose a Substantial Share of The Market ......... 24

        2.   CollegeNET Fails to State a Claim Based on the Alleged "Tying and Bundling/Forced Purchase Requirements" ................................... 27

        3.   The "Equal Treatment" Requirement Is Not Exclusionary or a Group Boycott .................................................................................. 30

        4.   TCA's "Uniformity Requirements" Are Procompetitive as a Matter of Law ....................................................................................... 31

V.   CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
 141 F.3d 947 (9th Cir. 1998) ................................................................18

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
 592 F.3d 991 (9th Cir. 2010) ...........................................................24, 26

*Am. Ad Mgmt., Inc. v. GTE Co. of Cal.*,
 190 F.3d 1051 (9th Cir. 1999) ..................................................... *passim*

*Apple, Inc. v. Psystar Corp.*,
 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................8

*Atl. Richfield Co. v. USA Petroleum Co.*,
 495 U.S. 328 (1990)...................................................................... *passim*

*Baum Research & Dev. Co. v. Hillerich & Bradsby Co.*,
 31 F. Supp. 2d 1016 (E.D. Mich. 1998).................................................33

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)..................................................................8, 9, 26

*Blades v. Monsanto Co.*,
 400 F.3d 562 (8th Cir. 2005) ................................................................19

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
 441 U.S. 1 (1979)..................................................................13, 16

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
 509 U.S. 209 (1993).................................................................... *passim*

*Cal. ex rel. Harris v. Safeway, Inc.*,
 651 F.3d 1118 (9th Cir. 2011) ..............................................................10

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
 532 F.3d 1111 (10th Cir. 2008) ................................................20, 21, 22

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*,
 810 F.2d 869 (9th Cir. 1987) ................................................................31

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
 851 F.2d 478 (1st Cir. 1988)................................................................32

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

*Collins v. Associated Pathologists, Ltd.*,
   844 F.2d 473 (7th Cir. 1988) .........................................................................29

*ECOS Elecs. Corp. v. Underwriters Labs.*,
   743 F.2d 498 (7th Cir. 1984), *cert. denied*, 469 U.S. 1210 (1985) ................................ *passim*

*Epstein v. Wash. Energy Co.*,
   83 F.3d 1136 (9th Cir. 1996) ...........................................................................8

*Expedite, Inc. v. Plus, Bags, Cars & Serv, LLC*,
   2011 WL 6399460 (D. Or.) ....................................................................2, 12, 16

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) .........................................................................32

*Handicomp, Inc. v. U.S. Golf Ass'n*,
   2000 WL 426245 (3d Cir.) ...........................................................................30

*Hirsh v. Martindale-Hubbell, Inc.*,
   674 F.2d 1343 (9th Cir. 1982) ...............................................................10, 27, 28

*Ill. Tool Works Inc. v. Indep. Ink., Inc.*,
   547 U.S. 28 (2006) ...................................................................................29

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984), *abrogated on other grounds*, *Ill. Tool Works Inc. v. Indep.*
   *Ink., Inc.*, 547 U.S. 28 (2006) .................................................................25, 27

*Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
   783 F. Supp. 952 (D. Md. 1992), *aff'd*, 993 F.2d 1538 (4th Cir. 1993) ...............................28

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ...............................................................................10, 12

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ..................................................................................22

*Nelson v. Monroe Reg'l Med. Ctr.*,
   925 F.2d 1555 (7th Cir. 1991) .........................................................................12

*NicSand, Inc. v. 3M Co.*,
   507 F.3d 442 (6th Cir. 2007) .........................................................................25

*Oil Exp. Nat., Inc. v. D'Alessandro*,
   1998 WL 214727 (N.D. Ill.) ..........................................................................21

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ..............................................................13, 16, 25, 26

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
   629 F.3d 697 (7th Cir. 2011) ............................................................20

*Parrino v. FHP, Inc.*,
   146 F.3d 699 (9th Cir. 1998), *superseded by statute on other grounds as
   stated in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006)............................9

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 1677521 (N.D. Cal.) ............................................................26

*Pool Water Prods. v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ............................................................12, 13, 16

*Princo Corp. v. ITC*,
   616 F.3d 1318 (Fed. Cir. 2010) (en banc)............................................................32, 33

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................11, 12, 13

*Reudy v. Clear Channel Outdoors, Inc.*,
   693 F. Supp. 2d 1091 (N.D. Cal. 2010), *aff'd sub nom. Reudy v. CBS Corp.*,
   430 F. App'x 568 (9th Cir. 2011) ............................................................*passim*

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008) ............................................................27, 29

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
   720 F. Supp. 1196 (W.D.N.C. 1989), *aff'd and remanded for further
   proceedings on counterclaims*, 912 F.2d 463 (4th Cir. 1990) ............................................................23

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001), *amended on other grounds,* 275 F.3d 1187 (9th
   Cir. 2001) ............................................................8, 9

*Stamatakis Indus. v. King*,
   965 F.2d 469 (7th Cir. 1992) ............................................................11, 12, 19, 21

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*,
   373 F.3d 57 (1st Cir. 2004)............................................................25, 26

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)............................................................24

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ............................................................8, 18, 22

*Triple M Roofing Corp. v. Tremco., Inc.*,
   753 F.2d 242 (2d Cir. 1985)............................................................12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................25

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ..............................................................................19

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ................................................................30

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) .......................................................................13, 20

*William O. Gilley Enters. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) .................................................2, 9, 18, 33

*Witt Co. v. Riso, Inc.*,
    948 F. Supp. 2d 1227 (D. Or. 2013) (Hernandez, J.) .......................8, 30

*Yang v. Dar Al-Handash Consultants*,
    250 Fed. Appx. 771 (9th Cir. 2007) ........................................................9

## Rules

Fed. R. Civ. P. 12 ...................................................................... *passim*

## Other Authorities

Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law (3d ed. 2008) ........................... *passim*

Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law (4th ed. 2013) ..................................10

Phillip Areeda and Donald F. Turner, *Predatory Pricing and Related Practices
    under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975) ..................................11, 19

Robert H. Bork, The Antitrust Paradox (1978) ...................................................................10, 11

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

## COMPLIANCE WITH LR 7-1

Pursuant to LR 7-1, counsel for Defendant The Common Application, Inc. certifies that a good faith effort to confer with Plaintiff's counsel concerning the issues raised in this motion was made prior to filing this motion, but the parties were unable to resolve the issues.

## MOTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), The Common Application ("TCA") respectfully moves this Court to dismiss CollegeNET's First Amended Complaint ("FAC") in its entirety. In support of this motion, TCA relies upon its Memorandum of Law, the pleadings and documents on file, and such oral argument and other matters that the Court may consider.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

## I.    INTRODUCTION

Stripped of its long-winded rhetoric, CollegeNET's FAC confirms that it seeks to turn the clock back to 1975, (FAC ¶ 144), and make it harder for students to submit, and colleges to process, applications – all so CollegeNET can compete with less effort. The FAC alleges that TCA, a non-profit association of non-profit colleges and universities, benefits both students and colleges by standardizing some aspects of the application process, thereby allowing more students to apply to more colleges more easily. That admitted stimulation of competition and expansion of output is antitrust's ultimate goal, and belies CollegeNET's assertion that TCA has somehow behaved anticompetitively, or that CollegeNET has suffered an antitrust injury because it would prefer to charge higher prices than colleges are willing to pay. *See id.* ¶¶ 150-51.

Not surprisingly given that backdrop, CollegeNET pleads itself out of court as a matter of fundamental antitrust law. Not only does the FAC fail to allege any facts suggesting an adverse effect on prices (higher) or output (lower) – by itself making CollegeNET's claims unique in the

history of antitrust cases – it alleges the opposite.  CollegeNET expressly alleges that, since the

advent of the supposed competitive restraints it challenges, prices have fallen and output risen.

The "Challenged Restraints" (*id.* ¶ 15), "enable members to spend below-competitive levels on

Online College Application Processing services without losing applicants" and "secure a boost in

members' applications." *Id.* ¶ 157(a) & (c).[1]  Those twin hallmarks of robust competition prove

that TCA's innovative service is pro-consumer and pro-competitive as a matter of law – more

colleges choose to accept, and more students to use, the Common Application.  CollegeNET's

plea for protection from competition is antithetical to the antitrust laws it purports to invoke, and

should be dismissed.  *See*, *e.g.*, *Expedite, Inc. v. Plus, Bags, Cars & Serv., LLC*, 2011 WL

6399460, at *5 (D. Or.), report and recommendation adopted, 2011 WL 6372320 (D. Or.)

(Hernandez, J.) (dismissing monopolization claim without leave to amend where plaintiff did not

allege that consumers suffer from a lack of services in the relevant market or that defendant's

actions caused the price of those services to increase); *see also Am. Ad Mgmt., Inc. v. GTE Co. of

Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (the antitrust laws exist for the protection of

"competition, not competitors."); Part IV.A, below.

    CollegeNET's attempts to avoid that fundamental problem with its case make no

economic sense, run into each other, and so fail as a matter of law.  *See William O. Gilley Enters.

v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (on Rule 12, an antitrust complaint must

be economically plausible).  At its heart, the FAC posits that a group of buyers (the member

Colleges) conspired to reduce competition among their suppliers, and thus victimize themselves

---

[1]    As discussed below, it is important to note that, whatever CollegeNET means by prices
"below competitive levels," it does not and cannot allege that TCA's prices are below cost, a
prerequisite to a price-based antitrust claim.  What CollegeNET really means is prices are below
what it would prefer to charge – not an antitrust problem by any stretch.  Parts IV.A, B.2, C.1,
below.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

through inferior products.  That nonsensical theory's linchpin is an economically and legally meaningless term, "Net Output," that CollegeNET literally made up for this case.  It is designed to turn more output into less, and transform lower prices into higher ones, based on CollegeNET's subjective assessment that TCA's services are really bad for the colleges and students that choose to use them.  Indeed, CollegeNET's so-called Net Output is *inversely proportional* to actual output, so the more of TCA's services consumers use, the worse off they are.  CollegeNET's competitive alchemy fails.  The antitrust laws do not allow disgruntled competitors to remake marketplace rules and subvert consumer choice, or to dictate what consumers *should* want, much less based on subjective and unenforceable criteria created from whole cloth and, apparently, designed solely to avoid Rule 12.  *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); Part IV.B, below.

CollegeNET's attempt to turn procompetitive price and output effects into an antitrust case is enough to dismiss its complaint, but there is more.  Its specific antitrust claims also fail independently as a matter of law.  TCA's supposed "exclusivity" requirement is nothing more than a modest (above-cost) discount that most of its members choose to forego, and that is renegotiated each year and terminable at will.  It is both *per se* lawful discounting and not remotely exclusionary in any event.  Part IV.C.1, below.  CollegeNET's "tying" claim is based on a fiction.  Its own allegations confirm that TCA never offered the "basic data" CollegeNET claims is the source of the illicit tie; and even if consumers preferred that product to be offered separately, CollegeNET admits it would be "elementary" for competitors to do so, so TCA could have no market power.  Part IV.C.2, below.  CollegeNET's "group boycott" claim is no such thing as a matter of law; CollegeNET admits TCA's members are free to use competing applications, and many do.  Part IV.C.3, below.  Finally, CollegeNET's complaint about

"uniformity" takes issue with the degree of standardization of the Common Application, a quibble that the antitrust laws do not reach. Part IV.C.4, below. In any case, these claims are self-defeating: "Net Output" – CollegeNET's purported measure of competitive merit – would actually decrease in the but-for world as more colleges and students spent more time and money on differentiating their applications, which CollegeNET (erroneously) claims the Challenged Restraints *prevent* them from doing.

The college application processing market is highly competitive, with falling prices and increasing output, and CollegeNET's own allegations concede that TCA has stimulated, not harmed, that competition. CollegeNET's revised effort to state a claim fails, and reveals that its litigation goals are fundamentally at odds with antitrust law . The FAC should be dismissed without leave to amend.

## II.   FACTS

The facts relevant to this motion, taken from the FAC and incorporated by reference, are set forth below.

### A.   The Parties

Established in 1975, TCA is a non-profit association, made up of 549 public and private non-profit member colleges, that provides a standardized college application form and related forms and processing services for use in the college application process. FAC ¶¶ 7, 38. Both Colleges and college applicants are consumers of application processing services, and providers like TCA and CollegeNET compete to serve both sets of consumers, among other things by offering "lower prices" and better services. *Id.* ¶¶ 25-27.[2]

---

[2]     According to CollegeNET, "Colleges compete to attract applicants not only to ultimately secure high-value students but also because an increase in the number of applications received by a College increases the application fees it generates and lowers its admission rate, which raises its selectivity rating and its college ranking. This in turn allows the College to attract even more

As the college application process moved from paper to electronic submissions, TCA's services evolved to meet market demand. In 1998, TCA launched an online application system that it offered in conjunction with paper applications. FAC ¶ 40. As electronic submission became more widespread, TCA expanded its product offerings. Currently, in addition to a standardized application form transmitted electronically to the member schools chosen by the applicant, TCA offers a number of related services to member colleges, including online processing services related to application forms, evaluations, transcripts, and application fees. *Id.* ¶¶ 40, 59-60 ("[I]n the mid-2000s, Common Application introduced several Common Application-branded supplement forms and its own Institutional Supplement and payment processing services (which it contracted with Sallie Mae to provide)."). TCA offers these services to colleges as a bundle with its Common Application. *See id.* ¶ 61.

By using TCA, students "save[] the time of having to fill out the[ir] background information more than once" and can submit their application to "any of the network Colleges." FAC ¶¶ 22, 38. Students can also "request evaluations from within the Common App online system," (*id.* ¶ 60), submit application fee payments, (*id.* ¶ 20(e)), and check submission status online. *Id.* ¶ 20(c). For Colleges, TCA provides a portal for "the sometimes extensive re-configuration of the submitted information in a way that allows the College to make use of it in reviewing applicants, *e.g.*, online review portals, flexible download engines, and export services." *Id.* ¶ 20(c). Thus, according to CollegeNET, TCA has led more students to apply to more colleges. *Id.* ¶ 50. "In 2014-15, an estimated 9.4 million undergraduate applications will be submitted, with 5-6 million processed online by third-party providers," including TCA. *Id.* ¶ 115. In aggregate, from 2001-12, the number of applications submitted through TCA nearly

---

(and higher-value) applicants, greater alumni donations, and better professors, increases the College's creditworthiness, and lowers its borrowing costs." *Id.* ¶ 31.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

quadrupled, to some three million.  Request Seeking Judicial Consideration of Documents

Incorporated by Reference ("RJC"), Ex. 1, at 1-2.  CollegeNET alleges that TCA members

receive a 20-40% increase in application volume.  FAC ¶ 113.

Membership in TCA has grown from the original 15 colleges to approximately 549 out of

1,500 U.S. Colleges, as CollegeNET defines them.  FAC ¶¶ 7, 38.  Almost two-thirds of TCA's

members are Non-Exclusive, and may use one or more other admission applications, including

their own.  RJC, Ex. 1, at 1 (one-third of the 500 members in 2012 were exclusive).[3]  TCA

competes with CollegeNET, AOL, XAP, Hobsons and AY to provide online application

processing services.  FAC ¶ 93.

CollegeNET is a for-profit company providing "web-based on-demand technologies to

institutions of higher education and non-profits."  FAC ¶ 35.  It offers "a suite of web-based

administrative services, including customized online application forms and processing services

and contact management services, to higher education and non-profit organizations."  *Id.* ¶ 6.

### B.    Alleged Competitive Effects Of TCA's Challenged Conduct

CollegeNET alleges TCA has imposed various "restraints" on competition in a laundry

list of alleged "relevant markets" and submarkets, resulting in a variety of purported antitrust

violations.  *See* FAC ¶¶ 15, 90, 149-162.  The alleged restraints are discussed further in Part

IV.C, below, but common to all of them is the dual allegation that TCA's challenged conduct has

resulted in lower prices for, and greater output of, college applications and related processing

---

[3]    Exclusive Members agree to use the Common Application as their only admission
application.  FAC ¶¶ 76-77.  The agreements with Exclusive II Members include additional
terms pertaining to fees, deadlines, Early Decision requirements, and various application
supplements.  *Id.* ¶ 77. Fees for TCA services vary depending on the level of membership, with
larger discounts available to Exclusive II Members.  *Id.* ¶¶ 76-78.  CollegeNET does not allege
that TCA's pricing is predatory (below-cost), or that it could not offer similar or lower pricing to
colleges if it chose to.  *See id.* ¶ 151.  To the contrary, CollegeNET alleges its prices are "lower"
than TCA's.  *Id.* ¶ 152.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

services. *Id.* ¶ 157(a) (challenged "restraints enable members to spend below-competitive levels on Online College Application Processing services without losing applicants"); *id.* ¶ 157(c) (more students are applying to more colleges using TCA, resulting in "a boost in members' applications"); *see also id.* ¶ 50 (percentage of students applying to 3 or more or 7 or more colleges between 2010 and 2011 more than doubled the percentage of such students one decade prior); *id.* ¶ 137 (TCA is "gaining[] applicant users"); *id.* ¶ 151 (TCA's "equal treatment" requirement has "lower[ed] prevailing prices for" Online College Application Processing services).[4]

After TCA pointed out the fatal problem with CollegeNET's allegations of increased output in its prior motion to dismiss, CollegeNET came up with a new idea. It now alleges:

> "Net Output" is the net value derived from Online College Application Processing services by both Colleges and applicants. Net Output increases as the quality, functionality, features, ease of use, and level of innovativeness of Online College Application Processing services improve. Net Output also increases as those services better enable Colleges to discover and matriculate students who are good matches for their College, applicants to discover and matriculate at Colleges that are good matches for them, and Colleges to predict yield (how many accepted applicants will matriculate). Net Output decreases as the amount of resources (*e.g.*, money and time) expended by Colleges and applicants in connection with using Online College Application Processing services in the college admissions process increases.

FAC ¶ 21.

According to CollegeNET:

> Net Output from Online College Application Processing services is not measured in the number of applications processed because it does not account for the costs of submitting, processing, and reviewing such applications (in dollars and time). As applicants submit a greater number of applications, they pay more application

---

[4]    CollegeNET admits that TCA's prices, even for Non-Exclusive members and unadjusted for inflation, were lower after TCA imposed its alleged anticompetitive restraints. *See, e.g.*, FAC ¶¶ 59, 61 (comparing prices before and after alleged restraints). For exclusive members, prices fell even more, though were still above cost and pro-competitive as a matter of law. *See id.*; Part IV.C.1, below.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

fees, spend more time preparing applications, and receive a greater number of rejections. Furthermore, a greater number of applications processed bears no relationship to the ability of Colleges and applicants to discover good matches or Colleges to predict their yield.

FAC ¶ 32. Thus, by definition, as actual output (the number of applications submitted and processed) increases, Net Output decreases: Magic.

## III.    LEGAL STANDARD

### A.    Rule 12

To withstand a motion to dismiss for failure to state a claim, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Witt Co. v. Riso, Inc.*, 948 F. Supp. 2d 1227, 1234 (D. Or. 2013). Allegations of material fact are taken as true, and reasonable inferences drawn in plaintiff's favor, but "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("conclusory assertion" insufficient to support a relevant antitrust market). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal quotations omitted). The Court may disregard internally inconsistent factual allegations. *See Tanaka*, 252 F.3d at 1063 (disregarding conclusion about the relevant market contradicted by factual allegation); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (finding no proper relevant market alleged where allegations were "internally contradictory").

"The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or" incorporated by reference into the FAC. *See, e.g., Sprewell v. Golden State*

*Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds,* 275 F.3d 1187 (9th Cir.

2001); *Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 772 (9th Cir. 2007) (holding

that a district court need not "blindly accept the allegations in the pleadings as true if these

allegations are contradicted by uncontested facts set forth in (1) exhibits to the non-moving

party's pleading, (2) documents that are referred to in the non-moving party's pleading, or (3)

facts that are included in materials that can be judicially noticed.").[5]  The policy underlying these

rules is to prevent plaintiffs from insulating complaints against motions to dismiss by artful

pleading.  *See, e.g.*, *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998) (judicial notice

rules aimed at "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately

omitting references to documents upon which their claims are based"), *superseded by statute on*

*other grounds as stated in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006).

"[A] court must determine whether an antitrust claim is 'plausible' in light of basic

economic principles" and common sense.  *William O. Gilley*, 588 F.3d at 662.  Courts are

particularly wary of conclusory or insufficient allegations in antitrust claims, because of the

potential for needless and extremely burdensome discovery.  "[A] district court must retain the

power to insist upon some specificity in pleading before allowing a potentially massive factual

controversy to proceed," particularly in light of the fact that "antitrust discovery can be

expensive."  *Twombly*, 550 U.S. at 558 (citation omitted).

### B.    Foundational Antitrust Principles

CollegeNET's FAC turns antitrust fundamentals upside down by complaining that TCA's

allegedly improper policies produced *lower* prices and *increased* output, which are the hallmarks

---

[5]    TCA's accompanying Request Seeking Judicial Consideration of Documents
Incorporated by Reference discusses material cited and relied on in the FAC that the Court may
consider on this motion.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

A/76570733.7

of procompetitive practices.  CollegeNET confuses the "harm" produced by robust competition

(in which CollegeNET falls short) with the kind of real, actionable harm to the market actually

produced by antitrust violations.  In the process, CollegeNET ignores fundamental, indisputable

goals of antitrust law:  markets should respect consumer preference; the antitrust laws serve to

protect competition, not competitors; and business conduct that decreases price and increases

output, as does the conduct challenged here, is invariably procompetitive.  Each is summarized

below.

### 1.    Consumer Welfare Is the Touchstone of Antitrust Law

At its core, "[a]ntitrust is about the effect of business behavior *on consumers*."  Robert H.

Bork, The Antitrust Paradox ("Bork"), 51 (1978) (emphasis added).  "Congress designed the

Sherman Act as a consumer welfare prescription."  *NCAA v. Bd. of Regents of Univ. of Okla.*,

468 U.S. 85, 107 (1984) (internal citation omitted); *see also Cal. ex rel. Harris v. Safeway, Inc.*,

651 F.3d 1118, 1132 (9th Cir. 2011).  In fact, "[t]he only legitimate goal of American antitrust

law is the maximization of consumer welfare," Bork at 90, which the Ninth Circuit recognizes as

the "touchstone" of antitrust law.  *See Safeway, Inc.*, 651 F.3d at 1132.

Vigorous competition enhances consumer welfare and effectuates consumer preference.

"A competitive market system is preferred largely because of the widely held belief that

competition promotes consumer welfare."  *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343,

1348 (9th Cir. 1982).  "[C]onsumers are almost invariably best served by low prices, low costs,

innovation, and hard competition generally – all outcomes that are completely consistent with an

exclusively economic approach to antitrust law."  Phillip E. Areeda and Herbert Hovenkamp,

Antitrust Law, ¶ 111c at 109 (4th ed. 2013).  *See also Reudy v. Clear Channel Outdoors, Inc.*,

693 F. Supp. 2d 1091, 1128 (N.D. Cal. 2010) ("[C]onsumers are presently actually better off

because the acts . . . neither reduce output nor raise prices, [and] appear to be pro-competitive."),

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

A/76570733.7

*aff'd sub nom. Reudy v. CBS Corp.*, 430 F. App'x 568 (9th Cir. 2011).

CollegeNET re-writes this antitrust law precept by suggesting that consumer preference should be disregarded or overruled because, it suggests, consumers do not know what they should want or what is best for them.  However, "[c]laims of excessive competition are especially suspect when they accuse the consumers of misunderstanding their own interests." *Stamatakis Indus. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).  "[A]ntitrust law is not the appropriate vehicle" to make "social judgments" and "should accept marketplace decisions as the expression of consumer preference."  Phillip Areeda and Donald F. Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697, 731 (1975) ("Areeda & Turner").  When a competitor like CollegeNET claims a defendant violates the antitrust laws by implementing a "lower quality" standard, which results in greater sales of lower priced products, the claim is actually "directed toward *lessening* competition" because the competitor "seeks to avoid the fetters of price competition by claiming that consumers are injured when they choose inferior [products] because of the price."  *ECOS Elecs. Corp. v. Underwriters Labs.*, 743 F.2d 498, 502 (7th Cir. 1984).

### 2.     Antitrust Laws Protect Competition, not Competitors

It is well-settled that the antitrust laws exist for the protection of "competition, not competitors."  *Am. Ad Mgmt.*, 190 F.3d at 1055.  In fact, "the antitrust laws are only intended to preserve competition for the benefit of consumers," even at the expense of competitors.  *Id.*; *see also* Bork at 66 ("The legislative histories of the antitrust statutes . . . do not support any claim that Congress intended the courts to sacrifice consumer welfare to any other goal.").

It is an antitrust truism that "[n]ot all conduct injuring rivals is anticompetitive."  Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law, ¶ 651d at 116 (3d ed. 2008) ("Areeda & Hovenkamp") (identifying conduct that increases output and conduct that decreases price as

11

procompetitive conduct that can nonetheless injure rivals); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (even conduct that eliminates competitors does not invoke the Sherman Act unless it harms consumer welfare); *Triple M Roofing Corp. v. Tremco., Inc.*, 753 F.2d 242, 243 (2d Cir. 1985) ("The antitrust laws were never intended to provide a balm for the hardships occasioned by vigorous competition."). On the contrary, "'injuries to rivals are byproducts of vigorous competition' of the kind and quality that antitrust laws seek to nurture." *Expedite*, 2011 WL 6399460, at *5 (citations omitted); *accord Rebel Oil*, 51 F.3d at 1433.

### 3.    Consumer Welfare Is Enhanced, not Injured, by Practices that Maximize Output and Minimize Price

Antitrust law "seeks to protect the process of competition on the merits and the economic results associated with workable competition." Areeda & Hovenkamp, ¶ 651d at 117. Accordingly, "the Sherman Act[] command[s] that price and supply be responsive to consumer preference." *Bd. of Regents,* 468 U.S. at 110. An adverse effect on competition is signified by a reduction of output or an increase in price. *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) ("Antitrust injury 'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.'"). On the other hand, lower prices and higher output are not actionable – they are "the economic results associated with workable competition." Areeda & Hovenkamp, ¶ 651d at 117.

"The antitrust injury doctrine requires every plaintiff shows that its loss comes from acts that reduce output or raise prices to consumers." *Stamatakis Indus.*, 965 F.2d at 471 (internal citations and quotation marks omitted). If the plaintiff's alleged injury flows from conduct that is neutral or beneficial to competition, it is not actionable. *See Pool Water Prods.*, 258 F.3d at

1034 (citing *Rebel Oil*, 51 F.3d at 1433). Alleged injuries "which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Am. Ad Mgmt.*, 190 F.3d at 1057 (emphasis in original). "Conduct that reduces the defendant's costs typically injures rivals . . . [and] virtually always benefits consumers," (Areeda & Hovenkamp, ¶ 651d1 at 118), which is why establishing "competitive injury resulting from a rival's low prices" requires a plaintiff to "prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Grp.*, 509 U.S. at 222-23. Because "low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition"; this principle applies "regardless of the type of antitrust claim involved." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) (Supreme Court "particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, chill[] legitimate price cutting, which directly benefits consumers" (internal quotation omitted)).

Similarly, conduct that increases output is encouraged and protected, not prohibited, by antitrust laws. *See Pool Water Prods.*, 258 F.3d at 1034; *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 19-20 (1979) (antitrust laws concerned with conduct that "restrict[s] competition and decrease[s] output") (citations omitted); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (not reasonable to infer "injury to competition" when evidence shows "increasing output [and] decreasing prices"). "Consumers are generally benefitted by higher output, which is nearly always accompanied by lower prices. … Since output increases are presumably in the best interest of consumers as well, a court must be wary of condemning above-cost, output-increasing conduct." Areeda & Hovenkamp, ¶ 651d2

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

at 118.[6]

While disgruntled competitors like CollegeNET do not like it when their rivals increase output and decrease price, consumers benefit enormously.  No antitrust action should go forward where, as here, it targets conduct by a rival that reduces price and increases output.

## IV.    THE FAC SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

CollegeNET is misusing this litigation to shield itself from increased competition and its own competitive shortcomings, to the detriment of the consumers antitrust law is designed to protect.  "Antitrust law should not impose sanctions for the very conduct [*i.e.*, robust competition] it would encourage."  Areeda & Hovenkamp, ¶ 651d at 117.  "Behavior that is no more restrictive of rivals' opportunities than is reasonably necessary to effect competition on the merits is and should be approved by Sherman Act §2.  Such behavior is, after all, indispensable if the antitrust laws are to achieve their objective."  *Id.*.

### A.    CollegeNET Admits Lower Prices And Higher Output, So It Cannot Allege Harm To Competition As A Matter of Law

CollegeNET repeatedly acknowledges that TCA's Challenged Restraints have reduced, not increased, prices.  Part II.B, above.  "[A] plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs."  *Brooke Grp.*, 509 U.S. at 222-23.  CollegeNET does not allege below-cost pricing, but instead alleges that TCA has lowered prices "below competitive levels."  *See* FAC ¶ 151.  Whatever that carefully phrased allegation means, it fails as a matter of antitrust law because low, non-predatory prices benefit consumers, and are not actionable, no matter how they are set.  *See Atl. Richfield*, 495 U.S. at 340.  CollegeNET's

---

[6]    The only potential exceptions are where increased output is not marketwide, or where defendant is engaged in predatory pricing, neither of which is, or could be, alleged here.  *See* Part II.B, above; Part IV.A, below.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

allegations that TCA's low prices make it harder for CollegeNET to compete are irrelevant and contrary to basic antitrust principles.  *See id.*; *Am. Ad Mgmt.*, 190 F.3d at 1057.

CollegeNET also alleges that the Challenged Restraints have resulted in "a boost in members' applications," as more students are applying to more colleges using TCA.  FAC ¶ 157(c); *see also* Part II.B, above.  According to the FAC, "between 2010 and 2011, the percentage of students applying to at least three Colleges rose from 77% to 79% (more than 10% more than in 2000)" and the percentage of students applying to at least seven Colleges rose from 25% to 29% (both of which are more than double the percentage of such students a decade earlier)."  FAC ¶ 50.  The FAC concedes that the growth in output of online applications, and thus Online Application Processing Services, during the period of the Challenged Restraints has been "stunning":



*Id.* ¶ 82, Fig. 1.  In addition, that greater output is both "a product" of enhanced competition among colleges in the "market for student applications," as CollegeNET admits, and itself enhances competition in the alleged College Admissions Market.  *See* Plaintiff CollegeNET,

Inc.'s Response in Opposition to Defendant's Motion to Dismiss, Docket 59, at 30 n.19.  An

increase in the number of submitted applications leads to greater (direct) competition among

colleges for students that have applied.[7]

Having alleged that TCA's conduct furthers the two primary goals of antitrust law,

CollegeNET has pled itself out of court.  *See BMI*, 441 U.S. at 19-20; *Omega Envtl.*, 127 F.3d at

1164; *Pool Water Prods.*, 258 F.3d at 1034.  Similarly, CollegeNET has failed to allege that it

suffered antitrust injury, or injury "of the type the antitrust laws were intended to prevent," an

independent requirement for a private antitrust plaintiff.  *Am. Ad Mgmt.*, 190 F.3d at 1057; *see

also Reudy*, 693 F. Supp. 2d at 1128 n.35 ("[T]his is not an antitrust injury because this alleged

harm has not decreased output nor raised prices.").  "The Supreme Court has made clear that

injuries which result from *increased* competition or lower (but non-predatory) prices are not

encompassed by the antitrust laws." *Am. Ad Mgmt.*, 190 F.3d at 1057.

The FAC's allegations describe a market in which the Challenged Restraints have

lowered prices and increased output.  Those allegations are a textbook-quality example of market

forces in operation.  They are not the basis for an antirust claim as a matter of law.  *See Expedite*,

2011 WL 6399460, at *5 ("Alleging the natural consequences of competition is insufficient to

state a claim under Section 2 of the Sherman Act.").

---

[7]    As CollegeNET has previously argued, "a student's submission of her application to a
given school is a product of . . . competition" among colleges to recruit students.  *Id.*  It is
equally true that a student's application initiates a second level of competition among colleges to
which she has applied.  In any event, CollegeNET does not and cannot allege any facts showing
that the Challenged Restraints have had any *anti*competitive effect on price or output in the
Admissions Markets for "College degree programs."  *See id.*; FAC ¶¶ 149-62; *Pool Water
Prods.*, 258 F.3d at 1034.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

**B.**    **The Two Cornerstones Of CollegeNET's FAC Do Not Make Economic Sense And Fail To Salvage Its Case**

CollegeNET's response to that fundamental problem with its case is to step through the looking glass.  It claims the lower prices and greater output that it concedes resulted from the Challenged Restraints are really just the opposite, and thus evidence of anticompetitive injury.  That remarkable position rests entirely on CollegeNET's newly minted theory of "Net Output," which posits that consumers' decisions to use more of TCA's services are socially wasteful or a poor use of time, and thus come at a higher ("net") cost.  CollegeNET's theory of social merit, even if it were true (it isn't), is found in no antitrust authority, anywhere, and contradicts basic notions of competitive markets.  It is like claiming that competitor collaborations that allow streaming of televised content to mobile devices, or that lower the price of soft drink bottles, are "bad" for consumers because people should watch less TV and drink less soda.  CollegeNET's "Net Output" invention is unsupported, arbitrary, and self-defeating as a matter of basic antitrust law.  Part IV.B.1, below.  Its attempt to turn low prices into an antitrust violation by invoking a "buyers' cartel" theory also fails as a matter of law and common sense.  Part IV.B.2, below.

**1.**    **CollegeNET's Fabricated Concept of "Net Output" Is an Antitrust Non-Starter**

Unable to deny the procompetitive "boost" to output caused by the Challenged Restraints (FAC ¶¶ 50, 157(c)), CollegeNET hangs its case on an alternate reality where greater output is really less, because "Net Output" is what counts.  *Id.* ¶¶ 21, 32.  This device, not supported by any antitrust authority and seemingly created to avoid Rule 12 in this case, fails as a matter of law.  First, output measures just what its name suggests: the goods and services that markets produce.  In this case, allegedly involving Online Application Processing Services, the admitted greater consumption of those services by Colleges and students equates to more output, produced as a result of the Challenged Restraints.  "Net Output," which is expressly "not measured in the

17

number of applications processed," (FAC ¶ 32), is legally irrelevant and cannot sustain an antitrust claim. *See, e.g., Tanaka*, 252 F.3d at 1064 (affirming dismissal without leave to amend; disregarding allegation of plaintiff's personal preferences as "irrelevant to the antitrust inquiry" regarding relevant market).

CollegeNET goes on to prove that is true. By its definition, Net Output is *inversely proportional* to the actual increasing output alleged in the FAC. According to CollegeNET, "[a]s applicants submit a greater number of applications" – *i.e.*, actual output increases – Net Output *decreases* because applicants "pay more application fees, spend more time preparing applications, and receive a greater number of rejections." FAC ¶ 32. Similarly, in CollegeNET's view, colleges do not benefit from "a greater number of applications" because they have to spend more time reviewing them and there is a reduction in "their ability to find a good match or predict yield." *See id.* ¶¶ 32, 157.[8] Thus, Net Output literally turns antitrust law and economics upside down. "[A]n antitrust claim [must be] 'plausible' in light of basic economic principles" and make economic sense. *William O. Gilley*, 588 F.3d at 662. CollegeNET's Net Output-based complaint fails this threshold test.[9]

CollegeNET's subjective opinions about applicants applying to too many colleges (*i.e.*, an increase in output), the supposed inferiority of TCA's service, and the purported limitations

---

[8]     CollegeNET's legally insufficient allegations are also misleading. Submitting and reviewing more applications might "cost" more time and money *in aggregate* (just like buying two more widgets costs more than buying one), but CollegeNET is suspiciously silent on the *per application* cost. Elsewhere it admits, as it must, that those costs, in both time and money, have fallen. Part IV.A, above.

[9]     CollegeNET's attempt to equate the technical difficulties experienced by CA4 with a reduction in either output or "Net Output" (FAC, ¶¶68-72) also fails. "Just as a temporary decline in the number of competitors is not a significant restraint of trade, neither is a related temporary decline in quantity, quality, or efficiency." *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

on colleges' ability to market themselves "while gaining[] applicant users" (FAC ¶ 137), do not allow CollegeNET to use "Net Output" to substitute its own social judgment about what consumers should value over actual consumer preference revealed through actual market outcomes. *See Stamatakis*, 965 F.2d at 471; *ECOS Elecs. Corp.*, 743 F.2d at 502 (rejecting claim that "seeks to avoid the fetters of price competition by claiming that consumers are injured when they choose inferior [products] because of the price"). "Although legislation can explicitly substitute a social judgment for that of the marketplace, antitrust law is not the appropriate vehicle for such a substitution and should accept marketplace decisions as the expression of consumer preference." Areeda & Turner at 371; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371 (1963) (stating that effect on competition, not an evaluation of social factors or a "value choice," determines whether a merger violates antitrust laws). CollegeNET's suggestion that the procompetitive price and output effects of TCA's conduct should be devalued based on a competitor's subjective opinion about the socially optimal level of output "is beyond the practical ability of a judicial tribunal to control without courting intolerable risk[] of chilling legitimate price cutting." *Brooke Grp.*, 509 U.S. at 223.

Ultimately, CollegeNET's nonsensical "Net Output" theory not only violates basic economic principles and antitrust law, it is also self-defeating. Even accepting it for argument's sake as the appropriate measure of output, there would be no injury to competition as a result of the Challenged Restraints. Competitive injury analysis compares price and output in the actual world to a "but-for" world free of the challenged conduct. *See Reudy*, 693 F. Supp. 2d at 1128; *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) ("To establish antitrust impact, an expert is required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive."). According to CollegeNET, however, "Net Output

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

decreases as the amount of resources (*e.g.*, money and time) expended by Colleges and applicants in connection with using Online College Application Processing services in the college admissions process increases." FAC ¶ 21. Thus, for students, Net Output would *decrease* in the but-for world absent TCA's "uniformity requirements" as they spent more time "showcas[ing] themselves," "upload[ing] documents," and otherwise "customiz[ing] their applications to different Colleges." *Id.* ¶ 155. Likewise, for Colleges, Net Output would decrease in the absence of the "equal treatment" requirement, as they spent more time and money investing in institution-specific applications "as a marketing tool to differentiate themselves" and "first-class technology" to divert applicants from competing schools. *Id.* ¶¶ 150, 165. CollegeNET's Net Output invention thus defeats itself. *See Reudy*, 693 F. Supp. 2d at 1128 (allegations of competitive injury insufficient because the alleged acts, though illegal, "result in an increased supply and lower pricing, . . . [and] eliminating [them] from the market place will actually restrict competition and cause prices to rise").

> **2.    CollegeNET Cannot Allege TCA's Lower Prices Are Anticompetitive Because Its Buyers' Cartel Claim Is Unsupported as a Matter of Law**

CollegeNET also tries to conjure an antitrust claim out of TCA's lower prices by suggesting TCA's members engaged in a "buyers' cartel."[10] FAC ¶ 172 (alleging that the TCA

---

[10]    The object of a buyers' cartel is to "force the prices that suppliers charge the members of the cartel below the competitive level." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (citation and internal quotation marks omitted). Because procompetitive joint purchasing and a buyers' cartel can look very similar, the key to a buyers' cartel claim is a reduction in demand: "the former is an output-increasing activity while the latter reduces output." Areeda & Hovenkamp, ¶ 2012b, at 139. Thus, one can distinguish a buyers' cartel from joint purchasing "by examining whether the participants sought to limit collective purchases or to expand them." Areeda & Hovenkamp, ¶ 2010 at 128. *See also Weyerhaeuser*, 549 U.S. at 320-21 (to exercise monopsony power, a monopsonist "will seek to restrict its input purchases below the competitive level, thus reducing the unit price for the remaining inputs it purchases") (internal quotation marks and citation omitted); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power

members, the buyers of Online College Application Processing services, conspired to ensure

"prices paid for such services [are] below competitive levels").  CollegeNET does not allege an

explicit buyers' cartel.[11]  Although CollegeNET claims it was paid "below-competitive prices"

for its services, (*id.* ¶ 151), there is no allegation that TCA member colleges actually agreed to

fix prices paid to CollegeNET.  Rather, CollegeNET suggests that through TCA's "equal

treatment" requirement, member colleges have somehow "reduced competition" and

"suppress[ed] demand for Online College Application Processing services, thus lowering

prevailing prices for such services below competitive levels" and demanded "below-competitive

prices" for CollegeNET's services.  *Id.* ¶¶ 150-51.  CollegeNET's allegations in support of that

conclusory claim are schizophrenic and legally insufficient.

First, CollegeNET claims TCA members refused to deal with CollegeNET, but

simultaneously claims some have "contracted with CollegeNET."  *See* FAC ¶¶ 151-52.  Second,

CollegeNET alleges TCA's prices are "below competitive levels" (but not below cost) and that

TCA members therefore demand prices from CollegeNET that are too low, but also claims its

prices are "lower[]" than TCA's.  *Id.* ¶ 151-52.  Third, CollegeNET contradicts its allegation that

---

to decrease market demand for a product and thereby lower prices" below a competitive level
and reduce output.).

[11]     CollegeNET has apparently abandoned the nonsensical theory that TCA conspired to
reduce *its own* selling prices, but attempts to save the claim by now alleging that the member
colleges have conspired with TCA to suppress the prices CollegeNET can charge and refused to
deal with CollegeNET.  *See* FAC ¶ 172.  Implicit in this iteration of the theory is that the
member colleges conspired to suppress their own competitive options by excluding a supplier.
"Why would [a college] want to injure itself in this way?  A theory of liability attributing
irrationality to consumers does not get very far."  *Stamatakis Indus.*, 965 F.2d at 471-72; *Oil
Exp. Nat., Inc. v. D'Alessandro*, 1998 WL 214727, at *4 (N.D. Ill.) (dismissing group boycott
claim and rejecting theory that "a group of consumers in the [relevant] market have banded
together to drive [plaintiff], a supplier to that market, out of business" because with "fewer
suppliers, there would be less competition among suppliers in terms of pricing, and the
consumers themselves … would suffer the antitrust injury").

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

TCA members "have demanded below-competitive amounts of" Online College Application Processing services because it admits that they pay lower prices to TCA "without losing applicants" and output is increasing. *See id.* ¶¶ 151, 157(a). The Court need not credit CollegeNET's self-contradictory allegations. *See Tanaka*, 252 F.3d at 1063.

Regardless, CollegeNET confuses reduced demand for *its* services with a marketwide reduction in demand. A buyers' cartel claim is based on "depress[ed] demand" *in the market overall*. *See Campfield*, 532 F.3d at 1118. CollegeNET cannot and does not claim that marketwide demand has decreased; it alleges just the opposite. *See* FAC ¶ 50; Part II.B, above. Increased output is the result of marketwide demand for processing services increasing, not being suppressed.

CollegeNET's real complaint is that because it saw a reduction in demand for *its* services, it was forced to lower its prices to compete. Again, CollegeNET does not allege TCA's prices were below cost, or even lower than CollegeNET could offer if it chose to. Even if TCA's prices were "below competitive levels," CollegeNET would have no claim. "[N]onpredatory price competition for increased market share, as reflected by prices that are below 'market price' . . . 'is not activity forbidden by the antitrust laws.'" *Atl. Richfield*, 495 U.S. at 340 (citation omitted). Indeed, "[a] firm complaining about the harm it suffers from nonpredatory price competition 'is really claiming that it [is] unable to raise prices.'" *Id.* at 337-38 (alteration in original) (citation omitted). Such an "attempt to use the antitrust laws as a means of stifling price competition" is "nothing less than a frontal assault on the basic policy of the Sherman Act," and thus "antithetical to the goals of the Sherman Act." *ECOS Elecs. Corp.*, 743 F.2d at 502 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)). "It would be

ironic indeed if the standards" for establishing antitrust injury "were so low that antitrust suits themselves became a tool for keeping prices high." *Brooke Grp.*, 509 U.S. at 226-27.

*Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196 (W.D.N.C. 1989),[12] is directly on point.  Plaintiff, a manufacturer of plastic soft drink bottles, brought antitrust claims against soft drink bottlers and Southeastern Container, a joint venture owned by the bottlers that also made bottles.  *Id.* at 1198.  The court noted that since the "formation of Southeastern . . . , plastic bottle prices have decreased, [and] output of plastic bottles has increased. . . ."  *Id.* at 1218.  Regarding harm to competition, the best plaintiff could show was that "Southeastern has at times experienced quality problems with its bottles and that certain companies have decreased research and development expenditures."  *Id*.  The court held that Sewell could not establish antitrust injury because "consumers of plastic bottles . . . have benefitted from decreased, nonpredatory prices" and to "allow Sewell to recover treble damages for lost sales to the Bottlers would be to allow a windfall."  *Id*. at 1222.  The facts in *Sewell* match CollegeNET's allegations:  since TCA's formation, prices have decreased (*see e.g.*, FAC ¶¶ 59, 61, 151, 157(a)); output has increased (*see e.g.*, *id.* ¶¶ 50, 82, 137, 157(c)); and, at best, CollegeNET has alleged that TCA suffered temporary quality problems.  *See id.* ¶¶ 68-69.  Thus, CollegeNET's alleged facts are insufficient to establish antitrust injury as a matter of law.

CollegeNET's case rests fundamentally on a complaint that consumers prefer TCA. While the market benefitted from lower prices and greater output, CollegeNET found it difficult to compete.  That is competition, not an antitrust violation, and CollegeNET's inversion of the law and economics does not change it.  The antitrust laws are designed to protect competition, not to make it easier or more convenient for an individual competitor to compete, or to charge

---

[12]    *Aff'd and remanded for further proceedings on counterclaims*, 912 F.2d 463 (4th Cir. 1990).

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

the prices it would like to charge.  The FAC can and should be dismissed on that basis.  In addition, CollegeNET's specific antitrust claims fail.  We turn to that.

### C.   CollegeNET's Challenged Restraints Do Not Injure Competition Or Consumer Welfare As A Matter of Law

Each of CollegeNET's claims is based on one or more of four Challenged Restraints: "Tying and Bundling/Forced Purchase Requirements"; "Exclusivity Restrictions"; "'Equal Treatment' Requirements"; and "Uniformity Requirements."  FAC ¶ 15; *see also id.* ¶¶ 164, 172, 179, 192, 200-02, 208, 213-14.  Beyond CollegeNET's failure to allege harm to competition and antitrust injury generally, each of its claims also fail because none of the Challenged Restraints injure competition or otherwise state a claim as a matter of law.

### 1.   The "Exclusivity Restrictions" Are *Per Se* Legal Discounts and, in Any Event, Do Not Foreclose a Substantial Share of The Market

CollegeNET alleges that TCA has "coerc[ed]" members into "entering into exclusivity agreements."  FAC ¶ 179.  "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  It violates the antitrust laws only if there is "substantial" foreclosure in the relevant market.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961); *Allied Orthopedic*, 592 F.3d at 996 & n.1 ("[T]he plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition").  CollegeNET cannot allege an exclusive dealing claim.

To begin with, TCA has not "coerced" members to do anything.  The only "coercion" CollegeNET alleges is a modest, two-tiered incentive discount, which TCA members are free to accept or not (in fact, two-thirds do not).  FAC ¶¶ 74-77 (noting two categories of "exclusivity"); RJC Ex. 1, at 1 (stating one-third of members are exclusive).  Because CollegeNET does not and cannot allege TCA's discounted prices are below an appropriate measure of cost, they are

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

procompetitive, and cannot support any antitrust claim, as a matter of law.  *See Atl. Richfield*, 495 U.S. at 337-39; *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (if defendant's "price reductions offered to the buyers for the exclusive right to supply a set of stores under multi-year contracts" "'are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of defendant's conduct.  It is in the interest of competition to permit . . . firms to engage in vigorous competition, including price competition.'" (quoting *Atl. Richfield*, 495 U.S. at 340-41)).

In any event, CollegeNET cannot allege facts to support its conclusory allegation that the alleged exclusivity agreements "foreclosed a substantial amount of competition in the Online College Application Processing Market."  FAC ¶ 180.  Courts frequently find exclusive dealing to be valid even where 30% or more of the market is foreclosed.  *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45-46 (1984) (O'Connor, J. concurring) (exclusive dealing lawful with 30% foreclosure), *abrogated on other grounds*, *Ill. Tool Works Inc. v. Indep. Ink., Inc.*, 547 U.S. 28 (2006); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 69 (1st Cir. 2004) ("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.  But while low numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny." (citations omitted)); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (recognizing "the roughly 40% or 50% [foreclosure] usually required in order to establish a share § 1 violation); *Omega Envtl.*, 127 F.3d at 1162-65 (upholding series of exclusive dealing arrangements that foreclosed 38% of the relevant market).

First, CollegeNET fails to allege any percentage of the market allegedly foreclosed by TCA's alleged exclusive agreements.  The absence of *factual allegations* to support the

conclusory allegation of substantial foreclosure alone requires dismissal. *See Twombly*, 550 U.S. at 555; *see also Stop & Shop*, 373 F.3d at 69 ("[R]eliable [foreclosure] numbers are an essential starting point.").

Second, CollegeNET's omission is unsurprising because, in fact, only *one-third* of TCA member colleges are "exclusive." RJC, Ex. 1, at 1. Even assuming CollegeNET's allegation that TCA's market share in the Online College Application Processing Market is 60%, (*see* FAC ¶ 115), the market foreclosure rate would only be approximately 20% (60% x 33%), far less than the 30% or greater foreclosure necessary to allege an exclusive dealing claim. *See Omega Envtl.*, 127 F.3d at 1162 ("The foreclosed market, in purely quantitative terms, is more accurately described as *the percentage of* [defendant's] total market share sold through its [exclusive customers]." (emphasis added)).

Third, CollegeNET fails to allege substantial foreclosure because TCA's membership agreements are of short duration and easily terminated, which "negate[s] substantially their potential to foreclose competition." *Omega Envtl.*, 127 F.3d at 1163-64 (citing cases finding one-year contracts presumptively legal); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *5 (N.D. Cal.) (citing cases where contracts from one to five years were held reasonable). CollegeNET concedes that TCA's membership agreements have a term of only one year. FAC ¶ 88. Moreover, CollegeNET does not and cannot allege that TCA member colleges could not terminate an exclusive agreement at will. A college that is "exclusive" "could choose at anytime [sic] to forego the discount offered by [TCA] and purchase from [another] competitor." *Allied Orthopedic*, 592 F.3d at 997 (finding no substantial foreclosure from market share discounts and sole source agreements and noting that "[d]iscounts conditioned on exclusivity in relatively short-term contracts are rarely problematic." (citation omitted)). CollegeNET's claim that the

"penalties" for choosing not to be exclusive are "extreme," (FAC ¶ 78), is belied by the fact that two-thirds of members, including CollegeNET's example, Harvard, freely choose not to be.

CollegeNET's exclusive dealing claim, premised on an above-cost discount and lacking any factual allegations of substantial foreclosure, fails as a matter of law.

### 2.  CollegeNET Fails to State a Claim Based on the Alleged "Tying and Bundling/Forced Purchase Requirements"

CollegeNET alleges TCA unlawfully ties the sale of "Standard College Application Data" (the alleged tying product) to "Online College Application Processing" services (the alleged tied product). FAC ¶ 192. To state a tying claim, a plaintiff must allege, among other things, "that the defendant tied together the sale of two distinct products or services; [and] that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product." *Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 971 (9th Cir. 2008). CollegeNET's tying claim fails because it has not adequately alleged that "Standard College Application Data" is a separate product market or, even if it had, that TCA has market power in that market.

"[N]o tying arrangement can exist unless there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer" the two products separately. *Jefferson Parish*, 466 U.S. at 21-22. Where a plaintiff alleges tying of "two components of one product," there are no separate or distinct products to support a claim. *Hirsh*, 674 F.2d at 1350-51. CollegeNET defines "Online College Application Processing" services as "online application and evaluation forms and processing services offered to Colleges and applicants," which includes, among other things, "develop[ing] a College's online application and evaluation forms, host[ing] those forms online, [and] process[ing] applicants' form submissions." FAC ¶ 20. The Common Application falls within

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

A/76570733.7

this definition.  CollegeNET, however, tries to carve out a single feature of the Common

Application – a "generic, text-based data entry form" for an applicant's "background

information," like name and address – and claim that it constitutes a separate "Standard College

Application Data" product market.  *Id.* ¶ 118.  That attempt fails.

CollegeNET offers nothing but the conclusory allegation that TCA offers background

"data" separately from the Common Application itself.  FAC ¶ 24.  CollegeNET's *factual*

allegations prove otherwise.  From the beginning, TCA offered a "common, standardized (paper)

*application form*," which "[a]pplicants could fill out . . . once, photocopy it, and *submit it* to any

member institution.  The form consisted of questions soliciting *background information* about

the applicant, *a short-answer question, and a selection of essay prompts.*"  *Id.* ¶ 38 (emphases

added).  As its name implies, the Common Application has always been a full *application* that

students "fill out" and "submit."  CollegeNET cannot separate the background data from the rest

of the application because both are, "in reality, but a single product" – a college application.  *See*

*Hirsh*, 674 F.2d at 1350; *see also Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo*

*Master Corp.*, 783 F. Supp. 952, 960-61 (D. Md. 1992) (dismissing tying claim where words and

pictures in a computerized real estate database were found to be "simply components of one

product – information"), *aff'd*, 993 F.2d 1538 (4th Cir. 1993).

In 1998, TCA started offering this common application online.  FAC ¶ 40.  While that

might have made separating the "background information" from the rest of the application

*possible*, that does not transform it into a separate market.  *Cf. Montgomery Cnty.*, 783 F. Supp.

at 960 (finding that words and pictures "traditionally [] sold and distributed together" constituted

a single product even though technological advances separated the two for a short time).  That is

confirmed by CollegeNET's definition of "Standard College Application Data," which describes

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

a service that TCA *has never offered*.  For example, member colleges do not "contract with [TCA] to allow for the auto-population of their application forms with the applicants' background information."  FAC ¶ 22.  Nor has TCA ever offered applicants the ability to "enter[ a] unique identification number generated by [TCA]" to "auto-populate[]" applications in a "College's online application system."  *Id*.[13]  This is just another attempt to re-engineer the market, force a new business model on TCA, and create an artificial "tying" claim where none exists.

CollegeNET's claim that background data is a distinct product because "not all Colleges that purchase Online College Application Processing services also buy Standard College Application Data services" (FAC ¶ 188), misses the point.  CollegeNET never alleges that there is "sufficient demand" for Standard College Application Data separate from the rest of the application.[14]  *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 477-78 (7th Cir. 1988) (no separate demand for pathology services apart from hospital services because "patients never request and physicians rarely request specific pathologists").

Even assuming Standard College Application Data services were a distinct product, CollegeNET cannot allege TCA has market power in that alleged market.  *See Rick–Mik,* 532 F.3d at 972; *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42-43 (2006) (tying "must be supported by proof of power in the relevant [tying] market rather than by a mere presumption thereof").  Failure to "plead allegations regarding barriers to entry and the lack of ability by

---

[13]    CollegeNET alleges another company, XAP, offers these services, but also alleges that XAP is not in the Standard College Application Data services market.  *See* FAC ¶¶ 119-20.

[14]    CollegeNET's allegation that colleges could purchase "Institutional Supplement services" separately from "Standard College Application Data services" is further off point.  FAC ¶ 190. That only alleges the institutional supplement is separate from the Common Application; it has nothing to do with whether background data is separate from the Application, and it is not.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW

competitors to increase their share of the" tying product market is a sufficient ground to dismiss a tying claim. *See Witt*, 948 F. Supp. 2d at 1244 (holding that plaintiff failed to allege market power, despite 65% market share because "there are insufficient allegations establishing barriers to entry"). Not only does CollegeNET fail to allege barriers to entry into the purported Standard College Application Data market, it alleges the *opposite*, claiming those services involve a "generic, text-based data entry form for applicants to input their background information" and that the "technology required to capture this data, and to store it in a database to transmit to subscribing Colleges, is *elementary*." FAC ¶ 118 (emphasis added). Thus, there are no barriers preventing a competitor from entering the market and offering this "elementary," "generic" service. *See United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) ("Time after time, we have recognized this basic fact of economic life: A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."); *Handicomp, Inc. v. U.S. Golf Ass'n*, 2000 WL 426245, at *3-4 (3d Cir.) (despite 72% market share, defendant lacked market power because there was "no difficulty in programming" the data processing system in question and thus plaintiff was "unable to prove substantial barriers to entry").

### 3.    The "Equal Treatment" Requirement Is Not Exclusionary or a Group Boycott

CollegeNET alleges that TCA's "equal treatment" requirement "operates as a group boycott agreement among members" because by agreeing not to "promote rival providers' applications" over TCA, members have somehow "effectively agreed not to purchase" from rival providers including CollegeNET. FAC ¶ 152. A "group boycott" exists where "either (1) two or more firms agree not to deal with a competing firm in an industry that requires horizontal dealing

. . . or (2) two or more firms agree not to deal with a firm with which they are in a vertical relationship in an industry that requires vertical dealing." *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 877 (9th Cir. 1987).

CollegeNET's own allegations demonstrate that the "equal treatment" requirement does not fit either scenario.  It merely requires a member school that chooses to offer an alternative application to promote TCA in an equivalent fashion.  Indeed, the language of the requirement itself shows that it applies only if and when a member school *does choose* to deal with CollegeNET or another supplier.  FAC ¶ 46 (TCA requires "(1) charging an application fee to Common Applicants that was 'no greater than the fee charged for [their] *other accepted applications*'. . . ; (2) providing 'an equally prominent link to the Common App Online wherever [they] post[ed] a link *to another online application*'; and (3) . . . 'explicitly offer[ing] any special benefits (expedited admissions decisions, special scholarship consideration, e.g.) to students *regardless of the application they choose*.'"[15] (emphases added)).  CollegeNET admits, as it must, that "members are permitted to offer their own, institution-specific application," and that some of them contract *with CollegeNET* to do so.  FAC ¶¶ 150-51.  Thus, it concedes there is no group boycott of CollegeNET or any other supplier.

### 4.    TCA's "Uniformity Requirements" Are Procompetitive as a Matter of Law

Finally, CollegeNET claims that TCA's "uniformity requirements" "limit[] the value applicants derive from the application process."  FAC ¶ 155.  Of course, the whole idea of offering a "common application" *requires* some degree of "uniformity."  Such standardization,

---

[15]    CollegeNET's FAC erroneously inserted a "not" before "explicitly offer[ing] any special benefits . . . ," implying that the equal treatment requirement prohibits special benefits to applicants.  FAC ¶ 46.  The requirement says the exact opposite.  It instructs member schools that they must "explicitly offer" such benefits to students "regardless of the application they choose."  RJC, Ex. 2, at 3.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

ubiquitous in everything from DVDs to tires, by definition reduces variety to increase

compatibility and generate procompetitive benefits a fragmented market would not otherwise

provide, including "facilitating economies of scale in the market for complementary goods,

reducing consumer search costs, and increasing economic efficiency." *Golden Bridge Tech., Inc.*

*v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008); *see also Princo Corp. v. ITC*, 616 F.3d

1318, 1335 (Fed. Cir. 2010) (en banc) ("Collaboration for the purpose of developing and

commercializing new technology can result in economies of scale and integrations of

complementary capacities that reduce costs, facilitate innovation, eliminate duplication of effort

and assets, and share risks that no individual member would be willing to undertake alone,

thereby promot[ing] rather than hinder[ing] competition." (internal quotations omitted)).

The FAC demonstrates how TCA's "uniformity requirements" generate procompetitive

benefits by simplifying the college application process for member colleges and students alike.

*See* FAC ¶¶ 38, 41.  First, the Common Application allows students to apply more easily to

multiple colleges, which reduces search and transactions costs.  *See Clamp-All Corp. v. Cast Iron*

*Soil Pipe Inst.*, 851 F.2d 478, 487 (1st Cir. 1988) (finding procompetitive benefit from "the joint

development and promulgation of [certain] specification[s that] would seem to save money by

providing information to makers and to buyers less expensively and more effectively than

without the standard").  Second, standardizing the application creates economies of scale and

increases efficiency by allowing colleges to attract more applicants while reducing per

application cost.  *See Golden Bridge*, 547 F.3d at 273.  The increased output of applications (*see*

FAC ¶¶ 44, 50, 82), reflects, and in turn creates, more competition among colleges for a growing

number of applicants, and increases the choices of colleges readily available to students.  Part

IV.A, above.

CollegeNET's complaints about the *degree* of standardization are not the concern of antitrust law. CollegeNET alleges TCA's uniformity requirements produce an inferior product by limiting customization (including the "look and feel" of the application) and students' ability to offer customized information in the application. FAC ¶¶ 15, 64, 155. Those quibbles are misplaced, even if they were correct (they are not), because "it is not antitrust's mission to correct standards that are substantively wrong or even irrational, but only to seek out injuries to competition." Areeda & Hovenkamp, ¶ 2232d at 456; *see also ECOS Elecs. Corp.*, 743 F.2d at 502; *Baum Research & Dev. Co. v. Hillerich & Bradsby Co.*, 31 F. Supp. 2d 1016, 1019-23 (E.D. Mich. 1998) (rejecting alleged "safety" concern arising from defendant's standard-setting where it pose[d] no threat to competition in the relevant market. In fact, there is a logical inference that [the challenged conduct] ... actually fosters competition."). CollegeNET also cannot "indirectly force" TCA "to raise its prices by forcing [it] to raise its standards." *ECOS Elecs. Corp.*, 743 F.2d at 502.

In any event, the "uniformity requirements" have not "reduced competition" among TCA members. *See* FAC ¶ 155. It is economically implausible, and nonsensical, to claim that colleges would try to *reduce* competition for students by making it *easier* for students to apply to more colleges, which would only *increase* competition for applicants by presenting them with more choices. *See William O. Gilley*, 588 F.3d at 662. In fact, the availability of the Common Application as an option (as opposed to only individualized applications) gives colleges more choices to attract students. *See Princo*, 616 F.3d at 1335. While that choice might make competitive life harder for CollegeNET and other suppliers of individualized applications, that is not an antitrust concern. *See, e.g.*, *Am. Ad Mgmt.*, 190 F.3d at 1055.

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW
A/76570733.7

## V.    CONCLUSION

The FAC, CollegeNET's best effort, fails both generally and specifically as a matter of antitrust law, because it makes clear that CollegeNET challenges the effects of vigorous and lawful competition.  No further amendment could cure that fundamental deficiency.  The FAC should be dismissed without leave to amend.

DATED:  December 23, 2014                    Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:    /s/ Thane D. Scott
            Thane D. Scott, Pro Hac Vice
            Attorneys for Defendant
            The Common Application, Inc.

34

DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF LAW