IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLLEGENET, INC., a Delaware
Corporation,

               Plaintiff,

     v.

THE COMMON APPLICATION, INC.,
a Virginia corporation,

               Defendant.

No. 3:14-cv-00771-HZ

OPINION & ORDER

Sarah J. Crooks
Scott D. Eads
PERKINS COIE, LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 97209

David S. Steele
Shylah R. Alfonso
Catherine S. Simonsen
Susan E. Foster
PERKINS COIE, LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101

       Attorneys for Plaintiff

Thomas M. Triplett
Richard K. Hansen
SCHWABE, WILLIAMSON, & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204

Dominique Malata Perez
Frank M. Hinman
Jacqueline S. Delbasty
Sujal J. Shah
Susan J. Welch
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105

Thane D. Scott
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff CollegeNET, Inc. brings this antitrust action against Defendant The Common Application, Inc., contending that Defendant violated the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiff alleges collusion among competitor colleges[1] and conspiracy with their joint-venture entity, Defendant, to monopolize and restrain trade and foreclose rival providers in the admissions and online college application processing markets. Plaintiff brings the following claims in its First Amended Complaint[2]: (1) Horizontal Restraint of Trade in the Admissions Markets; (2) Horizontal Restraint of Trade in the Online College Application Processing Market; (3) Exclusive Dealing; (4) Tying; (5) Monopolization; (6) Attempted Monopolization; and (7) Conspiracy to Monopolize.

---

[1] Plaintiff defines "college" for the purpose of this action as "a regionally accredited, not-for-profit educational institution in the United States that offers four-year (baccalaureate), full-time programs." Am. Compl. ¶ 17.
[2] On November 3, 2014, the Court dismissed Plaintiff's 103-page Complaint under Rule 8. Plaintiff submitted the present 55-page Amended Complaint [75] on November 24, 2014.

Defendant moves to dismiss Plaintiff's Amended Complaint. Because Plaintiff fails to adequately allege antitrust injury, a required element for each of Plaintiff's claims, the Court grants Defendant's motion.

## BACKGROUND

Plaintiff is a Portland, Oregon-based company that provides "web-based on-demand technologies to institutions of higher education and non-profits." Am. Compl. ¶ 35. Plaintiff offers a "suite of web-based administrative services, including customized online application forms and processing services and contact management services." Id. at ¶ 6.

Defendant is an association of 549 non-profit member colleges and universities. Id. at ¶ 7. According to Plaintiff, Defendant is not a single entity, but rather a "consortium of competitors." Id. at ¶ 84. Defendant was formed in 1975 to assist students by simplifying the college admissions process by providing one "common" student application form (the "Common Application") for students to submit basic background information in a standardized way as they applied to member colleges. Id. at ¶¶ 13, 38. Defendant provided a common, standardized (paper) application form for use at each of the member institutions. Id. at ¶ 38. Applicants could fill out this Common Application once, photocopy it, and submit it to any member institution. Id. Membership was limited to "selective" colleges. Id. at ¶ 42.

Over time, Defendant has grown to be a "dominant online college application processing provider," as colleges join the association in order to access Defendant's "national pipeline of applicants" and use Defendant as their common application developer and processor. Id. at ¶¶ 14, 23, 48. Today, membership is open to almost any college. Id. at ¶ 83. As Defendant's membership ranks grow, so do the number of student applicants using that service and, therefore, the number of applications members receive. Colleges compete to attract applicants not only to

secure "high-value students" but also because an increase in the number of applications increases

the application fees a college generates and lowers its admission rate, thereby raising its

selectivity rating and college ranking. Id. at ¶ 31.

Defendant has a three-tiered membership structure. Id. at ¶ 74. All members must (1) use

Defendant's Common Application for all form and payment processing—including Institutional

Supplements—for Common Applicants; (2) accept all Common Applicant evaluation forms

(including final transcripts) online, for schools that choose to send them online; and (3) accept

the Common Application fee waiver. Id. at ¶ 75. In addition, "Exclusive I" members must also

use the Common Application as their only admission application for full-time, undergraduate,

degree-seeking applicants, and "Exclusive II" members must further (1) establish uniform fees

for all applicants; (2) use the Common Application as their only transfer application; and (3) use

Slideroom.com for their Arts Supplement (if they offer one). Id. at ¶¶ 76, 77. According to

Plaintiff, the "penalties"[3] for choosing to be a Non-Exclusive versus Exclusive II member are

"extreme." Id. at ¶ 78.

Plaintiff alleges that Defendant's agreements with its members have reduced "Net

Output," which Plaintiff defines as the net value derived from Online College Application

Processing services by both Colleges and applicants:

> Net Output increases as the quality, functionality, features, ease of use, and level of
> innovativeness of Online College Application Processing services improve. Net Output
> also increases as those services better enable Colleges to discover and matriculate
> students who are good matches for their College, applicants to discover and matriculate at
> Colleges that are good matches for them, and Colleges to predict yield (how many
> accepted applicants will matriculate). Net Output decreases as the amount of resources
> (e.g. money and time) expended by Colleges and applicants in connection with using
> Online College Application Processing services in the college admissions process
> increases.

---

[3] There is a $2 difference per application between Exclusive and Non-Exclusive members. Am. Compl. ¶
78. Plaintiff characterizes this as a "penalty" on Non-Exclusive members. Id. Defendant characterizes it
as a "modest, two-tiered incentive discount" for Exclusive members. Def.'s Mot. 24.

Id. at ¶ 21. Plaintiff alleges that Defendant has reduced Net Output by imposing the following membership restrictions and restraints (thereinafter, "Challenged Restraints"): tying and bundling/forced purchase requirements, exclusivity restrictions, an "equal treatment" requirement, and uniformity requirements. Id. at ¶ 15. According to Plaintiff, Defendant's Challenged Restraints have led to a significant growth in Defendant's membership and revenue, yet none of them are necessary to achieve any legitimate or procompetitive goal. Id. at ¶ 16.

Plaintiff hosted Common Application Institutional Supplements[4] and supported Common Application member colleges in a variety of ways prior to Defendant's adoption and enforcement of the "Challenged Restraints." Id. Plaintiff alleges that it has been injured because it has been prevented or significantly limited in its ability to offer customized application processing services to colleges and applicants. Id. at ¶ 160. Plaintiff alleges that it has lost over 200 college customers to Defendant in the last 10-15 years due to Defendant's "anticompetitive and exclusionary conduct." Id. at ¶ 37.

As to the tying and bundling/forced purchase requirements, Plaintiff alleges that Defendant has tied access to the applicant pipeline generated by its Standard College Application Data service to members' use of Common Application's Online College Application Processing services. Id. at ¶ 153. Plaintiff contends that Defendant's tying arrangement harms competition in the relevant markets by limiting college choice, limiting the scope of services and price competition available to student applicants, and foreclosing rival providers from capturing colleges' and applicants' business. Id. at ¶ 153.

Plaintiff alleges that Defendant's exclusivity provisions have further disadvantaged and foreclosed rival providers by making it prohibitively expensive for members to use and offer to

---

[4] "Institutional Supplements" are member-specific supplements which many members require in addition to the Common Application. Am. Compl. ¶ 15.

applicants those rivals' services. Id. at ¶ 154. The exclusivity provisions charge a lower per-application fee for members who agree to use the Common Application exclusively. Id. at ¶ 47.

Defendant's "equal treatment" requirement requires members to encourage the use of the Common Application by ensuring that the fee for Common Applicants is no more than for other accepted applications, providing an equally prominent link to the Common Application Online whenever the college posts a link to another online application, and offering any special benefits to students regardless of what kind of application they choose.[5] Id. at ¶ 46. Plaintiff alleges that Defendant's "equal treatment" requirement is "tantamount to an agreement among members to suppress demand for Online College Application Processing services" and also operates as a group boycott agreement among members, pursuant to which they agree not to promote rival providers' applications. Id. at ¶ 152.

Finally, Plaintiff alleges that Defendant's uniformity requirements have forced colleges to limit the content and standardize the look and feel of their applications and to limit applicants' ability to upload documents, customize their applications to different colleges, and otherwise showcase themselves. Id. at ¶ 155. This has resulted in reduced competition, depressed Net Output, and has foreclosed competitors. Id.

Plaintiff identifies four relevant markets in which to analyze its claims: (1) Online College Application Processing Market; (2) College Market for Standard College Application Data Services; (3) Student Application Market; and (4) College Admissions Market (markets (3) and (4) collectively, the "Admissions Markets"). Id. at ¶ 90. Alternatively, Plaintiff argues that

---

[5] While Plaintiff's Amended Complaint says that members are required to "not explicitly offer special benefits," Am. Compl. ¶ 46 (emphasis added), this must have been a typographical error on Plaintiff's part because Defendant's 2013 Membership Profile Form for Non-Exclusive members states that members are required "to explicitly offer special benefits." Def.'s Request for Judicial Notice, Ex. 2 at 4, [82].

the Admissions Markets may be limited to "Elite Colleges,"—top ranked colleges. Id. at ¶¶ 132, 141.

The Online College Application Processing Market is the market for online application and evaluation forms and processing services offered to colleges and applicants. Id. ¶ 20. Online College Application Processing providers develop a college's online application and evaluation forms, host those forms online, process applicants' form submissions, process applicants' transcripts, and/or process applicants' application fee payments. Id. Plaintiff estimates that Defendant's share of this market is "at least 60%." Id. at ¶ 115. Plaintiff further estimates that Defendant's share of each of this market's submarkets—those for (1) online application forms and processing, (2) online evaluation forms and processing, (3) transcript processing, and (4) payment processing—is at least 60%, "except perhaps in transcript processing market." Id. at ¶¶ 20, 115. Therefore, according to Plaintiff, Defendant has market and monopoly power in these submarkets. Id. at ¶ 116.

The Standard College Application Data Service market is the market for a generic, text-based data entry form for applicants to input their background information as required by more than one college. Id. at ¶ 118. The market includes full application form development and processing. Id. According to Plaintiff, Defendant's share of this market is in excess of 90%. Id. at ¶ 122.

The Student Application market encompasses the market for student applications to full-time, four-year degree programs at colleges. Id. at ¶ 32. This market does not include the market for student applications to non-U.S. colleges, graduate student programs, two-year and/or part-time degree programs, unaccredited institutions, or for-profit institutions. Id. at ¶ 127. According to Plaintiff, Defendant has market power because its members will process at least 40-45% of

college applications in the 2014-2015 year. Id. at ¶ 129. Alternatively, Plaintiff states that the Student Application Market may be limited to the Elite Student Application Market—the market for student applicants for admission to Elite Colleges. Id. at ¶ 132. Plaintiff alleges that Defendant will process approximately 70% of Elite Colleges' freshman admissions applications in the 2014-2015 year. Id. at ¶ 141.

The College Admissions market is the market for students to enroll in full-time, four-year degree programs at colleges. Id. at ¶ 138. As with the Student Application market, Plaintiff excludes from the College Admissions market the market for student applications to non-U.S. colleges, graduate student programs, two-year and/or part-time degree programs, unaccredited institutions, or for-profit institutions. Id. at ¶ 139. Additionally, Plaintiff alleges Defendant's market share and market power are the same as in the Student Application Market, and that the market can similarly be limited to Elite Colleges. Id. at ¶¶ 140-41.

## STANDARDS

**I.      Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." Am. Family Ass'n, Inc. v. City & Cnty. of S.F., 277 F.3d 1114, 1120 (9th Cir. 2002). However, the court need not accept conclusory allegations as truthful. See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint, and we do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations") (internal quotation marks, citation, and alterations omitted). Rather, to state

a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" Id. (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Additionally, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. A complaint must contain "well-pleaded facts" which "permit the court to infer more than the mere possibility of misconduct[.]" Id. at 679.

## II.    Antitrust Analysis

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Congress designed the Sherman Act as a consumer welfare prescription." Reiter v. Sonotone Corp., 442 U.S. 330, 343 (1979) (internal quotation marks omitted). "Consumer welfare is maximized when economic resources are allocated to their best use" and when "consumers are assured competitive price and quality." Rebel Oil Co. v. Atl. Richfield Co., 51

F.3d 1421, 1433 (9th Cir. 1995). "A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 107, 104 (1984). Congress sought to ensure that competitors not cut deals aimed at stifling competition and at permitting higher prices to be charged to consumers than would be expected in a competitive environment, or permitting lower prices to be paid to those from whom competitors bought materials than a fair market rate. California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1132-34 (9th Cir. 2011).

Agreements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade are outlawed. However, the Supreme Court has repeatedly recognized that by the language of the Sherman Act, "'Congress intended to outlaw only *unreasonable* restraints.'" Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors[.]" State Oil, 522 U.S. at 10. The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." Dagher, 547 U.S. at 5. "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects." Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1156 (9th Cir. 2003). The court reviews all the facts, including the precise harms alleged to the competitive markets, and the legitimate justification provided for the challenged practice, and determines whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects. Id.

In order to state a Section 1 claim under the rule of reason, plaintiffs must plead facts which, if true, will prove "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition;" and (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an "anti-competitive aspect of the practice under scrutiny." Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (citations omitted); see also Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). This fourth element is generally referred to as "antitrust injury" or "antitrust standing." Id.

Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce ... shall be deemed guilty of a felony...." 15 U.S.C. § 2. "In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." SmileCare Dental Grp. v. Delta Dental Plan of California, Inc., 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). The following elements are required to establish an attempt to monopolize claim: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." Id. To prove a conspiracy to monopolize in violation of Section 2, a plaintiff must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. Paladin, 328 F.3d at 1158.

While the rule of reason is the default standard to analyze allegedly anticompetitive conduct, "[s]ome types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*" State Oil, 522 U.S. at 10. Such restraints "'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" Nw. Wholesale Stationers, 472 U.S. at 289 (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)). *Per se* treatment is proper only "[o]nce experience with a particular kind of restraint enables the [c]ourt to predict with confidence that the rule of reason will condemn it." Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982). "[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing.'" Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877 (2007) (second alteration in original) (quoting Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58–59 (1977)). To justify *per se* condemnation, a challenged practice must have "manifestly anticompetitive" effects and lack "any redeeming virtue." Id. at 886 (internal quotation marks omitted). The Supreme Court has "'expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious.'" Dagher, 547 U.S. at 5 (quotation marks and ellipses omitted) (quoting State Oil, 522 U.S. at 10).

In sum, *per se* and rule-of-reason analyses are two methods of determining whether a restraint is "unreasonable"; in other words, whether its anticompetitive effects outweigh its procompetitive effects. Atl. Richfield Co., 495 U.S. at 341-42 n.12 (1990) ("Both *per se* rules and the Rule of Reason are employed 'to form a judgment about the competitive significance of the restraint.' [W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same-whether or not the challenged restraint enhances

competition.") (internal quotations and citations omitted). While the *per se* rule determines whether or not the Sherman Act was violated, antitrust injury must be shown even for *per se* claims. Id. at 341 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason.") (emphasis in original).

## DISCUSSION

### I.  Incorporation by Reference

The doctrine of incorporation by reference allows "a district court to consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." In re Silicon Graphics, Inc. Sec. Litig. (SGI), 183 F.3d 970, 986 (9th Cir. 1999) (internal quotation omitted). Because these documents have essentially been adopted as part of the complaint, the Court may consider them without converting the motion to dismiss into a motion for summary judgment. United States v. Richie, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

Defendant asks the Court to incorporate by reference: (1) a letter to Defendant's board members and (2) a copy of Defendant's 2013 Membership Profile Form for Non-Exclusive Members. Plaintiff does not oppose Defendant's request. Because both documents are referred to in the Amended Complaint and form part of the basis of Plaintiff's claims, the Court incorporates them by reference.

## II.  Antitrust Injury

Antitrust injury "is an element of all antitrust suits." Rebel Oil, 51 F.3d at 1433. Accordingly, the lack of antitrust injury serves as an independent basis for dismissal. LiveUniverse, Inc. v. MySpace, Inc., 304 F. App'x 554, 557 (9th Cir. 2008). The Court grants Defendant's motion to dismiss in its entirety because Plaintiff fails to adequately plead an antitrust injury.[6]

To assert a claim under § 1 and § 2 of the Sherman Act, a plaintiff must have suffered an "antitrust injury," meaning an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Plaintiff "must prove that [its] loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." Rebel Oil Co., 51 F.3d at 1433 (9th Cir. 1995) (citing Atlantic Richfield Co., 495 U.S. at 334); see also, Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir. 1996) ("a plaintiff must allege 'antitrust injury,' that is, that the agreement at issue actually caused injury to competition within a market, beyond its impact on the plaintiff.").

Because Congress designed the Sherman Act to protect consumers or purchasers of goods in a market, Reiter v. Sonotone Corp., 442 U.S. 330, 343 (1979), the focus of the antitrust injury analysis is the direct result of anticompetitive conduct on consumers. Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 266 (7th Cir. 1984). Hence the often repeated phrase—antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962); see also Gorlick Distribution Centers, LLC v. Car

---

[6] Because the lack of antitrust injury disposes of the entire case, the Court declines to reach the parties' additional arguments regarding the merits of specific claims.

Sound Exhaust Sys., Inc., 723 F.3d 1019, 1024-25 (9th Cir. 2013). A plaintiff must demonstrate

injury to competition in the market as a whole, not merely injury to itself as a competitor.

Gorlick, 723 F.3d at 1024-25; see also Brantley, 675 F.3d at 1200.

      As discussed in the Background section of this Opinion & Order, Plaintiff alleges that

Defendant engages in unlawful conduct in the form of four Challenged Restraints. Plaintiff

alleges that it has lost over 200 college customers to Defendant in the last 10-15 years. Id. at ¶

37. According to Plaintiff, these losses "were directly caused by [Defendant's] anticompetitive

and exclusionary conduct." Id. Plaintiff contends that Defendant has foreclosed a substantial

amount of competition, is likely to further foreclose a substantial amount of competition, and has

excluded Plaintiff from competing in the Online College Application Processing Market and

submarkets. Id. at ¶¶ 180-81. Plaintiff claims that Defendant has artificially suppressed

Plaintiff's output and profits and foreclosed possible customers from retaining Plaintiff. Id. at ¶

176. Furthermore, Plaintiff claims that is has been injured by being foreclosed from competing

with Defendant to provide Online College Application Processing services and from earning the

profits it would have earned but for Defendant's unlawful conduct. Id at ¶¶ 186, 198, 205, 211,

218.

      Plaintiff tries to translate its individual harm into harm to competition by alleging that

Defendant's Challenged Restraints injure both colleges and applicants. However, the Amended

Complaint lacks sufficient factual allegations of harm to either group of consumers.

      Defendant's Challenged Restraints have led to an increase in applicants applying to

colleges. See Am. Compl. ¶ 50 ("For example, between 2010 and 2011, the percentage of

students applying to at least three Colleges rose from 77% to 79% (more than 10% more than in

2000) and the percentage of students applying to at least seven colleges rose from 25% to 29%

(both of which are more than double the percentage of such students a decade earlier."). Nevertheless, Plaintiff contends that this increase in output of applications harms applicants and colleges when quality, and not just quantity, is accounted for.

Plaintiff uses the concept of "Net Output" as a framework for understanding the injury to consumers. Plaintiff contends that antitrust laws allow for "output" to encompass factors beyond quantity, such as quality, efficiency, and innovation. Taking those factors into account, Plaintiff contends that "Net Output" from Online College Application Processing services accounts for the costs of submitting, processing, and reviewing applications. Am. Compl. ¶ 32. While colleges are receiving more and more applications, the online application processing services are allegedly of an inferior quality because there is a lack of competition, resulting in a more expensive and time-consuming process for applicants and colleges. Id. ¶¶ 68-72, 137, 149-56, 159, 166-67. Plaintiff argues that Defendant's Challenged Restraints have decreased "Net Output," as seen by the anticompetitive effects of the Challenged Restraints—specifically, worse college matching, reduced choice, lower-quality, less innovative college application processing services, and higher effective prices to students. According to Plaintiff, "customization and information exchange in the college application process result in greater-quality matches with less application churn." Pl.'s Opp. 16. Colleges and applicants would save time and money by submitting and processing less meaningless applications, which would improve services and result in better matches. Id.

Plaintiff's concept of Net Output fails, however, because it is based on the assumption that colleges and applicants do not want to participate in an increased "application churn." Plaintiff's position rests upon the conclusion that colleges and applicants are harmed by a system that increases the number of applications to colleges, regardless of an applicant's likelihood of

16 – OPINION & ORDER

acceptance to any particular college. However, Plaintiff's opinion about what is best for applicants and colleges cannot suffice to establish antitrust injury. The Court finds it equally probable that the "application churn" is precisely what colleges and applicants desire—a system that facilitates increased applications in an efficient way. Even Plaintiff concedes that colleges want an increase in applications because they "secure a boost in members' applications, application fees, and rankings." Am. Compl. ¶157(c). "This in turn allows the College to attract even more (and higher-value) applicants, greater alumni donations, and better professors, increases the College's creditworthiness, and lowers its borrowing costs." Id. ¶ 31.

Contrary to Plaintiff's assertions, the product at issue here is unlike dating websites that advertise to help people find their *one* match or services in the real estate market that help a buyer find *one* house. The product here aims to do precisely what Plaintiff alleges is occurring—increasing the ease and efficiency by which applicants can apply to many colleges and by which colleges can receive many applications.

Furthermore, Plaintiff alleges that Defendant's Challenged Restraints have suppressed prices for online college applications processing services "below competitive levels." Am. Compl. ¶ 172. According to Plaintiff, the Challenged Restraints "enable members to spend below-competitive levels on Online College Application Processing services without losing applicants" and Defendant's "equal treatment" requirement has "lower[ed] prevailing prices for" Online College Application Processing services. Id. at ¶¶ 157(a), 151. Notably, Plaintiff does not allege that Defendant has set prices below-cost. An allegation of prices merely "below competitive levels," (as opposed to predatory pricing), does not form the basis of an antitrust claim. See Atl. Richfield, 495 U.S. at 340 ("Low prices benefit consumers regardless of how

those prices are set, and so long as they are above predatory levels, they do not threaten

competition. Hence, they cannot give rise to antitrust injury.").

Plaintiff does not offer, and this Court does not find, support for the proposition that an

injury solely based on less innovation and choice is sufficient to state a claim for antitrust injury.

Certainly, decreased innovation and choice can be relevant to a court's finding of antitrust injury.

However, an allegation of diminished quality alone is not sufficient to establish injury in any of

the cases cited by Plaintiff. See, e.g., Rebel Oil, 51 F.3d at 1433 (an act is deemed

anticompetitive under the Sherman Act only when it harms *both* allocative efficiency *and* raises

the prices of goods above competitive levels or diminishes their quality) (emphasis added). The

Court declines to make new law here and open the door for antitrust claims to be brought by any

plaintiff who claims to have a higher quality product that consumers *should* be choosing.

Both parties cite Sewell Plastics, Inc. v. Coca-Cola Co., 720 F. Supp. 1196 (W.D.N.C.

1989) aff'd and remanded, 912 F.2d 463 (4th Cir. 1990), in support of their arguments. In Sewell,

a plastic bottle manufacturer (Sewell) brought an action against soft drink bottlers and

Southeastern Container, a plastic bottle manufacturing cooperative formed by the defendant

bottlers, alleging violations of federal antitrust law (among other allegations). Id. Prior to the

defendant bottlers forming their manufacturing cooperative, they had purchased over 90% of

their bottles from Sewell. Id. at 1199. After forming their own bottling manufacturing facility,

defendant bottlers bought only about 17% of their bottle requirements from Sewell. Id. The court

found that the "economic consequences in the relevant market of the bottle-making defendants

were dramatic." Id. Prices for plastic bottles dropped, production of plastic bottles increased,

production processes became more efficient, the number of competitors in the market remained

the same but market concentration decreased, and—most importantly—"although some

competit*ors* may be making less profit, there has been no adverse effect on competit*ion*." Id. (emphasis in original). Because antitrust laws were enacted to protect competition, not competitors, the court granted the defendants summary judgment because the plaintiff could not establish an antitrust injury. Id.

Plaintiff argues that Sewell is distinguishable because the court found that there were no anticompetitive effects—price to consumers had decreased, consumer choice had increased, and innovation had increased. Id. at 1196, 1211, 1213, 1218-1219, 1222. Because Plaintiff alleges anticompetitive effects here, Plaintiff argues that its Complaint survives the motion to dismiss. However, in evaluating a motion to dismiss, the court looks not just at Plaintiff's allegations, but at the factual support underlying those allegations. As discussed above, Plaintiff fails to allege any facts to support a claim that Defendant's Challenged Restraints have had an anticompetitive effect that has injured consumers. As the Supreme Court has emphasized, an insistence on specificity of facts is warranted before permitting a case to proceed into costly and protracted discovery in an antitrust case because of the potential great expense of discovery. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007); see also Somers v. Apple, Inc., 729 F.3d 953, 966 (9th Cir. 2013). Because the Court fails to find facts to support an allegation of antitrust injury, Plaintiff's Amended Complaint is dismissed.

**III. Leave to Amend**

If the court dismisses a complaint, it must decide whether to grant leave to amend. See 28 U.S.C. § 1653. The Ninth Circuit has repeatedly held that dismissal without leave to amend is improper, even if no request to amend the pleading was made, unless it is clear that the defective pleading cannot possibly be cured by the allegation of additional facts. Snell v. Cleveland, Inc., 316 F.3d 822, 828 n. 6 (9th Cir. 2002) (citing Lee v. City of Los Angeles, 250 F.3d 668, 692 (9th

Cir. 2001)); <u>Lopez v. Smith</u>, 203 F.3d 1122, 1130–31 (9th Cir. 2000). Accordingly, the Court grants Plaintiff leave to amend.

## CONCLUSION

Defendant's Motion to Dismiss [80] and Amended Request Seeking Judicial Consideration of Documents Incorporated by Reference [82] are GRANTED. Plaintiff is granted leave to amend the First Amended Complaint to allege facts sufficient to demonstrate an antitrust injury. If Plaintiff chooses to amend its complaint, it must do so within 14 days of the date below.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge