IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLLEGENET, INC., a Delaware                    No. 3:14-cv-00771-HZ
Corporation,

                    Plaintiff,                  OPINION & ORDER

        v.

THE COMMON APPLICATION, INC.,
a Virginia Corporation,

                    Defendant.

Sarah J. Crooks
PERKINS COIE LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 97209

Susan E. Foster
Shylah R. Alfonso
David S. Steele
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101

Jon B. Jacobs
PERKINS COIE LLP
700 Thirteenth Street, NW Suite 600
Washington, DC 20005

        Attorneys for Plaintiff

Thomas Triplett
Richard K. Hansen
SCHWABE, WILLIAMSON & WYATT, P.C.
1900 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204

J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005

Heather M. Burke
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Sq., 9th Floor
Palo Alto, CA 94306

Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff CollegeNet, Inc., brings this antitrust action for violations of Sections 1 and 2 of the Sherman Act against Defendant The Common Application, Inc. Plaintiff brings seven claims for relief: (1) Horizontal Restraint of Trade in the Admissions Markets; (2) Horizontal Restraint of Trade in the Online College Application Processing Market; (3) Exclusive Dealing; (4) Tying; (5) Monopolization; (6) Attempted Monopolization; and (7) Conspiracy to Monopolize. Defendant moves to dismiss all of Plaintiff's claims and transfer this action to the Eastern District of Virginia. The Court denies Defendant's Motions to Dismiss and Transfer.

## BACKGROUND

### I.     The Parties

Plaintiff CollegeNET is a Portland-based corporation that offers various web-based administrative services to higher education and non-profit organizations, including customized online application forms, processing services, and contact management services. First Am.

Compl. ("FAC") ¶ 6, ECF 75. Defendant The Common Application is a Virginia-based non-profit corporation comprised of 549 non-profit member colleges and universities. *Id.* at ¶ 7. It offers a standard college application data service, application forms, and processing services. *Id.*

Defendant was formed in 1975 as a limited group of selective colleges seeking to simplify the college admissions process. *Id.* at ¶¶ 13, 38. The application was initially a paper form that was universally accepted by all member colleges, eliminating the need for applicants to write their basic information more than once. *Id.* at ¶ 13. According to Plaintiff, Defendant has since "transformed itself into a dominant online college application processing provider." *Id.* at ¶ 14. As it grew, Defendant's members began to "understand that Common Application was providing tangible monetary benefits to them at the expense of applicants. What started out as a service to simplify the college application process for students had become a pipeline of applicants" *Id.* at ¶ 48. According to Plaintiff, membership grew "not to serve students but in part to secure a boost in applications, application fees, and rankings." *Id.*

Plaintiff alleges that Defendant is not a single entity, but rather a "consortium of competitors" that have participated with Defendant as co-conspirators in connection with the alleged antitrust violations. *Id.* at ¶¶ 8, 84. A majority of Defendant's steering committee or board of directors is made up of admissions officers from member colleges. *Id.* at ¶ 85. The board discusses and approves membership agreements, Common Application changes, and restraints. *Id.* at ¶ 86. Each year, member colleges sign an agreement with Defendant to abide by its rules and regulations. *Id.* at ¶ 88.

## II.     Evolution of Defendant's Unlawful Conduct

Plaintiff alleges various anticompetitive behavior resulting from membership restrictions and restraints, including but not limited to: (a) Tying and Bundling/Forced Purchase

Requirements; (b) Exclusivity Restrictions; (c) the "Equal Treatment" Requirement; and (d) Uniformity Requirements. *Id.* at ¶ 15. Plaintiff suggests that none of these requirements—which Defendant operated without for 25 years—is necessary to achieve any legitimate or procompetitive goal of the Common Application. *Id.* at ¶ 16. According to Plaintiff, these restraints "have the primary effect of suppressing competition to provide online college application processing services to applicants and colleges, reducing net output, and excluding rival providers." *Id.* They "are not ancillary to or reasonably necessary to carry out Common Application's official mission." *Id.* at ¶ 159.

In 2003, Defendant "redefined its 'equal treatment' requirement." *Id.* at ¶ 46. Specifically, it began requiring members to "encourage the use of the Common Application" by "(1) charging an application fee to Common Applicants that was 'no greater than the fee charged for [their] other accepted applications; (2) providing 'an equally prominent link to the Common App Online wherever [they] post[ed] a link to another online application; and (3) not 'explicitly offer[ing] any special benefits to students regardless of the application they choose.'" *Id.* It also began charging non-exclusive members a higher fee per application than was charged to exclusive members. *Id.* at ¶ 47.

In 2005–06, Defendant entered into agreements with Naviance and ApplyYourself ("AY"). Naviance is the "largest provider of planning and advising systems for secondary schools" with an "electronic document transmission system . . . integrated into more than 5,500 schools." *Id.* at ¶ 55. Defendant became "tightly integrated" with Naviance's system, and college counselors familiar with Naviance "encourage[d] students to apply to college through the Common App." *Id.* Defendant also awarded an "exclusive Online College Application Processing Services contract" to AY from 2007 to 2013. *Id.* at ¶ 56.

During this time, Defendant also made several changes to its services and pricing structure. Plaintiff alleges that Defendant's "typical pattern was to begin by offering additional 'optional' services and then, after a few years, (1) bundle the services with its core offering, (2) make their use mandatory, and/or (3) impose penalties on members who did not agree to use Common Application's services exclusively." *Id.* at ¶ 58. In the mid-2000's, for example, Defendant introduced supplemental forms and payment processing services. *Id.* at ¶ 59. Initially, members could pay for membership, applications, application payment processing, supplemental applications, and maintenance of supplemental applications separately. *Id.* But, in the late 2000's, Defendant "bundled all of its distinct services (except for payment processing) into a single offering for one all-in fee." *Id.* at ¶ 61. In other words, Common Application still charged a membership fee and a fee per application, but the supplemental application and other services were "free." *Id.* In addition, members who were fully exclusive and did not use other application providers were charged $4.00 per application processed as opposed to the standard $5.50 fee per application. *Id.* at ¶¶ 61–62. Defendant also began "restricting member institutions' ability to customize and personalize their Institutional Supplements." *Id.* at ¶ 64.

In 2011, Defendant announced its intent to end its contract with AY and—in 2014 with its fourth-generation system "CA4"—to bring the online processing staff, software, and infrastructure in-house. *Id.* at ¶ 66. According to Plaintiff, Defendant was equipping itself to "'handle the full volume of the entire American college application process.'" *Id.* at ¶ 67.

Plaintiff alleges that CA4 was a "woefully deficient, technologically backwards, glitch-riddled product that would never survive in a competitive marketplace." *Id.* at ¶ 68. By further homogenizing the college application process, CA4 made it "harder for applicants and Colleges to identify good 'matches.'" *Id.* at ¶ 79. CA4 eliminated file uploads and used text boxes that

were limited to 650 words. *Id.* Applicants were further limited in the number of versions of essays they could upload and to answering four specific essay prompts. *Id.* at ¶¶ 80–81.

In addition, Defendant made further changes to its pricing and membership structure. Under its new three-tiered membership structure, all members had to (1) use Defendant's Common Application for all form and payment processing—including Institutional Supplements—for Common Applicants; (2) accept all Common Applicant evaluation forms (including final transcripts) online, for schools that chose to send them online; and (3) accept the Common Application fee waiver. *Id.* at ¶¶ 74–75. In addition, "Exclusive I" members had to use the Common Application as their only admission application for full-time, undergraduate, degree-seeking applicants, and "Exclusive II" members had to (1) establish uniform fees for all applicants; (2) use the Common Application as their only transfer application; and (3) use Slideroom.com for their Arts Supplement (if they offered one). *Id.* at ¶¶ 76, 77. According to Plaintiff, the "penalties" for choosing to be a Non-Exclusive versus Exclusive II member are "extreme." *Id.* at ¶ 78.

Since 2000, Defendant's membership has grown substantially, reaching 549 members in the 2014–2015 academic year. *Id.* at ¶ 44. With that growth, its total revenue increased from $339,046 in 2003 to $14.5 million in 2013. *Id.* It processed 3.45 million applications in the 2013–2014 application cycle. *Id.* at ¶ 82. In addition, in 2014 Defendant eliminated its "holistic admission membership requirement," allowing "virtually any College . . . to join Common Application." *Id.* at ¶ 83.

### III. Anticompetitive Effects and Injury

Plaintiff alleges that Defendant's agreements and the challenged restraints have had various anticompetitive effects. They have harmed competition in the Admissions and Online

College Application Processing Markets. *Id.* at ¶ 149. They have resulted in lower "Net Output," defined as the net value derived from Online College Application Processing services including (1) quality, functionality, features, ease of use and level of innovativeness of Application Processing services; (2) the ability of applicants and Colleges to find good matches; (3) the ability to predict yield or matriculation; and (4) the amount of time and money spent by Colleges and applicants using these services. *Id.* at ¶¶ 21, 151, 153–56. According to Plaintiff, the equal treatment requirement in particular has reduced competition among members to offer better alternatives to the Common Application. It amounts to a group boycott and an agreement to suppress demand for application services. *Id.* at ¶¶ 151–52. Plaintiff alleges that Defendant has impermissibly tied its Standard College Application Data service to its Online Application Processing service through its "one-price-for-all-services model." *Id.* at ¶ 153. The exclusivity provisions have also foreclosed rival providers by making it "prohibitively expensive for members to use and offer to applicants those rivals' services." *Id.* at ¶ 154. The uniformity requirements have similarly reduced Net Output by decreasing the value that applicants derive from the application process and limiting their ability to find a good match. *Id.* at ¶ 155.

Plaintiff has also been injured by the restraints. Plaintiff alleges that it has lost over 200 college customers to Common Application in the last 10–15 years. *Id.* at ¶ 37. Prior to the alleged restraints, Plaintiff asserts that it hosted Common Application Institutional Supplements and supported Common Application member colleges in other ways. *Id.* Plaintiff attributes its losses to these restraints. *Id.*

According to Plaintiff, members receive certain benefits from the restraints. *Id.* at ¶ 157. The restraints allow them to spend less on online application processing services without a reduction in applicants. *Id.* at ¶ 157(a). They boost their application numbers, fees, and rankings.

*Id.* at ¶ 157(c). Plaintiff alleges that early members in particular have a "significant financial interest and have invested substantial time and effort" in the commercial joint venture such that they are motivated to prevent competition. *Id.* at ¶ 157(b).

## IV.     The Relevant Markets

Plaintiff alleges that there are four relevant markets in which to analyze the effects of Defendant's allegedly unlawful restraints: "(1) the market for applicants to Colleges (the "Student Application Market"); (2) the market for admission to Colleges (the "College Admissions Market") ((1) and (2) collectively, the 'Admissions Markets'); (3) the Online College Application Processing Market and each of its submarkets; and (4) the College market for Standard College Application Data Services." *Id.* at ¶ 90. In the alternative, Plaintiff contends that the Admissions Markets may be limited to Elite Colleges, defined as top-50 universities and top-50 liberal arts colleges by U.S. News & World Report. *Id.* at ¶¶ 18, 91.

Plaintiff contends that the Online Application Processing Market is a distinct product market. *Id.* at ¶ 92. It is limited in geographic scope to the United States, and suppliers include: Defendant, Plaintiff, Applications Online LLC ("AOL"), XAP Corporation, Hobsons U.S., and AY. *Id.* at ¶¶ 33, 93. Plaintiff alleges that the market does not include applications to graduate programs (which cost more and are not a reasonable substitute for the college product) or student information systems ("SIS") (which are more limited products and require significant investment from the college). *Id.* at ¶¶ 96–106. Plaintiff alleges that barriers to entry are high because of the high fixed costs involved in entering the industry and the difficulty obtaining and retaining customers due to Defendant's entrenchment and exclusivity agreements. *Id.* at ¶¶ 107–10. Plaintiff also alleges that Defendant's exclusivity agreements, equal treatment requirements, bundling/forced purchase requirements, and tying behavior disincentivize offering other

applications and have made switching costs high. *Id.* at ¶¶ 110–13. Plaintiff contends that

Defendant's share of this market is 60%: "In 2014–15, an estimated 9.4 million undergraduate

applications will be submitted, with 5–6 million processed online by third-party providers, and

approximately 3.6 million of which will be processed by Common Application." *Id.* at ¶ 115.

The Standard College Application Service Market is a distinct product market. Unlike the

Online Application Processing Market, "which includes full application form development and

processing," the Standard College Application Data Service "provides a generic, text-based data

entry form for applicants to input their background information required by more than one

College." *Id.* at ¶ 118. Plaintiff alleges that there are no reasonable substitutes for access to this

product, which generates an "applicant pipeline." *Id.* at ¶ 121. Competitors in this market include

AOL (provider of the Universal College Application) and Defendant. *Id.* at ¶¶ 24, 122. Plaintiff

alleges that Defendant's share of this market is 90%. *Id.* at ¶ 122.

The Student Application Market and College Admissions Markets are also distinct

product markets. *Id.* at ¶ 124. They are supplied by Online Application Processing providers. *Id.*

at ¶ 125. The Student Application Market is limited to applications for admission to full-time,

four-year degree programs at Colleges ("regionally accredited, non-profit, undergraduate

colleges and universities"). *Id.* at ¶ 124. Similarly, the College Admissions Market is comprised

of full-time, four-year College degree programs. *Id.* Plaintiff contends that graduate programs;

part-time or two-year programs; programs at non-regionally accredited, for-profit schools; or

non-US institutions are not substitutes for Colleges and thus excludable from these markets. *Id.*

at ¶ 127. Plaintiff contends that Defendant will process 40–45% of College applications in 2014–

15 year and therefore controls at least 40–50% of the Student Application Market. *Id.* at ¶ 129.

Plaintiff alleges that this number is an understatement of Defendant's market power, or "their

ability to reduce Net Output without losing applicants" as a result of the network effects of its applicant pipeline. *Id.* at ¶ 130. There are also high barriers to entry in this market. *Id.* at ¶ 131.

The College Admissions Market is the market for admission to full-time, four-year College degree programs. *Id.* at ¶ 138. For the reasons discussed in the preceding paragraph, this market excludes other degree programs, and Defendant has similar market share and market power. *Id.* at ¶¶ 139–40. Plaintiff contends that the ability of Defendant to offer a product with "inferior functionality" at a high cost with limitations on Colleges' advertising opportunities and the ability of applicants to find a good College (without losing users) is direct evidence of Defendant's "unconstrained exercise of their market power." *Id.* at ¶ 137.

## V.      Procedural History

Plaintiff filed this case in the District of Oregon on May 8, 2014. Compl., ECF 1. On May 15, 2015, the Court granted Defendant's first Motion to Dismiss Plaintiff's claims for failure to plead antitrust injury. Opinion & Order, ECF 96. On appeal, the Ninth Circuit reversed the decision of the district court and remanded this case for further proceedings. Mandate, ECF 112. On July 12, 2018, Defendant filed its Motion to Dismiss, and on August 3, 2018, Defendant filed its Motion to Transfer. Def. Mot. Dismiss, ECF 137; Def. Mot. Transfer, ECF 146.

## STANDARDS

## I.      Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  *Am. Family Ass'n, Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1120 (9th Cir. 2002).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face[,]" meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  In other words, a complaint must contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

However, the court need not accept conclusory allegations as truthful. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint, and we do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations.") (internal quotation marks, citation, and alterations omitted). A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted).

## II.     Motion to Transfer Venue

28 U.S.C. § 1404 governs motions to transfer venue: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The purpose of the § 1404(a) is to "prevent the waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal citation and quotation marks omitted). The decision whether to transfer venue

lies in the discretion of the district court.  28 U.S.C. § 1404; *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (Under section 1404(a), "the district court has discretion to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.") (internal quotation omitted).

The burden is on the moving party to demonstrate that the balance of conveniences favoring the transfer is high. The defendant must make "a clear showing of facts which . . . establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).

## DISCUSSION

## I.      Judicial Notice

Both parties filed requests for judicial notice.[1] Typically, "when the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), review is limited to the complaint." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Id.* However, without turning a motion to dismiss into a motion for summary judgment, the Court may consider "material which is properly submitted as part of the complaint," documents not physically attached to the complaint if their authenticity is not contested and they are relied on in the complaint, and documents that are subject to judicial notice. *Id.* at 688–89.

---

[1] Plaintiff also filed an "Objection to Defendant's 'Non-Request' for Judicial Notice" in response to Defendant's Reply to the Motion to Transfer. ECF 158. Plaintiff objects to two websites that were cited in Defendant's Reply but were neither attached to a declaration nor included in a request for judicial notice. *See* Def. Reply Transfer 16–17, ECF 156 The Court, however, has not relied on either source in its decision and, therefore, declines to address this objection further.

Courts may take judicial notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may take judicial notice of SEC filings, press releases, or contents of a website, when they are "matters of public record." *See Lee*, 250 F.3d at 688–89; *see also Nw. Pipe Co. v. RLI Ins. Co.*, No. 3:09-CV-01126-BR, 2014 WL 1406595, at *5 (D. Or. Apr. 10, 2014). When a court takes judicial notice of a public record, "it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity." *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1157 (D. Nev. 2009) (quoting *Lee*, 250 F.3d at 690).

Turning first to Defendant's request, the Court declines to take judicial notice of the attached documents. Specifically, many of Defendant's exhibits are used to challenge inferences from facts alleged in the complaint. For example, numerous exhibits involve the "Coalition Application" and are cited to demonstrate that, because Plaintiff and other member colleges entered the market, barriers to entry are low, *see* Def. Mot. Dismiss 30 (citing RJN Exs. 2, 3, 5) (arguing that actual entry "proves that there are low barriers to entry" defeating Plaintiff's Section 2 claim), and there is no group boycott, *see id*. at 12 (citing RJN Exs. 23–34) (asking the Court to infer from the fact that some colleges provide multiple application options that there is no group boycott). Others are used to challenge Plaintiff's allegations of market power. *See id.* at 29 (citing RJN Exs. 17–18). In its own words, Defendant is "asking the court to take judicial notice of uncontested facts" and "[f]rom there, . . . assess the plausibility of Plaintiff's allegations in light of those uncontested facts." Def. Reply Req. Judicial Notice 3, ECF 150. Thus, Defendant improperly asks the Court to take notice of the facts contained within these documents

and infer from them that Plaintiff cannot state its claims under the Sherman Act. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018) (finding that a report was generally susceptible to judicial notice but declining to take notice because "there [was] a reasonable dispute as to what the report establishes"). In addition, some of the exhibits are irrelevant to the motion to dismiss, such as the exhibits demonstrating that only one public institution in Oregon offers The Common Application. Def. Mot. Dismiss 5. Accordingly, Defendant's Request for Judicial Notice is denied.[2]

Turning to Plaintiff's request, the Court finds that the documents in question are irrelevant to the disposition of the Motion to Transfer. In connection with its response to Defendant's Motion to Transfer, Plaintiff asks the Court to take judicial notice of the per diem costs in Washington, D.C., and the endowments of certain member schools. Pl. Req. Judicial Notice, ECF 155. But neither of these exhibits is relevant in determining whether the Court should transfer this case to the Eastern District of Virginia. *See Neylon v. Cty. of Inyo*, No. 1:16-CV-0712 AWI JLT, 2016 WL 6834097, at *4 (E.D. Cal. Nov. 21, 2016) (citing *Adriana Intern. Corp. v. Thoeren*, 913 F.2d 1406, 1410 n.2 (9th Cir. 1990)) ("[I]f an exhibit is irrelevant or unnecessary to deciding the matters at issue, a request for judicial notice may be denied."). Accordingly, Plaintiff's Request for Judicial Notice is also denied.

///

---

[2] Defendant also asks the Court to take judicial notice of the 2014 U.S. News & World Report rankings. The Court instead finds that the complaint incorporates this doctrine by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."). Plaintiff does not dispute this documents authenticity. It merely objects that it was neither extensively relied on in the complaint nor formed the "entire basis" of Plaintiff's claims. However, the Rankings form the basis for Plaintiff's alleged Elite College Submarket. FAC ¶ 18 ("'Elite College' means a top-ranked College (*e.g.*, by U.S. News & World Report as a top-50 national university or a top-50 liberal arts college)."). Accordingly, this document is properly incorporated by reference.

## II.    Defendant's Motion to Dismiss

Plaintiff's claims arise under Sections 1 and 2 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Agreements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade are outlawed." *California ex. rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011). However, the Supreme Court has repeatedly recognized that by the language of the Sherman Act, "'Congress intended to outlaw only *unreasonable* restraints.'" *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce . . . shall be deemed guilty of a felony. . . . " 15 U.S.C. § 2.

Defendant moves to dismiss all of Plaintiff's antirust claims. For the reasons that follow, the Court finds that Plaintiff has plausibly alleged all seven of its claims for relief. Accordingly, Defendant's Motion to Dismiss is denied.

### A.    Horizontal Restraints on Trade (Claims 1 & 2)

Plaintiff's first and second claims for relief arise under Section 1 of the Sherman Act. "[A] cause of action under 15 U.S.C. § 1 consists of the following three elements: (1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a *per se* or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 788 (9th Cir. 1996).

Defendant argues that Plaintiff has not adequately plead a claim under Section 1 of the Sherman Act for horizontal restraint of trade. Specifically, Defendant contends that Plaintiff has

not adequately alleged (1) an agreement; or (2) any unlawful restraint on trade that harmed competition. Def. Mot. Dismiss 8–19.

i.    Agreement

In the absence of direct evidence of a horizontal agreement, the plaintiff must demonstrate "parallel conduct plus." *In Re Musical Instruments and Equipment Antitrust Litigation*, 798 F.3d 1186, 1193 (2015). In other words, in addition to demonstrating parallel conduct—"such as competitors adopting similar policies around the same time in response to similar market conditions"—the plaintiff must plead "some further factual enhancement" or a "further circumstance pointing toward a meeting of the minds" *Id.* (citing *Twombly*, 550 U.S. at 557, 560). In addition, the Supreme Court has indicated that, under certain circumstances, a joint venture constitutes an agreement under Section 1: "[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010); *see also NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 US 85, 99 n.18 (1984); Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 1477, 1478 (4th ed. 2011) ("[T]he courts have had little difficulty in treating organizations created to serve their member-competitors or to regulate their market behavior as continuing 'agreements' among the members.").

Plaintiff makes the following relevant allegations in support of its contention that there was an agreement to restrain trade: Defendant is an association of 549 universities, which are all legally distinct entities. FAC ¶¶ 7, 84. They compete with one another for applicants. *Id.* at ¶ 84. Defendant's board is primarily comprised of admissions officers from member colleges. *Id.* at ¶ 85. They regularly meet in this capacity to discuss and vote on business decisions and modify

the restraints that Defendant imposes on members. *Id.* at ¶ 86. Annually, each member college signs an agreement with Defendant in which it agrees to abide by the restraints at issue here. *Id.* at ¶ 88. Plaintiff argues that "[w]hen horizontal competitors," like the member colleges, "form an association," like Defendant, "to adopt rules on how they will compete against each other, those rules constitute 'agreements' under Section 1." Pl. Opp'n Dismiss 9, ECF 143.

The Court agrees with Plaintiff. As noted above, the Supreme Court has acknowledged that such associations or joint ventures can, under certain circumstances, violate Section 1. Defendant responds that the restraints alleged here do not constitute concerted action because membership does not preclude colleges from buying or selling their own products or prohibiting them from using other services. Def. Reply Mot. Dismiss ("Def Reply") 12. Thus, membership "does not 'deprive the marketplace of independent centers of decisionmaking' and . . . does not fall into the 'concerted activity' covered by Section 1." *Id.* at 13 (citing *Am. Needle*, 560 U.S. at 194). But that is precisely what Plaintiff alleges. As described in more detail below, Plaintiff alleges that the challenged restraints in the membership agreement amount to a group boycott or refusal to deal in both the Admissions and Online College Application Processing markets. In other words, member Colleges who would otherwise be competitors and independent decision makers in the marketplace for online application processing services have, by virtue of their membership, limited their participation in the market. Thus, at this stage of these proceedings, Plaintiff has sufficiently alleged an agreement for purposes of Section 1 of the Sherman Act.

ii.     Unlawful Horizontal Restraints

Plaintiff and Defendant both characterize Plaintiff's first and second claims for horizontal restraints on trade as group boycott or buyer's cartel/refusal to deal claims. "[M]ost antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide

whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors[.]" *State Oil*, 522 U.S. at 10. The rule of reason is the presumptive or default standard, and it requires the antitrust plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "A conclusion that a restraint of trade is unreasonable may be 'based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.'" *NCAA*, 468 U.S. at 103 (quoting *Nat'l Soc'y of Prof. Eng. v. U.S.*, 435 U.S. 679, 690 (1978)). Ultimately, "[u]nder the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition." *Id.* at 104. Plaintiff can make this showing directly by demonstrating the anti-competitive effects of competition—such as "reduced output, increased prices, or decreased quality in the relevant market"—or indirectly through "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express. Co.*, 138 S.Ct. 2274, 2284 (2018).

 While the rule of reason is the default standard to analyze allegedly anticompetitive conduct, "[s]ome types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*" *State Oil*, 522 U.S. at 10. Such restraints "'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289 (1985) (quoting *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5 (1958)). *Per se* treatment is proper only "[o]nce experience with a particular kind of restraint enables the [c]ourt

to predict with confidence that the rule of reason will condemn it[.]" *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 344 (1982). "[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (second alteration in original) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc*., 433 U.S. 36, 58–59 (1977)). To justify *per se* condemnation, a challenged practice must have "manifestly anticompetitive" effects and lack "any redeeming virtue." *Id*. at 886 (internal quotation marks omitted). The Supreme Court has "'expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious.'" *Dagher*, 547 U.S. at 5 (quotation marks and ellipses omitted) (quoting *State Oil*, 522 U.S. at 10).

Plaintiff alleges that the challenged restraints—namely, the equal treatment requirement, exclusivity provisions, and tying—have all injured competition. FAC ¶¶ 149–56. For example, the equal treatment requirement has disincentivized investment in alternative applications that might provide better and less expensive services. *Id.* at ¶ 150. Tying of access to the applicant pipeline has foreclosed rival providers from capturing Colleges' business. *Id.* at ¶ 153. The exclusivity provisions make it cost prohibitive for members to use or offer rival services. *Id.* at ¶ 154.

Plaintiff's First and Second Claims for relief allege horizontal restraints of trade in the Admissions Market and the Online College Application Processing Markets, respectively. In Plaintiff's First Claim, Plaintiff alleges that the horizontal agreements among Defendant and its members amount to a conspiracy to insulate competitors in the application process, fix and reduce Net Output, stabilize or increase the prices paid, or reduce the benefits received by applicants. FAC ¶ 164. By boycotting other providers, Defendant and its members restrain

competition in the Admissions markets. *Id.* at ¶¶ 164–65. These are allegedly unlawful under the rule of reason because Defendant has significant market power and the restraints have reduced competition, reduced Net Output, and impaired access to other options. *Id.* at ¶ 167.

Similarly, in its Second Claim, Plaintiff alleges that the horizontal agreements among Defendant and its members amount to a conspiracy to refuse to deal or exclude rival providers in the Online College Application Processing Market in order to to suppress demand for services and prices paid below competitive levels. *Id.* at ¶ 173. Plaintiff alleges that the restraints are unreasonable under the rule of reason because Defendant and its members have significant market power and their adoption of the challenged restraints and boycott of rival providers have reduced competition in the Online College Application Processing Market. *Id.* at ¶ 174.

Defendant first challenges Plaintiff's "Group Boycott" Claim[3] on the grounds that the alleged restraints are not anticompetitive.[4] Def. Mot. Dismiss 11. Specifically, it argues that Plaintiff's claim fails because the equal treatment requirement does not affect the price or terms at which CollegeNet or other rivals can sell their services to Colleges. *Id.* at 11–14. The Court disagrees. Plaintiff plainly alleges that the challenged restraints are anticompetitive. By limiting

---

[3] The Court notes that Defendant cites the *per se* rules in its analysis and that neither party addresses the legal sufficiency of Plaintiff's claim under the rule of reason. Though horizonal restraints can—under some circumstances—be unlawful *per se*, the Court finds that analyzing Plaintiff's First and Second Claims under the rule of reason is likely most appropriate in this case, which involves an otherwise lawful joint venture involving certain horizontal restraints. *See Am. Needle,* 560 U.S. at 203 ("When 'restraints on competition are essential if the product is to be available at all,' *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason."); *NCAA,* 468 US at 100–01 (declining to apply the *per se* rule because the "case involve[d] an industry in which horizontal restraints on competition [were] essential if the product [was] to be available at all"); *see also* Areeda & Hovenkamp ¶ 1478 (noting that when single-entity claims are rejected, courts generally reject *per se* illegality as well).

[4] To the extent that Defendant's argument hinges on the difference between limiting what the school can charge students applications and what the provider can charge the College for its services, the effect of this difference is a factual issue that cannot be resolved at this stage in the proceedings.

members' abilities to offer more affordable alternatives, making non-exclusive memberships more expensive, and requiring members to purchase processing services to obtain access to the student data pipeline, Colleges are disincentivized to explore superior or more affordable alternative online college application processing services. In other words—as a result of the unlawful tying, equal treatment provisions, and exclusivity discounts—the members have "effectively agreed not to purchase higher-quality, more innovative, or lower-priced . . . services from rival providers." FAC ¶¶ 150, 152–54. In addition, Plaintiff alleges that the agreements— which constrain choice among the member colleges—have caused Net Output to decrease and quality in the relevant markets to suffer. *Id.*

Defendant also makes more targeted challenges to Plaintiff's "Refusal to Deal" Claim. Specifically, it argues that (1) Plaintiff's claims are illogical because a buyer's cartel in this context would only hurt all market participants, including Defendant and its member schools; and (2) that Plaintiff cannot allege suppression of demand because the number of applications ("output") increased as a result of increased demand. Def. Mot. Dismiss 14–19. With respect to Defendant's first argument, the Court finds that Plaintiff's allegations are not implausible. Plaintiff specifically alleges that Defendant and its member colleges have an interest in reducing demand and prices for application services. It is in their economic interest to eliminate all suppliers except Common App (which is controlled by members) and to prevent other competitor colleges from using a different supplier and changing the competitive landscape of the Admissions Market. FAC ¶ 157. These restraints benefit the members by allowing them to spend below-competitive levels on services without losing applicants and boosting their applications, application fees, and rankings. *Id.* In addition, members—particularly those who joined the venture early—have invested time and effort in Defendant and have a financial

interest in the success of The Common Application. On the second argument, the Court finds that Plaintiff has adequately alleged that Net Output has decreased as a result of Defendant's market power. *Id.* at ¶¶ 149–56, 166, 173. Members and Colleges have derived less value from the process, including a reduction in their ability to find good matches, poorer quality and innovativeness of the application process, and increased monetary costs. *Id.* at ¶¶ 149–57. Accordingly, the Court declines to dismiss Plaintiff's first and second claims for relief.

B.      Exclusive Dealing (Claim 3)

Plaintiff's third claim for relief is for exclusive dealing under Sections 1 and 2 of the Sherman Act. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "There are 'well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition.'" *Id.* (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)). Thus, "'an exclusive-dealing arrangement does not constitute a *per se* violation of section 1." *Id.* (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303–04 (9th Cir. 1982)). Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its probable effect is to "foreclose competition in a substantial share of the line of commerce affected." *Omega*, 127 F.3d at 1162 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). Generally, this requires "a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (internal citations omitted).

Defendant argues that complaint does not allege either (1) an agreement to deal exclusively; or (2) substantial foreclosure of the market. Def. Mot. 20–21.

i.      Exclusivity Agreement

"[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) (quoting *ZF Meritor,* 96 F.3d at 270). Generally, courts focus on whether there are "requirements terms, volume or market share targets, or long-term contracts that "prevent meaningful competition by taking potential purchasers off the market." *Id.*; *Cf. Omega Envtl.*, 127 F.3d at 1163–64 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."). The Ninth Circuit has not recognized "de facto" exclusive dealing arrangements, *Aerotec*, 836 F.3d at 1182 ("Although we have not explicitly recognized a 'de facto' exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit, we need not reach the issue here . . . . ), but other circuit courts have, *see ZF Meritor*, 696 F.3d at 282 ("[A]n express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful."); *see also Tampa Elec.*, 365 U.S. at 326, 3 (noting that "even though a contract does not contain specific agreements not to use the (goods) of a competitor, if the practical effect is to prevent such use, it comes within the condition of the section as to exclusivity"). In determining whether such an agreement exists, the court "look[s] past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world." *ZF Meritor*, 696 F.3d at 270, 282–83 (finding that agreements that conditioned discounts on market-share targets were *de facto* agreements to deal exclusively where the defendant was a dominant supplier in the relevant market).

Here, Plaintiff adequately alleges exclusive dealing. First, provisions in the agreements for Exclusive members specifically condition exclusivity on a discount for Defendant's services. FAC ¶ 76–78. In addition, the membership agreements contain equal treatment provisions, which, among other things, prevent member schools from offering other applications at a lower price. *Id.* at ¶ 46. Further, Plaintiff plausibly alleges that Defendant has tied access to its data services—and the student pipeline—on using its online application processing services, in a sense requiring member schools to use Defendant's product instead of competitor products. *Id.* at ¶ 61. Combined with the alleged high switching costs associated with terminating membership with Defendant (a dominant supplier), the membership agreements here plausibly constitute *de facto* exclusive dealing arrangements that in practical effect prevent purchasers from using the services and goods of competitors. *See Pro Search Plus, LLC v. VMC Leonardo Inc.*, No. SACV 12-2102-JLS (ANx), 2013 WL 6229141, at *6 (C.D. Cal. Dec. 2, 2013) (finding, on a motion to dismiss, that Plaintiff had plausibly alleged a *de facto* exclusive dealing claim where costs of switching were "prohibitive," the defendant's monopoly power made dealing with it an "economic necessity," at least one customer dealt exclusively with the defendant, and the defendant had market power).

    ii.    Substantial Foreclosure

To determine whether an agreement forecloses competition, the Ninth Circuit "focus[es] on whether there are requirements terms (*i.e.*, terms requiring a buyer to purchase all the product or service it needs from one seller), volume or market share targets, or long-term contracts that prevent meaningful competition by taking potential purchasers off the market." *See Aerotec*, 836 F.3d at 1181 (internal citations omitted). To determine substantiality, the court:

> [W]eigh[s] the probable effect of the contract on the relevant area of effective competition taking into account the relative strength of the parties, the

proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa Elec. Co.* 365 U.S. at 329. For claims arising under § 1, "'[s]ubstantial share' has been quantified as foreclosure of 40% to 50% of the relevant market." *Feitelson v. Google Inc.,* 80 F.Supp.3d 1019, 1030 (N.D. Cal. 2015) (citing *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)). For exclusive dealing, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004). Under § 2, less might be required. *See Microsoft*, 253 F.3d at 70 ("At the same time, however, we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

Plaintiff alleges that many aspects of the membership agreement—including the alleged tying, exclusivity discount, and equal treatment provisions—taken together amount to an exclusive dealing arrangement. Pl. Opp'n Dismiss 18–21. In other words, all the membership agreements—not just the Exclusive agreements—are relevant to this inquiry. *Id.* at 20–21 n.14. Plaintiff also alleges that Defendant has at least a 60% market share in the Online Processing Market and a 90% share in the Data Services Market. FAC ¶¶ 115, 122. Though the agreements are only one year in duration, Plaintiff alleges that there are high switching costs associated with ending or failing to renew the contract. *Id.* at ¶¶ 109–114, 116, 130, 154.

Again, taken together, Plaintiff has adequately alleged substantial foreclosure of the market. *Tampa Elec. Co.*, 365 U.S. at 334 (emphasizing, among other things, whether there is a seller in a dominant position, exclusive contracts, or tying arrangements). Defendant is a

dominant supplier that is alleged to control 60% of the market through these agreements, which exceeds the foreclosure rate that has been deemed significant in the past. Because switching costs are high, parties are unlikely to terminate their memberships. *Cf. Omega Envtl.*, 127 F.3d at 1163–64 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."). In addition, terminating their agreements with Defendant or pursuing other competitive options would be difficult for members, particularly in light of the equal treatment and tying provisions. Without access to Defendant's data services and student applicant pipeline, member colleges would lose applicants and, in turn, fall in their rankings. Taken together, Plaintiff plausibly alleges that potential purchasers are removed from the market, making it difficult for other competitors to enter or remain.

C.     Tying (Claim 4)

Plaintiff's Fourth Claim is for unlawful tying in violation of Sections 1 and 2 of the Sherman Act. "Tying is defined as an arrangement where a supplier agrees to sell a buyer a product (the tying product), but 'only on the condition that the buyer also purchase a different (or tied) product . . . .'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (citing *N. Pac. Ry. Co.*, 356 U.S. at 5–6). "The potential injury to competition threatened by this practice is that the tying arrangement will either 'harm existing competitors or create barriers to entry of new competitors in the market for the tied product,' or will 'force buyers into giving up the purchase of substitutes for the tied product.'" *Id.* (internal citations and quotations omitted).

"The Supreme Court has developed a unique *per se* rule for illegal tying arrangements." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008). Plaintiff "must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its

customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Id.* (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)) (internal quotation marks omitted); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992). "A *per se* tying violation 'is proscribed without examining the actual market conditions, when the seller has such power in the tying product or service market that 'the existence of forcing is probable,' . . . and there is 'a substantial potential for impact on competition.'" *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2011) (quoting *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir. 1990)).

Alternatively, "[a] tying arrangement which is not unlawful *per se* may be invalidated under the rule of reason if the party challenging the tie demonstrates that it is an unreasonable restraint on competition in the relevant market." *Id.* (internal citations and quotations omitted). As described earlier, the crux of this analysis is "whether the challenged agreement is one that promotes competition or one that suppress competition." *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 691. "[T]he plaintiff must allege an actual adverse effect on competition caused by the tying arrangement." *Brantley*, 675 F.3d at 1200 (internal citations omitted).

Defendant raises two challenges to Plaintiff's tying claim. First, Defendant asserts that Data Services and Processing Services are one product market, not two. Def. Mot. Dismiss 24–25. Second, Defendant argues that Plaintiff has not plausibly alleged coercion because there are no alleged facts to show an express or implied tying condition in the Common App's agreements with member colleges. *Id.* at 25–27.

///

///

i.    Distinct Products

To state a claim for unlawful tying, Plaintiff must show that there are two distinct

products or services offered for sale by the defendant. *Jefferson Parish Hosp. v. Hyde*, 466 U.S.

2, 21 (1984). "The existence of distinct products depends upon 'the character of the demand for

the two items.'" *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th

Cir. 2008) (quoting *Jefferson Parish*, 466 U.S. at 19). "There must be a sufficient demand for the

purchase of the tied product separate from the tying product to identify a distinct product market.

To determine this, the 'purchaser demand' test of *Jefferson Parish* examines direct and indirect

evidence of consumer demand for the tied product separate from the tying product." *Id.*

(brackets, quotations, and citations omitted). Direct evidence includes "whether, when given a

choice, consumers purchase the tied good from the tying good maker, or from other firms." *Id.*

By contrast, "indirect evidence includes the behavior of firms without market power in the tying

good market, presumably on the notion that (competitive) supply follows demand. If competitive

firms always bundle the tying and tied goods, then they are a single product." *Id.*

Here, Plaintiff has adequately alleged that two separate product markets exist. The tying

product is the Standard College Application Data service. This is a "a type of network service

where the service provider hosts a single, web-based background information form that

applicants wishing to apply to any of the network Colleges—which all require this same

information—fill out only once."  FAC ¶ 22. The tied product is the Online Application

Processing Services, or "online application evaluation forms and processing services offered to

Colleges and Applicants." *Id.* at ¶ 20. Plaintiff alleges that not all colleges that purchase

processing services buy data services. *Id.* at ¶ 188. The products do not operate better when

bundled than when integrated with a rival processing services provider. *Id.* at ¶ 189. They are

"physically and economically" separable as evidenced by Defendant's former pricing structure whereby members could purchase one or both. *Id.* at ¶ 190. Defendant, Plaintiff, AOL, XAP Corporation, Hobsons, and AY all provide Online Application Processing Services, and only Defendant and AOL provide standard application data services. *Id.* at ¶¶ 24, 33; *see Eastman Kodak*, 504 U.S. at 462 (emphasizing "[e]vidence in the record indicat[ing] that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners" and that "the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service."). Data Services—not Processing Services— provide the "pipeline" for student applicants. *Id.* at ¶¶ 23, 121. Taken together, these facts create a reasonable inference is that there is demand for such services separate and apart from application processing services. Thus, at least at this stage in the proceedings, Plaintiff has adequately alleged that there are distinct markets for the allegedly tied products.

      ii.    Coercion

Defendant argues that "CollegeNET has not plausibly alleged coercion because it did not allege any facts to show an express or implied tying condition in the Common App's agreements with member colleges." Def. Mot. 25. Courts typically encounter positive ties, or the "sale of the desired ('tying') product is conditioned on purchase of another ('tied') product. *Aerotec*, 836 F.3d at 1178. "[W]here the buyer is free to take either product by itself there is no tying problem." *N. Pac. Ry. Co.*, 356 US at 6 n.4. In addition, "[a] plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product." *Paladin*, 328 F.3d at 1159. "[F]orcing (or coercion) is likely if the seller has power in the tying product market." *Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc*., 732 F.2d 1403, 1407 (9th Cir. 1984). "For example, if the seller has a

patent on the tying product, or has a high market share, or if the tying product is so unique that competitors are unable to offer it, the court will assume adequate market power exists." *Id.*

In *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, the Tenth Circuit held that the plaintiff—a commercial provider of bar examination preparation services—had created an issue of fact on summary judgment with respect to its tying claim. 63 F.3d 1540, 1543 (10th Cir. 1995). There, the defendants—competitors that also provided bar preparation materials—began bundling their full-service bar examination workshop with their smaller MBE workshop. *Id.* at 1544–45. The supplemental MBE course was initially priced below cost and then marketed as free even though the defendants increased the cost of the full workshop by $50 the year after they began bundling the products. *Id.* Consumers could still purchase the supplemental course but would not receive a discount on any other services. *Id.* at 1546. The Court first found that, in the year the supplemental course was truly free, no separate or tied purchase was involved. *Id.* at 1548. However, when tuition was raised the subsequent year for the bundled course and reflected the cost of the tied product, customers were purchasing the tied product. *Id.* Thus, the circuit court found that the plaintiff had "presented enough evidence to create a triable issue as to whether the tuition for the bundled . . . course covered some portion of the [supplemental course costs], and therefore whether the conditioning element was satisfied." *Id.*

Here, Plaintiff has plausibly alleged a tying condition in the agreements with member colleges. Initially, Defendant is alleged to have offered its Data Services to colleges in the form of a paper application. FAC ¶ 13. More recently, however, both products are bundled together such that a school cannot purchase Data Services—and the pipeline of student applications that comes with it—without also purchasing Processing Services. *Id.* at ¶¶ 61, 192. In other words,

this is not a case where the consumer can buy both products separately and the seller is merely offering them together at a lower price. *Cf. Jefferson Parrish*, 466 U.S. at 12 n.17 ("[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."); *Cascade Health Sols.*, 515 F.3d at 915 ("[T]he fact that a customer would end up paying higher prices to purchase the tied products separately does not necessarily create a fact issue on coercion."). Under the facts alleged, the consumer is unable to purchase the tying product without the purchased of the tied product. In addition, though additional services are marketed as free, the pricing of Defendant's services changed once they were bundled together. FAC ¶¶ 59, 190. Thus, Plaintiff plausibly alleges that Defendant coerced Colleges into purchasing application processing services from Defendant instead of from other providers.

C.       Monopolization (Claims 5, 6 & 7)

Plaintiff's Fifth, Sixth, and Seventh Claims for relief are for monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section 2 of the Sherman Act. "In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) Possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). To establish an attempt to monopolize claim, the plaintiff must show: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Id.* To prove a conspiracy to monopolize in violation of Section 2, a plaintiff must show four elements: "(1) the existence

of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin*, 328 F.3d at 1158.

Defendant argues that Plaintiff's monopolization claims should be dismissed for three reasons. First, Defendant contends that Plaintiff cannot adequately allege monopoly power. Second, Defendant alleges that Plaintiff's entry into the Online College Application Market defeats its Section 2 claims. Third, Defendant argues that Plaintiff has not alleged sufficient facts to support its conspiracy claims.

### i. Market Power

To state a claim under the Sherman Act, "a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. IKON Office Solutions*, 513 F.3d 1038, 1044 (9th Cir. 2008). Market power under Section 2 can be demonstrated in two ways: (1) through "direct evidence of the injurious exercise of market power," such as restricted output and supracompetitive prices; or (2) circumstantial evidence. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995). Proof by circumstantial evidence is more common and requires plaintiff to: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output in the short run." *Id*. "The question of whether, and if so in what market, [the defendant] has monopoly power is complex, nuanced, and fact dependent." *CollegeNET v. The Common Application, Inc.*, 711 F. Appx 405, 407 (9th Cir. 2017). "There is no requirement that these elements of the antitrust claim be pled with specificity." *Newcal* 513 F.3d at 1045. In this case, Defendant challenges all three elements of Plaintiff's market power allegations.

///

a. Market Definition

Defendant first argues that "Plaintiff wrongfully excludes other competitor application options, including a college's own internal application, which shifts the market share analysis." Def. Mot. 29. Separately, Defendant also argues that Plaintiff's product markets inappropriately focus on a small subset of colleges by excluding two-year colleges and graduate school admissions. *Id.* at 33–34.

 "[A] 'market' is the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'" *Rebel Oil*, 51 F.3d at 1434 (citing *Thurman Indus. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *see also Thurman Indus.*, 875 F.2d at 1374 ("[A] product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand."). Courts should look to both demand and supply elasticity in determining whether two products are part of the same market. *Rebel Oil*, 51 F.3d at 1436. "As a matter of law, courts have generally recognized that when a customer can replace the services of an external product with an internally-created system, this 'captive output' (i.e. the self-production of all or part of the relevant product) should be included in the same market." *U.S. v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001) (brackets and citations omitted).

"[T]he validity of the 'relevant market' is typically a factual element rather than a legal element, [and] alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal Indus.*, 513 F.3d at 1045; *see also Rebel Oil*, 51

F.3d at 1435 ("[T]he definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility."). Consequently, an antitrust claim will survive a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Indus.*, 513 F.3d at 1045; *see also Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient and a motion to dismiss may be granted.").

In *RealPage, Inc. v. Yardi Systems, Inc.*, the parties were competitors in the real property management business. 852 F. Supp. 2d 1215, 1218 (C.D. Cal. 2012). RealPage and Yardi were the only two competitors in the market for supplying vertically integrated cloud computing services for real property owners and managers. *Id.* at 1224. RealPage brought antitrust claims against Yardi and excluded from the relevant market any "self-hosting of management software." *Id.* at 1218. The district court acknowledged that RealPage's market definition was "quite narrow"; however, the definition was not "facially unsustainable" because RealPage considered and rejected multiple conceivably interchangeable substitutes in "great factual detail." *Id.* at 1225. The district court denied the motion to dismiss the antitrust claims, explaining that the exclusion of "self-hosting of management software" did not render the relevant market inappropriate and that the resolution depended on issues of fact inappropriate for resolution at a motion to dismiss. *Id.*

Here, as in *RealPage*, Plaintiff's complaint does not suffer from a "fatal legal defect" as it adequately considers and rejects alternatives. First, with regard to the exclusion of in-house or

SIS-based application services from the Online Application Processing Market, Plaintiff alleges that they are not a reasonable substitute for third-party processing. Third-party solutions have distinct features, such as better data security and payment processing, and SIS-based application services require substantial time investment by the College. FAC ¶¶ 100–05. Because these systems are so "barebones," Plaintiff alleges that Colleges would not turn to them in response to a small but significant, nontransitory increase in price. *Id.* at ¶ 106.

Similarly, Plaintiff excludes two-year, part-time, and graduate schools from the Admissions markets because of their distinct characteristics. *Id.* at ¶¶ 127, 139. The customer base is distinct because students seeking four-year or full-time undergraduate degree programs would not consider these—or could not consider them in the case of graduate programs—as alternatives. *Id.* Graduate program applications all require more specialized applications and processing, and graduate school application processing services are sold at a higher price. *Id.* at ¶¶ 97–98. Thus, according to Plaintiff, a small but significant, nontransitory increase in the price of College programs would not result in students applying to these other programs, nor would an increase in price result in Colleges using graduate products. *Id.* at ¶¶ 98, 127, 139. Plaintiff therefore plausibly alleges that these products are not interchangeable. The extent to which these markets are too narrow turns on issues of fact more appropriate for resolution at summary judgment.

b.  Market Share

Defendant also contends that Plaintiff has miscalculated its market share. Def. Mot. Dismiss 30. "Courts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (*citing American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946)). "[A] market

share of less than 50 percent is presumptively insufficient to establish market power." *Rebel Oil*,

51 F.3d at 1438. Though "the minimum showing of market share required in an attempt case is a

lower quantum than the minimum showing required in an actual monopolization case, . . . . a

market share of 30 percent is presumptively insufficient to establish the power to control price."

*Id.* (finding that a market share of 44% was sufficient to support a finding of market power in an

attempt case). "Where such an inference is not implausible on its face, an allegation of a specific

market share is sufficient, as a matter of pleading, to withstand a motion for dismissal." *Hunt-*

*Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 925 (9th Cir. 1980).

The parties primarily dispute the appropriate way to calculate market share. Defendant

alleges that Plaintiff's market share—which it calculates by dividing Defendant's total number of

members by the total number of Colleges—is only 24% and is, therefore, insufficient to

constitute a monopoly. Def. Mot. Dismiss 30. Plaintiff, by contrast, calculates market share of

the Online College Application Processing Market by looking to the number of undergraduate

applications processed by Defendant.  FAC ¶ 115. According to Plaintiff's calculation, this puts

Defendant's total market share 60%. *Id.* The Court cannot say that Plaintiff's calculation is

incorrect as a matter of law. Therefore, at this stage in the proceedings—where the Court is

required to take Plaintiff's allegations as true—Plaintiff plausibly alleges monopoly power in the

Online Application Processing Market.

c.   Barriers to Entry

Defendant also contends that Plaintiff cannot demonstrate barriers to entry. Def. Mot. 33.

"Entry barriers pertain not to those already in the market, but to those who would enter but are

prevented from doing so." *United States v. Syufy Enterprises,* 903 F.2d 659, 671 n.21 (9th Cir.

1990). "A mere showing of substantial or even dominant market share alone cannot establish

market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Rebel Oil*, 51 F.3d 1421. "Barriers to entry may be defined as either additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to incur monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993). "The main sources of entry barriers are: (1) legal license; (2) control over an essential or superior resource; (3) entrenched buyer preferences for established brands or company reputations; . . . (4) capital market evaluations imposing higher capital costs on new entrants; and (5) "economies of scale . . . in some situations." *Id.* at 1428 n.4 (citing 2 Areeda & Turner, *Antitrust Law* ¶ 409b at 299–300 (1978)).

Here, Defendant's argument focuses on the recent entry of the Coalition Application into the market. Def. Mot. 30–31. Defendant argues that the entry of the Coalition defeats Plaintiff's Section 2 claims because it shows that barriers to market entry are low. *Id.* But the mere fact that a competitor entered the market does not defeat Plaintiff's allegations that barriers to entry are high at this stage in the litigation. Whether the entry of the Coalition is sufficient to defeat this claim is a factual question.[5] The Court does not know, for example, the output or capacity of the Coalition or whether it poses any challenge Defendant's market power. *See Rebel Oil*, 51 F.3d 1440 (9th Cir. 1995). ("If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power."); *Eastman Kodak*, 125 F.3d at 1208 ("Although some new entry was possible, the record reflects substantial evidence of entry barriers sufficient to prevent Kodak's

_____

[5] The litany of cases cited by Defendant on this point are inapposite: they were all decided either on a motion to summary judgment or after trial. *See* Def. Mot. Dismiss 30–31 (citing cases).

monopoly share from self-correcting."). The Court therefore declines to dismiss Plaintiff's monopoly claims on this basis.

ii.     Conspiracy

As stated above, to succeed on a claim for conspiracy to monopolize, the plaintiff must demonstrate: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *Paladin*, 328 F.3d at 1158. Like claims arising under Section 1, conspiracy claims under Section 2 require the plaintiff to show "the existence of an agreement, . . conspiracy[,] or concerted action." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *see also Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1491 (3d Cir. 1991) (when there was insufficient evidence of an agreement under Section 1, the Ninth Circuit also affirmed the district court's grant of summary judgment on the conspiracy to monopolize claim). As described above in Section II(A)(i), the Court has found that there are sufficient allegations of an agreement to withstand Defendant's motion to dismiss.

## III.     Defendant's Motion to Transfer Venue

Courts employ a two-step analysis when determining whether transfer is proper. First, a court must ask "whether the transferee district was one in which the action might have been brought by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960). Second, if the moving party has made this threshold showing, courts may consider "individualized, case-by-case consideration[s] of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp*., 487 U.S. 22, 29 (1988). In addition to considering the convenience of the parties and the witnesses, the court may consider, in "the interests of justice," a number of factors including the plaintiff's choice of forum, the location where the relevant agreements were negotiated and executed, the state that is

most familiar with the governing law, the respective parties' contacts with the forum, the contacts relating to the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the two forums, the availability of compulsory process to compel attendance of unwilling non-party witnesses, the ease of access to sources of proof, and the relevant public policy of the forum state, if any. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (2000).

Defendant moves to transfer this action to the Eastern District of Virginia. Though this alternate venue is proper, the Court finds that Defendant has not demonstrated that the convenience of the parties and witnesses or any other factors outweigh the great weight accorded to Plaintiff's choice of forum. Accordingly, Defendant's Motion to Transfer is denied.

A. Venue is proper in the Eastern District of Virginia

Plaintiff does not dispute that the Eastern District of Virginia is a permissible forum. Pl. Opp'n Transfer 9 n.2, ECF 152. Defendant's principal place of business is Virginia. 28 U.S.C. § 1391(b)(1), (c)(3); *see also* 15 U.S.C. § 22 (an antitrust suit against a corporation may be brought in any district where the defendant transacts business). Accordingly, the decision whether to grant Defendant's motion to transfer is based on this Court's considerations of convenience and fairness.

B. Convenience and Fairness

i. Plaintiff's Choice of Forum

Defendant asserts that Plaintiff's choice of forum should be given little weight because "the challenged conduct . . . lacks any substantial connection to Oregon." Def. Mot. Transfer 9, ECF 146. It argues that "the fact that ten colleges and universities in Oregon . . . accept The Common Application does not in and of itself make Oregon an appropriate venue" in light of the fact that Defendant provides products and services to colleges and applicants throughout the

United States. *Id.* at 9–10. It further notes that none of the contractual negotiations or bad acts took place in Oregon. *Id.* at 10–11

A plaintiff's choice of forum is generally accorded great weight. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). A defendant must make a strong showing of inconvenience to upset a plaintiff's choice of forum. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (explaining that a court should give the plaintiff's choice of forum great deference unless the defendant can show that other factors of convenience clearly outweigh the plaintiff's choice). However, a plaintiff's choice of forum may receive less weight "if the operative facts did not occur within the forum of original selection and that forum has no particular interest in the parties or the subject matter[.]" *Partney Const., Inc. v. Ducks Unlimited, Inc.,* Civil No. 08-574-SU, 2008 WL 4838849, at *2 (D. Or. Nov. 3, 2008); *see also Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968) ("In judging the weight to be given such a choice, as is the case with other types of actions, consideration must be given to the extent both of the defendant's business contacts with the chosen forum and of the plaintiff's contacts, including those relating to his cause of action. If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration.").

Here, the Court finds that Plaintiff's choice of forum should receive substantial weight. First, this is not a case where Plaintiff has no substantial connection with Oregon. *Cf. Ventress v. Japan Airlines*, 486 F.3d 1111, 1118–19 (9th Cir. 2007) (upholding the District Court's transfer from California to Hawaii because, in part, the plaintiffs both resided in Hawaii). Rather, Oregon is Plaintiff's home forum. *See Adidas Am., Inc. v. Cougar Sport, Inc.*, 169 F.Supp.3d 1079, 1096 (D. Or. 2016) ("The plaintiff's choice of forum is especially given deference where the plaintiff

is a resident of the forum in which the action is brought."). Second, Plaintiff's residence is not the only connection to Oregon. *Cf. Partney Const.*, 2008 WL 4838849, at *2 (noting that the plaintiff's residence was the only connection to Oregon and all the conduct giving rise to the claims occurred in Nevada and would likely be governed by Nevada law). Defendant's alleged anticompetitive conduct—governed by federal law—occurred throughout the United States, including in Oregon where at least twelve member schools are located. Thus, Defendant has some business contacts relevant to this case in the forum state, and the Court has some interest outside of Plaintiff in this subject matter. This factor, therefore, weighs heavily against transfer.

   ii.    Convenience of the Parties and Witnesses

Defendant argues that the Eastern District of Virginia is more convenient for both party and non-party witnesses and will reduce the financial burden on Defendant. Def. Mot. Transfer 12. First, Defendant argues that Plaintiff's monopolization claim will center on Defendant's office in Virginia, which is only seven miles from the federal courthouse. *Id* at 12–14 (citing Adam Decl. Ex. F, ECF 147). In addition, Defendant asserts that Virginia is a more convenient location for non-party witnesses, including member and non-members educational institutions, vendors, and partners, who will likely reside outside the 100-mile radius of Portland. *Id.* at 15. Here, Defendant also emphasizes the ease of access to third parties in Virginia. *Id.* at 16.

"Convenience of witnesses is often the most important factor in determining whether or not to transfer a given case." *Partney Const., Inc.,* 2008 WL 4838849, at *3 (citation omitted). The "convenience of the witnesses" factor takes into account the convenience to both party and non-party witnesses; however, courts give more consideration to non-party witnesses, as opposed to witnesses who are employees of a party to the litigation. *Id.* The court considers not only the

number of witnesses located in the respective districts, but also the nature and quality of their testimony, as it relates to the issues in the case. *Id.*

Defendant has not made a sufficiently strong showing of inconvenience to upset Plaintiff's choice of forum. To the extent that proceeding in Oregon presents a hardship to Defendant and its party witnesses—including its executives and other employees—proceeding in Virginia would present the same hardships to Plaintiff and its party witnesses, including executives and other employees. *Compare* Rickard Decl. ¶ 7 (noting that 80 of 87 employees work in the Virginia office, including key executive witnesses) and ¶¶ 10–12 (noting that trial is currently scheduled for Defendant's busiest months), ECF 148, *with* Trachtenbarg Decl. ¶¶ 3–5 (noting 147 of 165 its employees are located in Portland as are executives who are likely to be witnesses) and ¶ 6 (also noting that trial is scheduled during its busiest months), ECF 154. Thus, transfer of venue would merely shift inconvenience of trial from one party to another. *See Decker Coal Co.*, 805 F.2d at 844 (when witnesses were located in both districts, "[t]he transfer would merely shift rather than eliminate the inconvenience"). This is insufficient to justify transfer of this case to the Eastern District of Virginia.

As to nonparties, the Court notes that—with the information provided by both Plaintiff and Defendant—it is difficult to tell not only the number of witnesses located within the respective districts but also the nature and quality of their testimony. For example, Defendant notes that there are "three times as many" institutions of higher education within 100 miles of the Virginia courthouse and more elite or public institutions. But neither party has indicated that witnesses from these schools will be called or whether they are relevant to this case. Indeed, Plaintiff has indicated that it may call third-party schools—both members and non-members— located throughout the country and outside the subpoena power of both courts. *See* Pl. Opp'n

(citing Compl. ¶¶ 29, 54–56) (identifying colleges in Kansas, New York, South Carolina, California, and Louisiana).

In addition, no individuals or organizations have been identified or noted for deposition. *See* Alfonso Decl. ¶ 4 (no nonparty depositions have yet been identified), ECF 153. Though subpoenas for documentary evidence have been served on some third-party competitors within the subpoena power of the Eastern District of Virginia, *see* Adam Decl. ¶¶ 2–5, Exs. A–D, there is no evidence of the substance or materiality of their testimony or any indication that either party plans to call these third parties as witnesses, *Adidas Am.*, 169 F. Supp. 3d at 1096 ("As neither party identifies its witnesses with specificity, the Court finds it difficult [to] meaningfully evaluate the effect that a change of venue would have on any witnesses."). Thus, Defendant has not made a strong showing that the convenience of either the party or nonparty witnesses justify transferring this case.

### iii.    Other Factors in the Interest of Justice

As to the remaining factors, the Court finds that they are, on balance, neutral and therefore have little impact on this determination.

The place of negotiation and execution of the relevant agreements is neutral. Defendant argues that the place of negotiation was Virginia, where Defendant is located, and that this factor weighs in favor of transfer. The Court disagrees. The contracts in this case were negotiated by phone and email in Virginia and throughout the United States, wherever the relevant member school was located. Rickard Decl. ¶¶ 5–6. In other words, "there is no one prominent location for negotiation or execution that would sway this Court's determination under this factor." *Shee Atika Languages, LLC v. Kershner*, No. 107CV00009JWSDMS, 2008 WL 11429798, at *5 (D. Alaska Feb. 27, 2008) (where the parties negotiated by phone and email and the parties were

located in Virginia, Maine, and Alaska and not "one place" it had no bearing on the courts

analysis under § 1404).

Overall, the interest of judicial efficiency is a neutral factor. The relative court congestion

and time of trial in each forum weighs in favor of transfer. As Defendant notes, the Court's

recent scheduling order, which set trial just under two years from now in August of 2020, is

consistent with the "26.5 month median timeline from the filing of a civil case to trial in the

District of Oregon." *Id.* at 18 (citing Adam Decl. Ex. E). By comparison, the Eastern District of

Virginia is a "rocket docket," such that the median timeline from filing to trial is 10.8 months. *Id.*

As Plaintiff points out, however, the Court has already familiarized itself with the issues of the

case, handled multiple motions, and set a global case schedule. In addition, this case has been

pending in this district and the Ninth Circuit for over four years now. This factor weighs in favor

of Plaintiff. *See Commodity Futures Trading Commc'n v. Savage*, 611 F.2d 270, 279 (9th Cir.

1979) (affirming the district court's refusal to transfer and noting that "[t]he district court was

familiar with the case and transfer may have led to delay."); *DIRECTV, Inc. v. EQ Stuff, Inc.*, 207

F.Supp.2d 1077, 1083 (C.D. Cal. 2002) (finding that the "familiarity of the Court with the

relevant issues of a case" weighed against transfer where the district court had invested time and

resources in the case, including issuing a TRO and a Preliminary Injunction).

As to the familiarity of each forum with the applicable law, the law governing Plaintiff's

antitrust claims is federal and, therefore, the Court can presume all federal courts have equal

familiarity with the applicable law. The Court finds that this factor is neutral.

The Court concludes that the evidence is located in multiple locations, though perhaps

more evidence will be located in Virginia where Defendant is located. However, the evidence is

largely documentary evidence that can be easily transmitted from afar. *Adidas Am.*, 169 F.Supp.

at 1097 ("With regard to documents and records, transporting documents does not generally create a burden due to technological advances in document storage and retrieval."). Accordingly, this factor is neutral.

## CONCLUSION

The Court DENIES Defendant's Motion to Dismiss [137], Request for Judicial Notice [138], and Motion to Change or Transfer Venue [146]. The Court also DENIES Plaintiff's Request for Judicial Notice [155].

IT IS SO ORDERED.

Dated this _____28_____ day of _____November_____, 2018.


_____
MARCO A. HERNÁNDEZ
United States District Judge